MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625-0112
Attorney for Defendant Michelle Ray

By:  Marvin L. Freeman
     Deputy Attorney General
     (609) 376-2440
     marvin.freeman@law.njoag.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF CAMDEN

| | |
|---|---|
| SAMUEL BIRTH, | : CHRISTINE P. O'HEARN, U.S.D.J. <br> : ELIZABETH A. PASCAL, U.S.M.J. |
| Plaintiff, | : |
| v. | : Civil Action No.: 1:22-cv-05658 <br> (CPO-EAP) |
| MICHELLE RAY, NJ STATE TROOPER, JOHN DOES 1-20, | : |
| | : **DECLARATION OF COUNSEL** |
| Defendants. | : |

Marvin L. Freeman, Deputy Attorney General, of full age, having been duly sworn according to law, do of my own personal knowledge, make the following statements by way of declaration under penalty of perjury, pursuant to 28 U.S.C. § 1746.

1.   I am licensed to practice law in the State of New Jersey and am admitted to practice before the United States District Court, District of New Jersey.

2.   I am employed by the State of New Jersey, Department of Law and Public Safety, as a Deputy Attorney General.

3.   I am assigned to the Law Enforcement and Corrections Section of the Division of Law, which provides legal representation to the New Jersey State Police and its employees.

4.   I submit this Declaration on behalf of New Jersey State Police Detective Michele Ray ("Defendant"), in support of her motion for summary judgment pursuant to Fed.R.Civ.P. 56(c).

5.   Attached hereto as **Exhibit-A** is a true and accurate copy of plaintiff's complaint.

6.   Attached hereto as **Exhibit-B** is a true and accurate copy of the Plaintiff's deposition transcript.

7.   Attached hereto as **Exhibit-C** is a true and accurate copy of Plaintiff's answers to Defendant's interrogatories filed under seal.

8.   Attached hereto as **Exhibit-D** is a true and accurate copy of Defendant Michele Ray's Drug Recognition Expert Certification.

9.   Attached hereto as **Exhibit-E** is a true and accurate copy of Defendant Michele Ray's deposition transcript.

10.  Attached hereto as **Exhibit-F** is a true and accurate copies of Defendant Michele Ray's certified answers to Plaintiff's interrogatories, filed under seal.

11.  Attached hereto as **Exhibit-G** is a true and accurate recording of the Body Worn Camera of Trooper Michele Ray, filed under seal.

12.  Attached hereto as **Exhibit-H** is a true and accurate recording of the Body Worn Camera of Trooper Daniel Pamlanye, filed under seal.

13.  Attached hereto as **Exhibit-I** is a true and accurate recording of the Body Worn Camera of Trooper Anthony Liedtka, filed under seal.

14.  Attached hereto as **Exhibit-J** is a true and accurate recording of the Body Worn Camera of Trooper Adam Thistle, filed under seal.

15.  Attached hereto as **Exhibit-K** is a true and accurate recording of the Body Worn Camera of Trooper Dustin Guenther, filed under seal.

16.  Attached hereto as **Exhibit-L** is a true and accurate recording of the Body Worn Camera of Trooper David Sherman, filed under seal.[1]

17.  Attached hereto as **Exhibit-N** is a true and accurate copy of the New Jersey State Police Computer-Aided Dispatch Report, filed under seal.

---

[1] **Exhibit-M** was intentionally deleted and not included among Defendant's exhibits.

18.   Attached hereto as **Exhibit-O** is a true and accurate copy of the New Jersey State Police Drinking Driving Report, filed under seal.

19.   Attached hereto as **Exhibit-P** is a true and accurate copy of the Consent to Obtain and Test Urine.

20.   Attached hereto as **Exhibit-Q** is a true and accurate copy of the Office of Forensic Science Evidence Submission Review.

21.   Attached hereto as **Exhibit-R** is a true and accurate copy of New Jersey Drug Influence Evaluation, filed under seal.

22.   Attached hereto as **Exhibit-S** is a true and accurate copy of the Drug Recognition Expert Narrative Report, filed under seal.

23.   Attached hereto as **Exhibit-T** is a true and accurate copy of the New Jersey State Police Office of Forensic Sciences Toxicology Lab Report.

24.   Attached hereto as **Exhibit-U** is a true and accurate copy of the New Jersey State Police Consent to Search, filed under seal.

25.   Attached hereto as **Exhibit-V** is a true and accurate copy of Defendant's Answer to the Complaint.

26.   Attached hereto as **Exhibit-W** is a true and accurate copy of the Ghost Website.

27.   Attached hereto as **Exhibit-X** is a true and accurate copy of the New Jersey State Police Patrol Chart, filed under seal.

28.  Attached hereto as **Exhibit-Y** is a true and accurate copy of the International Association of Chiefs of Police Drug Recognition Expert Position Description.

I declare under penalty of perjury that the foregoing is true and correct. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

<u>s/Marvin L. Freeman</u>
Marvin L. Freeman
Deputy Attorney General

December 18, 2023

# Exhibit A

# FRIEDMAN & LEVIN ASSOCIATES
### 523 Cooper Street, Suite 301
### Camden, NJ 08102

JASON JAVIE*
LARRY FRIEDMAN, RETIRED
* Member of NJ Bar

215-563-7642
215-563-7614
Fax 215-563-9145
jason.javie@crllaw.com

PHILA. OFFICE
1500 JFK Blvd
Suite 900
Philadelphia, PA 19102

23 September 2022

**VIA REGULAR AND CERTIFIED MAIL: 7022 0410 0002 1322 0398**
**New Jersey State Troopers**
**ATTN: Michele Ray**
**810 Bear Tavern Road, Suite 310**
**West Trenton, NJ 08628**

Re:   <u>**Samuel Birth v Michele Ray, et al.**</u>
      **U.S. Dist. Ct. D. NJ. No. 22-cv-05658-CPO-EAP**
      **Waiver of Service**

To Whom It May Concern:

Please be advised that I represent Samuel Birth in connection with a civil action against you. The complaint was filed on 21 September 2022 in the United States District Court for the District of New Jersey. This notice is provided to you in accordance with Rule 4 of the Federal Rules of Civil Procedure.

## WHY ARE YOU GETTING THIS?

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached. This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within **sixty (60) days** from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

## WHAT HAPPENS NEXT?

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 90 days from the date this notice is sent (see the date below) to answer the complaint.

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service. Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date: 23 September 2022

**FRIEDMAN & LEVIN ASSOCIATES**

By:  /s/ Jason Javie
      **JASON JAVIE**
      Attorneys for Plaintiff

## DUTY TO AVOID UNNECESSARY EXPENSES OF SERVING A SUMMONS

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does not include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

Very truly yours,

**FRIEDMAN & LEVIN ASSOCIATES**

By:  /s/ Jason Javie
      **JASON JAVIE**
      Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**SAMUEL BIRTH,**
*Plaintiff*

V.

**SUMMONS IN A CIVIL CASE**

**MICHELE RAY, ET AL.,**
*Defendant*

CASE
NUMBER: **1:22-CV-05658-CPO-EAP**

TO: *(Name and address of Defendant):*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States Agency, or an office or employee of the United States described in Fed. R. civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**s/ WILLIAM T. WALSH**

CLERK



**ISSUED ON 2022-09-23 09:58:50,** Clerk
USDC NJD

## RETURN OF SERVICE

| Service of the Summons and complaint was made by me(1) | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____
_____ ; or

☐ Left the summons at the individual's residence or usual place of abode with (name):
_____ a person of suitable age and discretion who resides there,
on (date):_____ and mailed a copy to the individual's last known address; or

☐ Name of person with whom the summons and complaint were left:
_____ ; or

☐ Returned unexecuted: _____
_____
_____ ; or

☐ Other (specify): _____
_____
_____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

    I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.


Executed on _____          _____
                     Date                        *Signature of Server*

                                              _____
                                              *Address of Server*

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
## for the
### District of New Jersey ▼

SAMUEL BIRTH
_____
*Plaintiff*
v.
MICHELE RAY, et al.
_____
*Defendant*

)
)
)
)
)

Civil Action No.  1:22-CV-05658-CPO-EAP

## WAIVER OF THE SERVICE OF SUMMONS

To: _____
*(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____, the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
_____
*Signature of the attorney or unrepresented party*

_____
*Printed name of party waiving service of summons*

_____
*Printed name*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| Samuel Birth,<br>　　　Plaintiff, | : | |
| | : | |
| | : | |
| **vs.** | : | Case No. _____ |
| | : | |
| Michele Ray, N.J. State Trooper<br>John Does 1-20 | : | |
| 　　　Defendants. | : | |
| | : | |

## CIVIL COMPLAINT

Plaintiff, **SAMUEL BIRTH** ("Mr. Birth" or "Plaintiff"), residing in the Villas and the State of New Jersey, by way of complaint against Defendant says:

## PRELIMINARY STATEMENT

1.　　This is an action seeking damages pursuant to the Ku Klux Klan Act (42 U.S.C. § 1983) for violations of the Fourth and Fourteenth Amendments committed under color of state law.

2.　　This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, as one or more causes of action arise under the United States Constitution and Federal Law.

3.　　Venue is proper in this District as it is either the District in which Defendants reside or the District in which the claims arose.

4.　　Specifically, all transactions material to the instant suit occurred in Atlantic County, New Jersey.

5.　　The Plaintiff, Samuel Birth, is an adult individual residing at 131 Cedardale

1

Avenue, Villas, New Jersey.

6.     Defendant, Michelle Ray, is an adult individual whom at all relevant times was employed as a New Jersey State Trooper by the Defendant, State of New Jersey.

7.     At all times relevant to the matters at issue in this complaint, Defendant Ray was acting under color of law and pursuant to authority derived from the State of New Jersey.

8.     This action is brought pursuant to the Ku Klux Klan Act (18 U.S.C. § 1983) insofar as Defendant Ray while acting under color of state law deprived Mr. Birth of his rights under the United States Constitution, to wit, the Fourth and Fourteenth Amendments to the United States Constitution.

9.     Defendants John Does 1-20 are unknown State Trooper(s), individual(s), law enforcement officer(s), business organization(s), government official(s) and/or agency(s) whose conduct and actions caused or contributed to the violation of Mr. Birth's Fourth and Fourteenth Amendment rights as described below.

10.    Specifically, these individuals participated in and at the behest of Defendant Ray but their identities have not been disclosed.

11.    Notwithstanding diligent efforts on behalf of the Plaintiff, the true identity of these defendants is not currently known, but a motion seeking leave to amend the complaint to reflect their identity(s) will be promptly made upon discovery of the same.

### COUNT I: Ku Klux Klan Act (42 U.S.C. § 1983)
### Samuel Birth v. Michele Ray and John Does 1-20
### UNREASONABLE SEARCH AND SEIZURE

12.    Plaintiff Samuel Birth reincorporates all preceding paragraphs.

13.    On the night of November 6, 2020, Defendant Michele Ray and her brother Troopers acted intentionally, willfully and knowingly to violate Mr. Birth's constitutional right

2

to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

14.    During the evening of November 6, 2020, Plaintiff Birth and several of his friends parked their cars at the John W. Quigley Recreational Area located in Folsom Borough in Atlantic County, New Jersey and were spending time together at a nearby pond or lake.

15.    That same evening, Defendant Ray was working in her official capacity as a law enforcement officer patrolling the area in and around Hamilton Township, New Jersey and elsewhere.

16.    On information and belief, Trooper Ray was the commanding officer and/or the highest ranking officer in the group of Troopers at issue and was accordingly in charge of and directed the other Troopers on scene.

17.    As noted above the identities of these Troopers has not been disclosed to the Plaintiff and the Plaintiff does not know their true identities.

18.    Defendant Ray and her brother Troopers drove into the parking lot of the recreation area, exited their vehicles and began shining flashlights into several parked vehicles including those in which Birth and his companions arrived.

19.    While peering into Mr. Birth's vehicle, Defendant Ray observed the packaging of an electronic cigarette that Mr. Birth's companion purchased at a Wawa convenient store earlier that night.

20.    Upon observing the same, Defendant Ray began to exclaim that she located "plain view CDS"[1] inside of the vehicle.

---

[1] On information and belief, Trooper Ray's use of the phrase "CDS" was a reference to "Controlled Dangerous Substance", the term of art used in New Jersey's Crimes Code for drugs,

21. This was affirmatively not true insofar as the packaging in question was for a lawfully purchased and possessed item.

22. Around the same time, Mr. Birth and his companions walked toward the parking lot area and encountered Defendant Ray and her brother Troopers.

23. Based on the "plain view CDS", Defendant Ray (along with several other New Jersey State Troopers) seized Mr. Birth and his companions.

24. The Troopers separated and interrogated Mr. Birth and his companions which included questions about the "plain view CDS" and the youths' purpose for being at the recreation area among other topics.

25. The Troopers searched the youths' and their vehicles.

26. During the investigation, one of Mr. Birth's companions suffered a panic attack such that emergency medical attention was required.

27. The Troopers including Defendant Ray subsequently realized that the packing they located was not in fact packaging for a controlled, dangerous substance.

28. Mr. Birth was instructed to discard this evidence.

29. Trooper Ray then took Mr. Birth aside and administered field sobriety tests, tests which may be conducted pursuant to official policy of the State of New Jersey and the New Jersey State Police.

30. Mr. Birth's person, vehicle and other effects were searched by or at the direction of Trooper Ray.

31. Defendant Ray then placed Mr. Birth under arrest for Driving While Intoxicated (N.J.S. 39:4-50), transported Mr. Birth in custody to a police station and initiated a prosecution

---

narcotics and other illicit or controlled substances. At the time of this investigation, marijuana was not available for recreational use in the State of New Jersey.

against him notwithstanding the fact that he passed a breath test she administered.

32. At all relevant times, Defendant Ray lacked probable cause to believe that Mr. Birth violated or was violating N.J.S. 39:4-50.

33. First, Defendant Ray lacked probably cause to believe that Mr. Birth was intoxicated.

34. In this regard, and after Birth provided evidence that he was not intoxicated, Defendant Ray acted pursuant to official New Jersey State Policies to buttress her alleged belief and purposely disregarded far more reliable evidence that Mr. Birth was not in fact intoxicated.

35. Second, Defendant Ray also lacked probable cause to believe that Mr. Birth operated or controlled a vehicle while he was intoxicated and indeed never observed Mr. Birth controlling or operating a vehicle at all.

36. During the course of the investigation, Defendant Ray and/or her fellow law enforcement officers destroyed or caused to be destroyed material evidence to the investigation.

37. Third, when Mr. Birth was transported to Defendant Ray's Barracks, Defendant Ray administered an Intoxilyzer Breath Test which Mr. Birth passed, i.e., proving that he was not under the influence of alcohol.

38. After passing the test and in an attempt to prove his innocence, Mr. Birth volunteered a urine sample.

39. Pursuant to an official policy enacted by the State of New Jersey and/or the New Jersey State Police, Trooper Ray purported to act as a "Drug Recognition Expert."

40. Under this official policy, Trooper Ray was supposedly trained to be able to detect whether or not an individual is under the influence of a controlled substance as well as the identity of the substance that the individual ingested.

5

41.   Acting pursuant to this policy, Ray completed a Drug Recognition Expert (DRE) Report, certifying that in light of her training, education and experience, Mr. Birth was under the influence of Marijuana.

42.   She completed arrest paperwork For Mr. Birth and Mr. Birth was formally charged with Driving While Intoxicated.

43.   All of this was in violation of Mr. Birth's rights under the Fourth Amendment to the United States Constitution as made applicable to the States through the Fourteenth Amendment.

44.   Subsequently, Mr. Birth's urinalysis came back negative for both alcohol and controlled substances including marijuana, i.e., conclusively establishing that Trooper Ray's Drug Recognition Expert analysis was dead wrong.

45.   After Mr. Birth was released from custody, he was forced to hire a lawyer to defend against the charge lodged by Trooper Ray.

46.   After several months, the State of New Jersey through its municipal prosecutor subsequently moved to dismiss the charge before the Honorable Michele Verno, Municipal Court Judge for Hamilton Township after informing the judge of the negative chemical tests and stating "I don't know what we're doing here."

47.   Judge Verno granted the State's motion and dismissed the charges.

48.   Insofar as Mr. Birth was seized, searched and arrested by Defendant Ray and her brother Troopers in the absent of a valid warrant, probable cause and/or exigent circumstances, Mr. Birth's rights under the Fourth and Fourteenth Amendment to the United States Constitution were violated.

49.   Defendant Ray's conduct caused Mr. Birth a great deal of anxiety and anguish

6

while the charges were pending, and Mr. Birth was forced to expend money to obtain the services of an attorney to defend him from the false charges.

50.    Under the Ku Klux Klan Act (Section 1983), Mr. Birth is entitled to monetary relief as a result of the unreasonable search and seizure of his person and effects by the defendant, Trooper Michele Ray.

**WHEREFORE,** for all of the foregoing reasons, Mr. Birth respectfully requests judgment against Defendants Ray and John Does 1-20, along with damages, costs and all other relief deemed appropriate under the law.

## COUNT II:
### Samuel Birth v. Michele Ray
### FALSE IMPRISONMENT

51.    Plaintiff Samuel Birth reincorporates all preceding paragraphs.

52.    This Court has supplementary jurisdiction over the instant state law cause of action.

53.    On the night of November 6, 2020, Defendant Michele Ray unlawfully detained Mr. Birth.

54.    In doing so, Defendant Ray may have acted with malice.

55.    Defendant Ray took affirmative steps to conceal the illegality of her actions on the night in question.

56.    Specifically, she restrained his personal liberty and freedom of movement without legal authority or justification.

57.    Such restraint and detention was accompanied by virtue of her authority as a New Jersey State Trooper.

58.    The restraint in question was against Mr. Birth's will and at no time did he agree

7

to said imprisonment.

59.     Defendant Ray intended to cause the confinement in question.

60.     Although Defendant Ray was a law enforcement enforcer on November 6, 2020, she arrested Mr. Birth in the absence of probable cause to believe that he was violating the law and the arrest in this regard was both illegal and unreasonable under the Fourth Amendment to the United States Constitution.

**WHEREFORE,** for all of the foregoing reasons, Mr. Birth respectfully requests judgment against Defendant Ray, along with damages, costs and all other relief deemed appropriate under the law.

Respectfully submitted,

**FRIEDMAN & LEVIN ASSOCIATES**

By: */s/ Jason Javie*
        JASON JAVIE
        Attorneys for Plaintiff
        523 Cooper Street, Suite 301
        Camden, New Jersey  08102
        (856) 782-1007
        jason.javie@crllaw.com

Date: September 21, 2022

8

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Samuel Birth

## DEFENDANTS
Michele Ray
John Does 1-20                          Unknown

(b) County of Residence of First Listed Plaintiff   Cape May
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Unknown
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Jason Javie, Friedman & Levin Associates, 523 Cooper Street, Suite 301, Camden, NJ 08102 (856) 782-1007

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| Student Loans | ☐ 340 Marine | Injury Product | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | New Drug Application | ☐ 470 Racketeer Influenced and |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | Corrupt Organizations |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | | ☐ 485 Telephone Consumer |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | **SOCIAL SECURITY** | Protection Act |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | Medical Malpractice | | Leave Act | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | or Defendant) | ☐ 896 Arbitration |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| | Employment | **Other:** | ☐ 462 Naturalization Application | 26 USC 7609 | Act/Review or Appeal of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | Agency Decision |
| | Other | ☐ 550 Civil Rights | Actions | | ☐ 950 Constitutionality of |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | State Statutes |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Ku Klux Klan Act (42 U.S.C. § 1983)
Brief description of cause:
Plaintiff was subjected to unlawful search and seizure under U.S.Const. amend. IV, XIX

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE                          DOCKET NUMBER

DATE
September 21, 2022

SIGNATURE OF ATTORNEY OF RECORD
*Jason Javie*

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# Exhibit B

Page 1

1            UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW JERSEY

3                 VICINAGE OF CAMDEN

4    _____

5    SAMUEL BIRTH,

6            Plaintiff,

7       v.                         Civil Action No.

8    MICHELE RAY, N.J. STATE TROOPER,   22-5658 (CPO-EAP)

9    JOHN DOES 1-20,

10           Defendants.

11   _____

12           VIDEOCONFERENCE DEPOSITION OF

13                 SAMUEL BIRTH

14   DATE:        Wednesday, September 27, 2023

15   TIME:        11:06 a.m.

16   LOCATION:    Remote Proceeding

17                Villas, NJ 08251

18   REPORTED BY: Jahkarah Haynes-Young, Notary Public

19   JOB NO.:     6130496

20

21

22

23

24

25

Page 2

```
1          A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF SAMUEL BIRTH:
3     JASON D. JAVIE, ESQUIRE (by videoconference)
4     Friedman & Levin Associates
5     523 Cooper Street, Suite 301
6     Camden, NJ 08102
7     jason.javie@crllaw.com
8     (856) 782-1007
9
10  ON BEHALF OF DEFENDANT MICHELE RAY, N.J. STATE
11  TROOPER:
12     MARVIN FREEMAN, ESQUIRE (by videoconference)
13     Deputy Attorney General
14     R.J. Hughes Justice Complex
15     25 Market Street
16     PO Box 112
17     Trenton, NJ 08625
18     marvin.freeman@law.njoag.gov
19     (609) 376-2998
20
21
22
23
24
25
```

Page 3

```
1          I N D E X
2  EXAMINATION:                        PAGE
3     By Mr. Freeman              5
4     By Mr. Javie              66
5     By Mr. Freeman              68
6
7          E X H I B I T S
8  NO.      DESCRIPTION              PAGE
9          (None marked.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1          P R O C E E D I N G S
2          THE REPORTER:  Good morning.  My name
3  is Jahkarah Young; I am the reporter assigned by
4  Veritext to take the record of this proceeding.  We
5  are now on the record at 11:06 a.m.
6          This is the deposition of Samuel Birth
7  taken in the matter of Samuel Birth vs. Michele Ray,
8  N.J. State Trooper, John Does 1 through 20 on
9  Wednesday, September 27, 2023, remote via Zoom.
10          I am a notary authorized to take
11  acknowledgments and administer oaths in Michigan.
12  Parties agree that I will swear in the witness
13  remotely.
14          Additionally, absent an objection on
15  the record before the witness is sworn, all parties
16  and the witness understand and agree that any
17  certified transcript produced from the recording of
18  this proceeding:
19          - is intended for all uses permitted
20             under applicable procedural and
21             evidentiary rules and laws in the
22             same manner as a deposition recorded
23             by stenographic means; and
24          - shall constitute written stipulation
25             of such.
```

Page 5

```
1          At this time will everyone in
2  attendance please identify yourself for the record.
3          MR. FREEMAN:  Marvin L. .
4          MR. BIRTH:  Samuel Birth .-
5          Oh, sorry.  Go.
6          I'm Samuel Birth.
7          MR. FREEMAN:  Marvin L. Freeman, Deputy
8  Attorney General.
9          MR. JAVIE:  And Jason Javi, attorney
10  for Mr. Birth.
11          THE REPORTER:  Thank you.  Hearing no
12  objections, I will now swear in the witness.
13          Mr. Birth, will you please raise your
14  right hand?
15  WHEREUPON,
16          SAMUEL BIRTH,
17  called as a witness and having been first duly sworn
18  to tell the truth, the whole truth, and nothing but
19  the truth, was examined and testified as follows:
20          THE REPORTER:  You may now proceed.
21          MR. FREEMAN:  Thank you,
22  Madam Court Reporter.
23          EXAMINATION
24  BY MR. FREEMAN:
25     Q   Good morning, Mr. Birth, to you.
```

2 (Pages 2 - 5)

Page 6

```
 1    A   Good morning to you.
 2    Q   My name is Marvin Freeman; I am a deputy
 3 attorney general.  You are here with your attorney,
 4 Mr. Jason Javie.  I'm here to conduct your deposition.
 5 Have you ever been deposed before?
 6    A   No.
 7    Q   Okay.  I'll go over quickly some preliminary
 8 instructions.  I don't suspect that this will take too
 9 long.  I will be asking you a series of questions
10 related to the incident for which you filed a lawsuit.
11 You filed a lawsuit against New Jersey State Trooper
12 Michele Ray and others named as John Does.  Your
13 complaint was filed on September 21st of 2022.  And
14 it's my job to defend the New Jersey State Trooper in
15 this case; okay?
16    A   Yes.
17    Q   I will be asking you a series of questions.
18 You've just been placed under oath, therefore you are
19 required to provide truthful responses to my
20 questions.  When I ask a question and you answer that
21 questions, all of your answers need to be verbal;
22 okay?
23       As the court reporter indicated earlier, she
24 can't record nodding of the head, shaking it one way
25 or the other or saying "uh-uh" or "uh-huh."  You have
```

Page 7

```
 1 to provide a verbal response to each of my questions;
 2 okay?
 3    A   Okay.
 4    Q   If you do not understand my question, let me
 5 know, and I will either rephrase it or withdraw it;
 6 okay?
 7    A   Okay.
 8    Q   It is also important that only one of us
 9 speak at a time.  Often times when I ask a question
10 and you know where I'm going with that question, the
11 tendency is to begin answering the question before I'm
12 finished asking it.  Try to resist that and wait until
13 I'm finished asking the question and provide a
14 response to the question; okay?
15    A   Okay.
16    Q   I will try to do the same.  Hopefully it'll
17 work.  If you don't remember something, "I don't know"
18 or I don't remember" is a perfectly good answer.  So
19 if you don't remember something or if you don't know
20 something, don't hesitate to let me know that as well.
21       There may be times when your attorney, Mr.
22 Javie, where you will hear him say "objection" or
23 "objection to the form of the question."  If you hear
24 that coming from him, I want you to stop talking and
25 to allow him to state exactly why he's objecting and
```

Page 8

```
 1 he will tell you how to proceed; okay?
 2    A   Okay.
 3    Q   I don't suspect this will take very long,
 4 but if you need a break, let us know, and we will
 5 accommodate you.  The only caveat is that you can't
 6 take a break while there's a question pending.  If I
 7 ask a question, you have to answer that question
 8 before you go on a break; okay?
 9    A   Okay.
10    Q   Today, September 27, 2023, are you taking
11 any medications that would interfere with your ability
12 to participate in these proceedings today?
13    A   No.
14    Q   Okay.  Did you review any documents in
15 preparation of this deposition today?
16    A   No.
17    Q   I don't want to know what was said, but did
18 you have an opportunity to talk to your attorney about
19 this proceeding?
20    A   Yes, absolutely.
21    Q   Okay.  Did you speak to anyone else besides
22 your attorney regarding --
23    A   My grandpop.
24    Q   Oh, okay.  And what did you say to your
25 grandfather?
```

Page 9

```
 1    A   I just told him what me and Jason were
 2 talking about.
 3    Q   You told him what you and Jason were talking
 4 about?
 5    A   Yes.
 6    Q   Okay.  There's a question as to whether you
 7 would have to divulge that, but just to make sure that
 8 I stay away from any attorney/client privilege, your
 9 conversation with your grandfather is not privileged,
10 but I am going to reserve that for now, rather than to
11 go into details of what you discussed with your
12 grandfather about what your attorney told you; okay?
13    A   Okay.
14    Q   Can you state your full name and spell your
15 name for the record, sir?
16    A   Yes.  My name is Samuel Raymond Birth.  And
17 then it's spelled S-A-M-U-E-L  R -- and then my middle
18 name is R-A-Y-M-O-N-D, and then my last name is
19 B-I-R-T-H.
20    Q   Have you ever used any other names beside
21 that name you just provided?
22    A   No.
23    Q   Okay.  Where were you born, Mr. Birth?
24    A   Philadelphia.
25    Q   And what's your date of birth?
```

3 (Pages 6 - 9)

Page 10

1    A    9/20/94.
2    Q    That would make you how old today?
3    A    Twenty-nine.
4    Q    What is your current address?
5    A    131 Cedardale Ave.
6    Q    Can you spell that?
7    A    C-E-D-A-R-D-A-L-E.
8    Q    Cedardale Ave.?
9    A    Yes.
10   Q    And where is that?
11   A    Villas, New Jersey.
12   Q    Villas?
13   A    Yeah.  V-I-L-L-A-S.
14   Q    Villas is in Atlantic County; isn't it?
15   A    I think it's Cape County.
16   Q    Is it Cape May County?
17   A    Cape May.  Cape May County.
18   Q    Okay.  How long have you lived at 131
19   Cedardale Avenue?
20   A    This is about six -- going on six years.
21   Q    Who lives at that address with you?
22   A    Me and my grandparents, my younger brother
23   lives here, and then my aunt and little cousin live --
24   lives here.
25   Q    So your grandparents live there.  Your

Page 11

1    grandmother and father?
2    A    Yes.
3    Q    And who else lives there?
4    A    My younger brother.
5    Q    And what's his name?
6    A    Mussa Profana [ph].
7    Q    Can you spell that?
8    A    M-U-S-S-A, and honestly I don't know how to
9    spell his last name.  He just moved back here from
10   Africa.  I haven't seen him in years before he moved
11   back here.
12   Q    And he is your brother?
13   A    Yes.
14   Q    And who else lives --
15   A    I guess my -- I guess my half-brother, if
16   you want to -- but yeah, we're blood related.
17   Q    We understand.  And who else lives there
18   with you?
19   A    And then my aunt and little cousin.
20   Q    What do you mean "little cousin"?
21   A    Like, her son; my aunt's son.
22   Q    Okay.  And what's his name?
23   A    Jack, and then his last name is Walsh.
24   Q    W-A-L-S-H?
25   A    Yes.

Page 12

1    Q    Okay.  And is he a minor?
2    A    Yes.
3    Q    Okay.
4    A    He's only, like, six -- or five or six.
5    Q    Okay.  Are you married, Mr. Birth?
6    A    No.
7    Q    Okay.  So when you moved to the Cedardale
8    Avenue address, did you move there from Philadelphia?
9    A    Yes.
10   Q    Okay.  And what was the address in
11   Philadelphia?
12   A    4302 Ashburner Street.
13   Q    Ashburner?
14   A    Yes.  Like, A-S-H, and then burner.
15   Q    Okay.  What part of Philadelphia is that?
16   A    That -- it was Northeast Philadelphia?
17   Q    Northeast?
18   A    Yes.
19   Q    Okay.  Is that where your parents still
20   live?
21   A    I'm not -- I -- my grandparents live here
22   with me.  I -- I don't -- I have never met my dad in
23   my life, and then my mom, I'm not very close with.
24   Q    Okay.  And I think you told me you were not
25   married; correct?

Page 13

1    A    I am not married, yes.
2    Q    Okay.  Now, the 131 Cedardale Avenue, was
3    that your address on the date of the incident that
4    brings us here today, the incident that occurred on
5    November 6, 2020?
6    A    Yes.
7    Q    Okay.  Have you ever been involved in any
8    prior legal litigation, such as this?
9    A    Absolutely not.
10   Q    I want to just get some background
11   information on your education and employment.  Did you
12   graduate from high school?
13   A    Yes.
14   Q    What high school?
15   A    I went to Lincoln High School in
16   Philadelphia.
17   Q    Okay.  And which year did you graduate?
18   A    2013 or 2012.  I can't remember exactly.
19   Q    Okay.  Did you go to any college or trade
20   school?
21   A    I did not.
22   Q    Have you ever served in the military?
23   A    I did not.
24   Q    And you're not in the Reserves or National
25   Guard; correct?

4 (Pages 10 - 13)

Page 14

1      A   No, sir.
2      Q   How tall are you, Mr. Birth?
3      A   Right around six-foot.
4      Q   Okay.  And how much do you weigh?
5      A   When I got weighed a couple weeks ago at the
6  doctor's, I was around 255-ish.
7      Q   Okay.  Are you currently employed?
8      A   I am.
9      Q   Where do you work?
10     A   I work at an arcade on Wildwood Boardwalk;
11  I'm a manager there.
12     Q   What's the name of the arcade?
13     A   Gateway 26.
14     Q   How long have you worked there?
15     A   I'm going on my third year come Easter.
16     Q   Okay.  And I would imagine your position
17  entails just running the place, managing other
18  employees as well?
19     A   Managing other employees and then, yeah,
20  help running the place with other -- there's a couple
21  of us that are managers there.
22     Q   Okay.  So you're not the only one?  There
23  are several managers?
24     A   Yes.  There's a few of us.
25     Q   Okay.  And before you were at Gateway 26,

Page 15

1  where were you working?
2      A   Walmart.
3      Q   And how long were you working at Walmart?
4      A   I want to say a year and a half.
5      Q   Okay.  And before Walmart, where were you
6  working?
7      A   It was a place called Towne Park.  It was,
8  like, a parking -- a valet parking place for a
9  hospital.
10     Q   Okay.  How long did you work there?
11     A   Two years.  It's been a while, so I can't
12  remember, but about two years, if I remember
13  correctly.
14     Q   Okay.  So you were at arcade for about three
15  years, you were at Walmart for one, so that's about
16  five years.  And you -- two years.  Does that take you
17  back to close to high school?  The arcade, the
18  Gateway, Walmart and Towne Park, were they all in New
19  Jersey?
20     A   Towne Park was in Philadelphia.  Walmart and
21  the arcade were both in New Jersey.
22     Q   Okay.  And what year did you move to New
23  Jersey?
24     A   2017, 2016.
25     Q   Okay.  Do you remember where you were

Page 16

1  working before Towne Park?
2      A   It was a bakery called Holmesburg Bakery up
3  in Philadelphia.
4      Q   I'm familiar with it.
5      A   I was delivering -- delivering for them.
6      Q   Okay.  And how long did you do that?
7      A   A year.
8      Q   Okay.  Any other jobs in Philadelphia that
9  you remember?
10     A   Driving Lyft.  I don't know if you want to
11  count that, but I did that for a little while in
12  Philadelphia.
13     Q   Okay.  Now, the incident that brings us here
14  today occurred on November 6th of 2020.  Where were
15  you working then?
16     A   I think I was unemployed at the time.
17     Q   What was your employment just prior to that
18  date?
19     A   That was Walmart, for sure.  I was either
20  working at Walmart at the time or I just got
21  unemployed from Walmart.
22     Q   Okay.  All right.  So Walmart, why did you
23  leave Walmart?
24     A   The pandemic started.  I have severe -- I
25  have asthma pretty bad, and I was afraid to get COVID.

Page 17

1      Q   Okay.
2      A   And I also didn't want to bring that home to
3  my grandparents.
4      Q   Understood.  Okay.  Prior to the arrest that
5  occurred on November 6th of 2020, prior to that date,
6  had you ever been arrested before?
7      A   Absolutely not.
8      Q   And, obviously, you've never been convicted
9  of a crime; correct?
10     A   Nope.  Not at all.
11     Q   Okay.  I would like to ask you some
12  questions regarding the incident that occurred with
13  the state police on November 6th of 2020.  Do you
14  remember that incident?
15     A   Yes.
16     Q   Where were you just before -- now, it's my
17  understanding the incident occurred at Quigley Park in
18  Atlantic County; correct?
19     A   Yes.
20     Q   Okay.  Now, just before you went to the
21  park, where were you?
22     A   We were at Collings Lake.  We wasn't at --
23  we were not at the park, we were at Collings Lake.
24  What -- you have to go through the woods to get to,
25  and it takes you to a lake.  So my friend, Rachel,

5 (Pages 14 - 17)

Page 18

1  wanted to show us it, so we were at that lake.
2      Q    Okay.  So before you arrived at Collings
3  Lake, where were you?
4      A    My friend, Allison's, house.
5      Q    You were at Allison's house?
6      A    Yes.
7      Q    Okay.
8      A    We had dinner there with her family.
9      Q    Okay.  So you were at Allison's house;
10  correct?
11      A    Yeah.  Who also -- Justin's younger brother
12  too.
13      Q    Okay.  So is Allison related to you?
14      A    No.  She's a very close family friend.  I
15  knew her since growing up from a campground that we
16  all went to.
17      Q    Okay.  And you're saying Justin is
18  Allison's -- or Justin is Allison's brother?
19      A    Yes.
20      Q    And he spells his name J-U-S-T-I-N?
21      A    Yes.
22      Q    Okay.  So you have Allison and Justin.  I
23  want to ask you some questions about what happened at
24  the park, but I'm trying to figure out all of the
25  players.  So we have Allison and Justin, both of them

Page 19

1  were at that location; right?  At the lake; correct?
2      A    Yes.  Yes.
3      Q    All right.  Now, who else were at the lake?
4      A    My other friend, Rachel, and then Allison's
5  one friend was also with us, but I really can't
6  remember her name.
7      Q    Okay.  But she was there?
8      A    Yes.
9      Q    And she's Allison's -- were anyone out there
10  related by blood except Allison and Justin?
11      A    No.
12      Q    Okay.  So you had Allison and Justin, then
13  we had Rachel, the friend you can't remember, and who
14  else do you remember being there?
15      A    And then it was just me.
16      Q    Okay.  So that's a total of five?
17      A    Yes.
18      Q    Okay.  Now, so you were having dinner at
19  Allison's house, and then what happened from there?
20      A    After that, we decided that we were going to
21  go -- my friend, Rachel, mentioned to us that she knew
22  a lake that she's been to with a few friends and it
23  wasn't too far from Allison's house, she lives in
24  Vineland.  And we decided to go check out that lake.
25      Q    Okay.  What time did you -- so when you left

Page 20

1  Allison's house to go to the lake, how many cars went
2  to the lake?
3      A    Two of them.
4      Q    Two.  What vehicle were you driving?
5      A    I was driving the silver Mercury.
6      Q    What's the model number?  I mean what's the
7  model?  I'm sorry.  What type of Mercury?
8      A    Mariner.
9      Q    Mariner?  Okay.
10      A    Yeah.
11      Q    And who was in the silver Mercury Mariner
12  with you?
13      A    I want to just say maybe me and Allison and
14  her friend.  And then I think -- okay.  And then those
15  were the three that was in my car.
16      Q    And what was the other vehicle?
17      A    I don't remember what vehicle Rachel drove
18  at the time because she drives a new car now.  But her
19  car was her and Justin, I know that.
20      Q    So Rachel and her brother [sic], Justin,
21  drove in the other vehicle?
22      A    Yeah, just so Rachel wasn't driving by
23  herself.
24      Q    And you don't remember what type of vehicle
25  that was at the time?

Page 21

1      A    No.
2      Q    Okay.  So did both vehicles arrive at the
3  park at the same time?
4      A    Yes.
5      Q    Can you park at the lake?
6      A    You can't park at the lake because it's
7  through woods.  That's why we parked at that
8  playground right across the street from the lake.
9      Q    Okay.  So you parked across the street, and
10  what's called Quigley, Q-U-I-G-L-E-Y -- so you parked
11  at Quigley Park, and then all of you walked across the
12  street to the lake at the same time?
13      A    Yes.
14      Q    Okay.  What time was it when you arrived at
15  the park
16      A    It was, I want to say, around ten-ish.  It
17  was later in the night, for sure.  I just don't
18  remember exactly what time.
19      Q    All right.  And so it was dark?
20      A    Yes.
21      Q    Okay.  Did you hang around the park before
22  you went across the street to the lake or you got out
23  of your vehicles and went immediately across the
24  street to the lake?
25      A    Immediately across the street to the lake.

6 (Pages 18 - 21)

Page 22

1    Q    And all five of you walked through the woods
2  together to get to the lake?
3    A    Yes.
4    Q    All right.  Now, it's my understanding that
5  the park was closed at the time.  Is that true?
6    A    I'm not sure what time, if the park closes
7  or not.  We didn't -- like I said, we didn't go to
8  that park, we just parked at the park.
9    Q    Okay.  And why did you say you went to the
10  lake?
11    A    We just wanted to check it out.
12    Q    Now, the trooper's report says the lake was
13  private property.  Did you see any signs as you went
14  across the street that it was posted as private
15  property?
16    A    I, personally, did not see any signs that
17  said it was private property.
18    Q    How do you get to the lake?  You said
19  you have to walk through the woods.  Is it a trail or
20  is it a road that leads there or what?
21    A    So once you get into the woods, it's a
22  straight trail right to the lake.  We didn't get fully
23  to the lake before the police pulled up to our cars
24  and was shining flashlights in them.
25    Q    Okay.  So the road that goes to the lake, it

Page 23

1  extends out to the road?
2    A    It -- no, not -- it doesn't start until you
3  get a little into the woods.
4    Q    Really?
5    A    Yeah.  It's, like -- it's, like, a bunch of
6  trees, and then, like, when you take, like, I don't
7  know, ten steps in, then it -- then the trail starts.
8    Q    Okay.  So the trail doesn't go to the road;
9  the trails goes somewhere else?
10    A    Yeah, it, like, ends at the tree stop, the
11  trees.
12    Q    Okay.
13    A    Where the trees start.
14    Q    So is it just a foot trail?
15    A    Yes.  You couldn't get a car or anything
16  like that back there.
17    Q    Okay.  And I think you stated earlier that
18  all five of you were walking on a trail, heading
19  toward the lake when you saw the troopers arrive, or
20  the flashlights; right?
21    A    Yes.
22    Q    So the lake is not part of the park?
23    A    I don't believe so, no.
24    Q    When you went into the park, or when you
25  went to the lake, rather, did you have a Ghost vape

Page 24

1  pen with you?
2    A    No.
3    Q    Do you know if anyone else had a Ghost vape
4  cartridge with them?
5    A    No.
6        MR. FREEMAN:  Madam Court Reporter,
7  when I say "Ghost," it's G-H-O-S-T, vape, V-A-P-E,
8  cartridge, C-A-R-T-R-I-D-G-E.  I'll be referring to
9  that periodically throughout this deposition.
10  BY MR. FREEMAN:
11    Q    And so you didn't know if anyone else had a
12  Ghost vape cartridge with them?
13    A    No.  I, personally, didn't see one.
14    Q    Okay.  And while you were on your way to the
15  lake, did you observe anyone using a Ghost vape
16  cartridge?
17    A    No.
18    Q    The state trooper who arrested you indicated
19  that there was a Ghost vape cartridge package on the
20  floor of the Mercury Mariner.  Do you know anything
21  about that?
22    A    I, personally, don't.  I mean, I have a lot
23  of people that get in my car.
24    Q    So you didn't observe that there when you
25  arrived at the park and got out to walk across the

Page 25

1  street to the lake?
2    A    No.
3    Q    And you don't know if Allison had a Ghost
4  vape cartridge with her?
5    A    I don't know for sure, but I know that I
6  have not seen one.  I did not see one at the time at
7  all.
8    Q    Okay.  Now, a Ghost vape package was located
9  on the passenger side on the floor of the Mercury
10  Mariner.  The trooper told you that; correct?
11    A    Yes.
12    Q    Okay.  And you don't know where that came
13  from or who had purchased it?
14    A    No.  It could've been there for -- I mean,
15  my car, to this day, is still trashed, so --
16    Q    Okay.  So you stated earlier that you saw
17  flashlights around your vehicles while you were
18  heading to the lake.  Tell me what happened.  What did
19  you do next?
20    A    I -- so I turned around and went outside of
21  the woods and -- because I wanted to just see what
22  was -- why was my car being searched or if we were not
23  allowed to be parked there -- I would've moved my car
24  or anything like that.  But then things turned --
25    Q    So who was the one -- I'm sorry.  So who was

1  the first one that saw the flashlights around your
2  vehicle?  Were you the first one that saw it?
3      A   I was not.  My friend, Rachel, actually saw
4  it first; the one that was driving the other car.
5      Q   Okay.  And what did Rachel say?
6      A   Rachel was like, "There's people around your
7  car with flashlights."  So we didn't go out of the
8  woods right away, we walked -- we walked back a little
9  bit just to, like, see -- to make sure -- once we saw
10 it was cops, we came out right away.  But we didn't
11 want it to be, like, some random people and then go
12 out and get hurt or anything like that.
13     Q   Okay.  So when you saw that there were --
14 how did you notice they were troopers?
15     A   'Cause we walked to the edge of the, like,
16 trees and stuff and -- and we saw that there was cop
17 cars, so we knew it was cops.  And then that's when we
18 all came out of the woods.
19     Q   Did you know they were state troopers or
20 just cop cars?
21     A   We did not know at first that it was state
22 troopers, at first, and then, obviously, later, we
23 did.  But -- and we just thought it was regular cops.
24     Q   Okay.  And they were in uniform?
25     A   Yes.

1      Q   So who was the first one that approached the
2  police?
3      A   I was.
4      Q   And tell me what happened.
5      A   I approached them, and then I want to say
6  one of them, like, grabbed me and put me in handcuffs
7  to -- not to arrest me, to detain me.  And then the --
8  Rachel wasn't put in -- Rachel, I think, was the only
9  one that was not put in handcuffs that night.
10     Q   Okay.  So you came out and they arrested you
11 to detain you.  Why did you think they only wanted to
12 detain you at that time?  Did the trooper tell you
13 that?
14     A   Well -- well, because I asked them, "Am I
15 being put under arrest," they said, "No, you're just
16 being detained for now until we do an investigation."
17 And I didn't even know what was going on at the time
18 when they told me that.
19     Q   Okay.  And so you were detained.  And where
20 did the trooper put you?
21     A   Well, they searched me first, and then when
22 they got done searching me, they put me in the back of
23 one of the cop cars.
24     Q   Okay.  What time was it would you say, if
25 you know, about when you first approached the trooper?

1      A   That I would not be able to tell you without
2  guessing.
3      Q   Okay.  All right.  So you arrived at the
4  park, you said, around ten p.m.?
5      A   I -- I want to say around there.  I know it
6  was later in the night.
7      Q   I understand.  And then you walked across
8  the street, heading to the lake.  It wasn't long
9  thereafter that you saw the flashlights and you came
10 back out; correct?
11     A   Yeah.  It had to be, like, maybe three or --
12 three to five minutes later.  Because, like I said, we
13 didn't even -- the lake is only about a six,
14 seven-minute walk, and we didn't even get to the late
15 'til we -- yeah, at the time.
16     Q   Okay.  So they placed you in one of the
17 trooper's vehicle.  What happened next, based on what
18 you remember?
19     A   And then I know they put Justin and Alli in
20 handcuffs.  And then --
21     Q   When you say "Alli," I don't -- you said
22 Justin and who?
23     A   Allison.
24     Q   Okay.
25     A   Sorry.  I didn't --

1      Q   Okay.  So you came out first.  And then do
2  you remember who was behind you when you came from the
3  lake?
4      A   No.  I want to -- no, I do not.  I think all
5  of us came out at the same time, but I -- I'm not 100
6  percent sure on that.
7      Q   Okay.  All right.  Fair enough.  Okay.  So
8  you're handcuffed, and you said that they put Allison
9  and Justin in handcuffs?
10     A   Yes.
11     Q   Okay.  And then what happened?
12     A   Then Justin -- I was in the cop car, so I
13 don't fully know what happened, but Justin got --
14 like, passed out, like, peed himself, so the cop kept
15 yelling in my face, "What did he take?  What did he
16 take?"  And I told the cop, I was like, "He didn't
17 take anything.  I was with him the whole night.  Like,
18 there's no possible way he could've took anything."
19         And I was like, "He's probably just scared.
20 I mean, he's only" -- I don't know.  He was 14 or 15
21 at the time.  He might've even been 13.  "Like, he's
22 scared.  You just put a 13-year-old kid in handcuffs."
23 It's, like -- I mean --
24     Q   Okay.  And what do you recall happened next?
25     A   They -- then, eventually, they -- I know

1 that eventually they took Allison and Justin out of
2 handcuffs, but took them back to the police station
3 because, obviously, they didn't realize that I was so
4 close to that family and they thought that Justin and
5 Allison snuck out with me.
6       But then once Allison's mom got to the
7 police station and waited for me to take -- bring me
8 home too after I got arrested and everything, they
9 were like, oh, okay.  Then he's just part of -- like,
10 he's actually close to their family and they didn't
11 sneak out.
12    Q    Okay.  I want to get more details about what
13 happened at the scene.  Now, are you aware that the
14 trooper that night, the trooper who arrested you,
15 Trooper Ray, are you aware that she was wearing a body
16 recorder?
17    A    Yes.
18    Q    Okay.  Did you have an opportunity to -- I
19 can show it to you and I can allow you to watch it
20 during this deposition, it will be up to you and your
21 attorney.  But I just want to confirm that you had an
22 opportunity to watch it.  Did you --
23    A    I -- I watched it.
24    Q    You watched the entire video?
25    A    I believe so, when it first came out a while

1 back -- I mean, not a while back, but couple months
2 ago.
3    Q    Okay.
4    A    But I have got to watch it, so we don't need
5 to watch it again.
6    Q    Okay.  Do you agree that the body recording
7 accurately reflects what happened the entire time
8 during her contact, or interaction, with you on that
9 night of November 6th of 2020?
10    A    What was the question again?
11    Q    Do you agree that the video accurately shows
12 what happened on that night?
13    A    Yes.
14    Q    Okay.  So at some point in time, you were
15 taken out of handcuffs at the scene?
16    A    Yeah.  And I was released.
17    Q    Okay.  And why did she release you?
18    A    She said that -- she -- she didn't really
19 say.  She said that, "You're not being -- you're not
20 going to be arrested," that "there was no device
21 found," and that kind of stuff.
22    Q    Okay.
23    A    I'm assuming it was because there was no
24 device found.
25    Q    Okay.  So after she released you, she took

1 the handcuffs off?
2    A    Yes.
3    Q    Okay.  And did she take handcuffs off of the
4 others who were there as well --
5    A    I believe so.  I -- I believe so.  They were
6 only in handcuffs for a little while.  Even when we
7 went back to the police station, they were not in
8 handcuffs at the time.
9    Q    Okay.  So after they took the handcuffs off
10 of you at the scene, what happened?
11    A    Basically, I was given all the stuff that
12 they took out of my pockets back.  And then they were
13 talking about us being freed to go and everything like
14 that.  Well, I was free to go, Rachel was free to go.
15 The kids had to wait for their parents to pick them up
16 because at the time, like I said, they thought all
17 those kids snuck out to come hang out with us, when
18 obviously, that's not the case; the parents knew that
19 they were out with us.
20       But so they had to get their parents to pick
21 them up.  Me and Rachel were free to go it seemed
22 like, and then out of nowhere, after I had my keys
23 back and everything like that, she was like, "Oh,
24 well, I want to -- I actually want to do a field
25 sobriety test."

1    Q    Okay.  When she gave you the keys back, did
2 she ask if you were going to drive?
3    A    That I don't remember, to be honest.
4    Q    Okay.  So how did you intend to -- so she
5 gave you the keys back and you were going to drive
6 your vehicle home; correct?
7    A    Yes.
8    Q    And you testified earlier that you drove to
9 the park; right?
10    A    I drove to the park, yes.
11    Q    Who was going back with you?  If you had
12 driven your vehicle from the park, who was going to be
13 going with you?
14    A    The reason Rachel drove herself is because
15 she was going to drive home because she had work the
16 next morning.  And then I was going to drive Allison,
17 her friend and Justin back to their house after we
18 were done.
19    Q    Okay.  Is that what you told the trooper?
20    A    I believe so, yes.
21    Q    Okay.  All right.  So after you told her
22 that, what happened?
23    A    Then she told me that she wanted to do a
24 sobriety test on me, which I told her I was fine with,
25 but I also told her that I have a lazy eye and I have

9 (Pages 30 - 33)

Page 34

1  a few problems with my feet.  So it's not easy for me
2  to keep balance, and it's not -- like, I -- my one
3  left eye, I can't control it sometimes, and I told her
4  that.  And then she did the test and said that my one
5  eye kept moving, and then that I wasn't able to keep
6  great balance.  So then she placed me under arrest at
7  that point.
8      Q   Was she accurate in that you were not able
9  to keep your balance?
10     A   I don't remember.  I mean, I felt like I did
11  a pretty good job, to be honest with you.
12     Q   So you felt that you were able to maintain
13  your balance, but you're saying that she said that you
14  were not?
15     A   Yes.
16     Q   Do you remember how that looked on video?
17  If you were actually able to maintain your balance?
18     A   No.  Not 100 percent.
19     Q   Okay.  So what happened after she -- do you
20  remember how many tests she administered?
21     A   Four or five of them.  Also, can I say
22  something to for one second?  She also told me that,
23  when we were at the police station, that I was the
24  highest she ever seen anybody in all her years of
25  working at the police station.  That, to me, is

Page 35

1  insane.  Especially that I didn't take any drugs at
2  all.  Because of my eyes, because I had a lazy eye.
3      Q   Okay.  Just one second.
4      A   Okay.
5      Q   How many different tests you said she
6  administered at the park to you?
7      A   It was either four or five.
8      Q   Okay.  And after she administered the tests,
9  what happened?
10     A   Then they told me that I was going to be
11  put -- placed under arrest for suspicious of DUI, or
12  DWI, one of those two.
13     Q   So it's suspicion of driving while under the
14  influence or DWI?
15     A   I think -- I want to -- I thought she said
16  DWI.
17     Q   She just said DWI or did she say both?
18     A   I can't remember.  I -- I definitely
19  remember DWI.
20     Q   Okay.  But you're not saying that she didn't
21  also say driving under the influence?
22     A   I don't remember if she brought that -- if
23  she said that also.
24     Q   You don't remember.  Okay.  So why did you
25  tell her that you had a lazy eye?

Page 36

1      A   Because -- I didn't tell her that until
2  after -- until I realized that they do eye tests.  I
3  just wanted her to know that because I know they look
4  for, like, an eye moving on its own or -- or stuff
5  like that.
6          So I was like -- so I just told her that
7  when -- I didn't even tell her -- because the first
8  couple tests they did were balance tests, so I didn't
9  tell her until after I realized that they were doing
10 stuff for my eyes.  But I also told her that I don't
11 have the greatest balance and I've always been clumsy
12 and have leg problems too.
13     Q   Okay.
14         MR. JAVIE:  Marvin, I'm sorry.  Can we
15 take, like, a five-minute break?  I have to deal with
16 something real quick at my office.  It'll take me five
17 minutes.  I'll be right back.
18         MR. FREEMAN:  You certainly can.  So
19 you want to come back, say, 12:05?
20         MR. JAVIE:  Yeah, that's fine.  12:05
21 is great.  I appreciate it.
22         MR. FREEMAN:  Okay.  Very good.
23         MR. JAVIE:  Thanks.
24         THE REPORTER:  We're now off the record
25 at 11:54 a.m.

Page 37

1          (Off the record.)
2          THE REPORTER:  We are now back on the
3  record at 12:08 p.m.
4  BY MR. FREEMAN:
5      Q   Okay.  Mr. Birth, you understand you're
6  still under oath; correct?
7      A   Yes.
8      Q   Okay.  You said earlier that you told the
9  trooper who was administering the test, Trooper Ray,
10 that you had lazy eyes.  Why did you tell her that?
11     A   I told her that because -- so I didn't tell
12 her that until after I got done, like, the balancing
13 parts of the test because I didn't realize that she --
14 but once she started shining the flashlight in my eye,
15 I was like I better bring this up before she thinks my
16 one eye is, like -- why my eye is doing that.
17     Q   Okay.  Do you recall what her response was?
18     A   No.
19     Q   Do you recall her mentioning the fact that
20 your eyes were like ping-pong balls?
21     A   She said that -- I do remember her telling
22 me something about she'd never seen someone as high as
23 me or something.
24     Q   So when she said you were high, did she mean
25 from drinking or being under the influence of drugs?

10 (Pages 34 - 37)

Page 34

1  a few problems with my feet.  So it's not easy for me
2  to keep balance, and it's not -- like, I -- my one
3  left eye, I can't control it sometimes, and I told her
4  that.  And then she did the test and said that my one
5  eye kept moving, and then that I wasn't able to keep
6  great balance.  So then she placed me under arrest at
7  that point.
8      Q   Was she accurate in that you were not able
9  to keep your balance?
10     A   I don't remember.  I mean, I felt like I did
11  a pretty good job, to be honest with you.
12     Q   So you felt that you were able to maintain
13  your balance, but you're saying that she said that you
14  were not?
15     A   Yes.
16     Q   Do you remember how that looked on video?
17  If you were actually able to maintain your balance?
18     A   No.  Not 100 percent.
19     Q   Okay.  So what happened after she -- do you
20  remember how many tests she administered?
21     A   Four or five of them.  Also, can I say
22  something to for one second?  She also told me that,
23  when we were at the police station, that I was the
24  highest she ever seen anybody in all her years of
25  working at the police station.  That, to me, is

Page 35

1  insane.  Especially that I didn't take any drugs at
2  all.  Because of my eyes, because I had a lazy eye.
3      Q   Okay.  Just one second.
4      A   Okay.
5      Q   How many different tests you said she
6  administered at the park to you?
7      A   It was either four or five.
8      Q   Okay.  And after she administered the tests,
9  what happened?
10     A   Then they told me that I was going to be
11  put -- placed under arrest for suspicious of DUI, or
12  DWI, one of those two.
13     Q   So it's suspicion of driving while under the
14  influence or DWI?
15     A   I think -- I want to -- I thought she said
16  DWI.
17     Q   She just said DWI or did she say both?
18     A   I can't remember.  I -- I definitely
19  remember DWI.
20     Q   Okay.  But you're not saying that she didn't
21  also say driving under the influence?
22     A   I don't remember if she brought that -- if
23  she said that also.
24     Q   You don't remember.  Okay.  So why did you
25  tell her that you had a lazy eye?

Page 36

1      A   Because -- I didn't tell her that until
2  after -- until I realized that they do eye tests.  I
3  just wanted her to know that because I know they look
4  for, like, an eye moving on its own or -- or stuff
5  like that.
6          So I was like -- so I just told her that
7  when -- I didn't even tell her -- because the first
8  couple tests they did were balance tests, so I didn't
9  tell her until after I realized that they were doing
10 stuff for my eyes.  But I also told her that I don't
11 have the greatest balance and I've always been clumsy
12 and have leg problems too.
13     Q   Okay.
14         MR. JAVIE:  Marvin, I'm sorry.  Can we
15 take, like, a five-minute break?  I have to deal with
16 something real quick at my office.  It'll take me five
17 minutes.  I'll be right back.
18         MR. FREEMAN:  You certainly can.  So
19 you want to come back, say, 12:05?
20         MR. JAVIE:  Yeah, that's fine.  12:05
21 is great.  I appreciate it.
22         MR. FREEMAN:  Okay.  Very good.
23         MR. JAVIE:  Thanks.
24         THE REPORTER:  We're now off the record
25 at 11:54 a.m.

Page 37

1          (Off the record.)
2          THE REPORTER:  We are now back on the
3  record at 12:08 p.m.
4  BY MR. FREEMAN:
5      Q   Okay.  Mr. Birth, you understand you're
6  still under oath; correct?
7      A   Yes.
8      Q   Okay.  You said earlier that you told the
9  trooper who was administering the test, Trooper Ray,
10 that you had lazy eyes.  Why did you tell her that?
11     A   I told her that because -- so I didn't tell
12 her that until after I got done, like, the balancing
13 parts of the test because I didn't realize that she --
14 but once she started shining the flashlight in my eye,
15 I was like I better bring this up before she thinks my
16 one eye is, like -- why my eye is doing that.
17     Q   Okay.  Do you recall what her response was?
18     A   No.
19     Q   Do you recall her mentioning the fact that
20 your eyes were like ping-pong balls?
21     A   She said that -- I do remember her telling
22 me something about she'd never seen someone as high as
23 me or something.
24     Q   So when she said you were high, did she mean
25 from drinking or being under the influence of drugs?

10 (Pages 34 - 37)

Page 38

```
1     A    I assume --
2          MR. JAVIE:  Objection to form.
3          You can answer.
4  BY MR. FREEMAN:
5     Q    You can answer the question, Mr. Birth.
6     A    Oh, okay.  She said that -- she said that I
7  was under the influence of drugs at the time.  At
8  first, she was saying that I -- I was drinking.  But
9  then she told me that she thought I was high when she
10 saw my eyes.
11    Q    And when she told you you were high, what
12 did you think she meant by that?
13    A    On drugs.
14    Q    Did you tell her you weren't drinking?
15    A    Yes.
16    Q    Did you tell her that you weren't high on
17 drugs?
18    A    Yes.
19    Q    Did she believe you?
20    A    No.
21    Q    Do you know why she didn't believe you?
22 Just if you know.
23    A    No.
24    Q    Okay.  So after she administered the test,
25 what happened?
```

Page 39

```
1     A    Then I was placed under arrest after that.
2     Q    Were you handcuffed?
3     A    Yeah, they put me in handcuffs.
4     Q    So they put the handcuffs back on?
5     A    Yes.
6     Q    Okay.  Now, before you were placed in
7  handcuffs and went to the station, everything else
8  occurred at the park; correct?
9          MR. JAVIE:  Objection to form.
10 BY MR. FREEMAN:
11    Q    From the time that you encountered the
12 troopers that night, the first time you were removed
13 from the park was when you went to the station;
14 correct?
15    A    Yes.
16    Q    I noticed that the video shows that the vape
17 cartridge was attached to the back of Allison's cell
18 phone.  Did you see that?
19    A    I did not.
20    Q    Okay.  Do you know that she had a vape
21 cartridge attached to the back of her cell phone?
22    A    I did not.
23    Q    Have you ever seen that before?
24    A    I don't recall.
25    Q    Why did you tell Trooper Ray that you were
```

Page 40

```
1  clumsy?
2     A    Because I've been clumsy my whole 29 years
3  of my life.
4     Q    Okay.  But why did you tell her that you
5  were clumsy at that time?
6     A    Because when she told me that I was going to
7  be tested and balancing was part of it, I was like
8  then that's probably good information to tell her.
9     Q    So you told her that before you had to do
10 the balancing tests?
11    A    Yeah.
12    Q    Is that because you didn't think you would
13 do well on the balancing tests?
14    A    No, I did not think I would do well.
15    Q    You're saying you didn't think you would do
16 well?
17    A    I did not think I would do well on it.
18    Q    How do you think you did, after looking at
19 the --
20    A    I thought I -- I mean, I thought I did well
21 at the time.
22    Q    Okay.  What happened after she put the
23 handcuffs on you?
24    A    She put me in the police car.
25    Q    Okay.  And then what happened?
```

Page 41

```
1     A    And then we went to the station.
2     Q    Okay.  She also read you your Miranda
3  Rights; correct?
4     A    Yes.
5     Q    Okay.  So what happened when you got to the
6  station?
7     A    We went to the back room and I did a
8  breathalyzer test.
9     Q    Okay.  You requested to do the breathalyzer?
10    A    I requested to do a breathalyzer and a drug
11 test --
12    Q    Okay.  And who --
13    A    My request.
14    Q    Okay.  I'm sorry.
15    A    That's okay.
16    Q    So who administered the breathalyzer test?
17    A    I don't think -- I don't think she did.  I
18 think she took me to the back room to interrogate me.
19 I think one of the guys did the breathalyzer test.
20    Q    Okay.
21    A    If I -- if I recall correctly.
22    Q    When you got to the station, how long were
23 you at the station before your handcuffs were removed?
24    A    Quite some time because I was -- they took
25 the handcuffs from behind my back and, like,
```

11 (Pages 38 - 41)

Page 42

1  handcuffed me to one of the chairs there.
2    Q   Oh, okay.  So at the station, they took you
3  out of handcuffs from behind and handcuffed you to a
4  chair?
5    A   Yes.  Like, 15, 20 minutes after we got
6  there, that happened, if I recall correctly.
7    Q   Okay.  And you said that she interrogated
8  you?
9    A   Yeah, after I did the test.  I did the
10  breathalyzer test, and then I did a drug test.  And
11  then she took me into a private room where just me and
12  her were in there, and then questioned me.
13    Q   Okay.  Do you recall what questions she
14  asked?
15    A   No.
16    Q   You don't recall what questions she asked
17  while she was interrogating you?
18    A   Not -- not fully.  I know -- I remember her
19  asking me questions about, like, if -- again, about,
20  like, Justin, if Justin took any drugs that I know of
21  or anything like that.  And I told her, "No.
22  Obviously, if I thought he was having -- if I thought
23  that was the issue and I thought he was having issues
24  with drugs, I would've said something to get him
25  help."

Page 43

1    Q   Okay.  Did she ask if you had consumed any
2  drugs?
3    A   Yes.  That I know was one of the question.
4    Q   Okay.  And --
5    A   And this is the room that she told me that
6  she'd never seen anybody as high as me.
7    Q   Okay.  Did she also ask if you had been
8  drinking?
9    A   Yes.
10    Q   Do you believe that she thought you were
11  drinking or under the influence?
12    A   There was a point where, in the night, where
13  I believe that she thought that she made a mistake.
14    Q   And why do you say that?
15    A   Just because of what I was told she told
16  Allison's mom when we were leaving.
17    Q   And who told you this?
18    A   Allison's mom.
19    Q   Allison's mom told you that?
20    A   Yes.
21    Q   And what was the statement?
22    A   Along the lines of -- I'm not 100 percent --
23  I don't remember.  I don't want to tell you
24  something -- but I just -- something that she said to
25  Allison's mom that night made me think that she

Page 44

1  thought she made a mistake.
2    Q   Okay.  Well, I'm asking what was it?
3    A   I know, but I'm not 100 -- it was something
4  along the lines of her saying to her that, "I already
5  arrested him, and later in the night, I started to
6  not" -- I don't remember 100 percent, to be honest
7  with you.
8        MR. JAVIE:  Mr. Freeman, if I may.
9        Sam, what he's asking you at this
10  point, and it's okay, you can clarify that you're hazy
11  on it or that you don't have the best recollection.
12  He's just asking your best recollection.  So, you
13  know, if you're incorrect in that regard, that's fine,
14  but just what is it that you recall?
15        THE WITNESS:  Okay.
16        MR. JAVIE:  And if we need to, we can
17  talk to Allison's mother.
18        THE WITNESS:  Okay.
19        MR. JAVIE:  But he's asking your
20  recollection.
21        THE WITNESS:  Well, Allison's mom, from
22  what I remember, it was that the cop basically told
23  her that -- because of how long I was there for, she
24  started to not think that I was under the influence.
25  //

Page 45

1  BY MR. FREEMAN:
2    Q   Okay.
3    A   This was after I was released, and
4  obviously, the ticket was already written up, the
5  court date -- the ticket and everything was written
6  up.
7    Q   Okay.
8    A   My car was already towed, like --
9    Q   Okay.  So do you remember any other
10  questions she asked you while you were being
11  interrogated?
12    A   No.
13    Q   After you were interrogated, what happened?
14    A   Then I went back out there and sat in a
15  chair for a little -- maybe I was in -- I might've
16  been in a holding cell for a little while after that
17  actually, now that I remember.
18    Q   Okay.  So when you were being interrogated,
19  you said you were handcuffed to a chair?
20    A   When I was -- no, that was before the
21  interrogation.  When I was being interrogated, I -- I
22  didn't have handcuffs on.
23    Q   So she removed the handcuffs for purposes of
24  the interrogation?
25    A   I -- I guess, yes.

12 (Pages 42 - 45)

Page 46

1    Q   Okay.
2    A   Because I was not handcuffed in that room.
3    Q   All right.  And then after the
4  interrogation, what happened?
5    A   I was placed in a holding cell for a little
6  while, and then I was released to Allison's mom a
7  little while after that.
8    Q   Who gave you -- you were given a summons
9  while you were at the station?
10    A   Yes.
11    Q   When did you receive the summons?  When you
12  were in the holding cell, in doing the interrogation
13  or when?
14    A   I believe that's why I was waiting in the
15  holding cell, to get the summons.
16    Q   Okay.  Now, when you were in the holding
17  cell, were you handcuffed?
18    A   No.
19    Q   Okay.  So after they released you from the
20  holding cell, is that when they gave you the summons?
21    A   Yes.  And then that's when I was released to
22  Allison's mom to go home --
23    Q   Okay.  And who gave you a summons?
24    A   I believe Officer Ray did.
25    Q   Okay.  Overall, just based on your

Page 47

1  assessment, how do you think Officer Ray treated you?
2    A   I think she went about this very poorly.
3  She treated someone that was a 13-year-old kid very
4  poorly.  She treated me like I was a full-on criminal.
5  I have never been arrested in my life for any criminal
6  activities in my whole entire life; I'm 29 years old.
7  And I just felt like she handled the situation very
8  poorly.
9    Q   And you're saying that because you were not
10  on any influence and you had not been drinking?
11    A   I -- that's part of it.  Part of the -- she
12  was not -- she was -- seemed very mean in the
13  situation, after I told her I was not -- I've never
14  committed a crime in my life.  And then it's, like --
15  it was kind of embarrassing, to be honest with you.
16  I'm getting arrested in front of friends of mine.
17      And my parents, both of my parents had
18  really, really horrible drug issues.  And to be
19  accused of doing something that I would never do in my
20  life -- I mean, it almost got me kicked out of my
21  house that I live in.  Like, it's not a very good
22  situation, I'll tell you that.  And I think it was
23  handled very poorly.
24    Q   And you said you thought she was mean?
25    A   I think she handled the -- yes.  I -- I do.

Page 48

1  And the way she treated kids, it's just -- I mean, a
2  13-year-old kid should've never been thrown to the
3  ground.
4    Q   Thrown to the ground?  Who was thrown to the
5  ground?
6    A   Justin.
7    Q   I thought you said he fainted?
8    A   He fainted after he was, like, tackled to
9  the ground by the cop.  And then he peed himself when
10  he got tackled to the ground, and then he was passed
11  out for a little while.
12    Q   So watching the video, you said that the
13  video depicts --
14    A   Well, the video -- I know -- the -- so I
15  know, from what I remember of the video, the video
16  showed Justin asking the cop that he had to pee, and
17  then the cop said, "Not -- you can't go to the
18  bathroom right now."  He peed himself, and while he
19  was peeing himself, the officer put him on the ground,
20  and then that's when he passed out.
21    Q   I see.  Okay.
22    A   From what I remember.
23    Q   All right.  So --
24    A   I mean, it's been, like, three years ago, so
25  it's not, like, the easiest thing to --

Page 49

1    Q   Okay.  So you went home with Allison's mom,
2  you said?
3    A   Yes.  And I slept there for the night
4  because I couldn't get my car until 12 p.m. the next
5  day.
6    Q   What happened to your car?
7    A   It was towed.  So I had to pay $300 for that
8  too.
9    Q   Okay.  Where was your car towed?
10    A   To an impound lot in -- I want to say it was
11  on either the Black Horse Pike or the White Horse
12  Pike.  I can't remember fully.
13    Q   So it was towed to an impound lot and you
14  paid $300 to get it out?
15    A   It was right around 300.  It might've been,
16  like, 280.
17    Q   Okay.
18    A   280 to, like, 300.
19    Q   When did you get your car out?
20    A   The next day, at 12 p.m., when I was allowed
21  to.  Picked my keys up from the police.  I wasn't
22  allowed to pick my keys up from the police station
23  until 12 p.m. the next day.
24    Q   Did they tell you why?
25    A   They said because that's -- in DUI cases,

13 (Pages 46 - 49)

Page 50

1  that's how it works.
2      Q   Okay.
3      A   Like, you can't -- yeah, I don't know.
4  That's what they told me.
5      Q   Okay.  So you went back to the state police
6  barracks to get the keys?
7      A   Yes.  Allison's mom drove me back there, and
8  then after that, we went to get my car.
9      Q   What barracks were you taken to?  Was it the
10  Buena Vista Barracks?
11     A   I'm not 100 percent sure.  It was right
12  by -- I don't know -- it was -- it's right by the
13  entrance of 73.  I don't know what -- on the side
14  street of 73.  I don't know if you know where that is.
15  It's -- I don't know what barracks it would be
16  considered.
17     Q   Okay.  So after you picked your vehicle up,
18  when was the next time you had to do anything in
19  connection with this case?
20     A   Well, after -- that day, I had to go deal
21  with my whole grandpop situation.  And then after
22  that, we contacted a lawyer and paid for a lawyer to
23  defend me just because I've never been in a situation
24  like that, and it's, like, obviously, a scary
25  situation.  So I want to -- I mean, paying for a

Page 51

1  lawyer isn't as bad as paying for a DUI in the long
2  run.
3      Q   Did you have -- I'm sorry.  I interrupted.
4  Go ahead.
5      A   I just wanted to make sure that I was taken
6  care of and dealt with it the right ways, with the --
7  with the help of a lawyer.
8      Q   Okay.  Did you have to make any court
9  appearances?
10     A   Not until -- not until the -- my trial.
11     Q   Okay.  So did you have to go to trial on
12  this matter at a later date?
13     A   Yes.
14     Q   And your attorney went with you?
15     A   Yes.
16     Q   Okay.  And what happened when you went to
17  trial?
18     A   There -- I got released and all of the
19  charges dropped because there was nothing in my
20  system.
21     Q   Okay.  Do you know officially why the matter
22  was dismissed?
23     A   I believe because I had nothing in my
24  system.
25     Q   Was this because the test results showed you

Page 52

1  had nothing in your system?
2      A   Yes.  Because the breathalyzer and the drug
3  test all came back negative.
4      Q   Okay.  Do you know if the trooper who
5  arrested you was there to testify?
6      A   I believe the police officer was there.
7      Q   Do you recall if that police officer
8  testified at your trial?
9      A   I do not recall.
10         MR. JAVIE:  Wait.  I just want to
11  object here.  And, Mr. Freeman, I just want to make
12  sure we're clear on the record because we're starting
13  to go a little far field.  All of this was done on
14  Zoom because this was during COVID.
15         And there actually wasn't a trial; the
16  state dismissed the charges.  So there was a trial
17  listing, but there was never -- you know, it's not
18  like we took testimony and I cross-examined the
19  trooper.  The prosecutor withdrew the charges and the
20  judge granted the motion.
21         MR. FREEMAN:  Okay.  And I'm asking him
22  if he knows why.  Or do you know why?
23         MR. JAVIE:  No, no, no, and I
24  understand that.  And I can answer that.  There was a
25  question about testimony at the trial, and I just

Page 53

1  wanted to make sure that we were clear about
2  procedurally what happened.  If you want me to answer
3  the question, I can answer it or if you want him to
4  answer it, it's your deposition.
5          MR. FREEMAN:  No, I'll take your
6  representation as to why the charges were dismissed.
7          MR. JAVIE:  Sure.  So we had a couple
8  of listings; I don't remember how many.  I think the
9  first listing, we were in the wrong court.  And then
10  the second -- there was at least two or three
11  listings, there might've even been four listings.
12         The case was continued because they
13  were waiting for, what was called, the Drug
14  Recognition Expert Report, which would've been from
15  Trooper Ray.  And they were also waiting for the
16  voluntary urinalysis results that he gave.
17         When the urinalysis came back negative,
18  the state -- and if I remember correctly, we weren't
19  in -- like, it was, like, in a breakout room.  We were
20  with Judge Verno, and it was the trooper.  I don't
21  know that Mr. Birth was there.  You'd have to ask him
22  if he was; I can't recall.
23         But we were in the back; the prosecutor
24  said, you know, to the judge, "Look, there was, you
25  know, negative breathalyzer, and then he volunteered a

14 (Pages 50 - 53)

Page 54

1 urinalysis. We have the results; it's negative for,
2 you know, any kind of controlled substance."
3          And I think the actual phrase he used
4 was "I don't know what we're doing here. It's our
5 motion to withdraw" or "it's our motion to dismiss the
6 case," and the judge granted that motion.
7          MR. FREEMAN: So you're saying it was
8 the prosecutor's motion that got the case dismissed?
9          MR. JAVIE: Correct. The case was not
10 tried. There was no trial in the actual case. The
11 prosecutor made the motion. You know, again, like,
12 there wasn't a transcript of it, but I remember
13 distinctly saying, you know, "I don't know what we're
14 doing here." And I remember the judge kind of shaking
15 her head, you know, like, yeah, I understand what
16 you're saying. And then, you know, she granted the
17 state's motion to dismiss the charges.
18          MR. FREEMAN: Okay. What judge was it?
19          MR. JAVIE: Michele Verno, and she's in
20 the Hamilton Township Municipal Court, I think, with
21 the Regional Municipal Court. She used to be the
22 prosecutor there, actually. I was surprised when I
23 walked in and I saw her as the judge.
24          MR. FREEMAN: This is M-I-L and not
25 M-M-O-N; right?

Page 55

1          MR. JAVIE: Hamilton, yeah.
2          MR. FREEMAN: Okay.
3          MR. JAVIE: It's right off of the Black
4 Horse Pike --
5          MR. FREEMAN: I know where it is --
6          MR. JAVIE: Okay. Yeah.
7          MR. FREEMAN: And what was the name of
8 the prosecutor?
9          MR. JAVIE: If you give me a minute.
10 The name that I recall was Tripician,
11 T-R-I-P-I-C-I-A-N. Give me one second, and I'm
12 looking that up for you just to make sure. Yeah, so
13 it would've been Carl, C-A-R-L, Tripician,
14 T-R-I-P-I-C-I-A-N, Esquire, Hamilton Municipal Court,
15 6101 13th Street, Mays Landing, New Jersey 08330.
16          MR. FREEMAN: Okay.
17 BY MR. FREEMAN:
18     Q    All right. So, Mr. Birth, after you were
19 released, charges were dismissed. Any other expenses
20 beside attorney's fees related to this case? Any
21 other money you had to pay out?
22     A    The money for the car and the money for the
23 attorney.
24     Q    Okay. Now, there was testimony, I think,
25 someone indicated during the trooper's interaction

Page 56

1 with them at the park that the vape cartridge was
2 purchased at Wawa. Do you know anything about that?
3     A    The only -- no, not -- I don't. I just know
4 that -- because they said that there was -- I know --
5 like, I have friends that do like Juul or vapes that
6 you buy at Wawa. And I was like, "They're the only
7 cartridges that I know that any of my friends had."
8 Not that night, but, like, in general, in my car, were
9 ones that you could purchase at Wawa.
10     Q    But you don't know if the vape cartridge
11 that was attached to Allison's cell phone, you don't
12 know where she purchased that?
13     A    No. I didn't even know about that until
14 just now, to be honest with you.
15     Q    After you were arrested, did they search
16 your car?
17     A    I gave them permission to search my car,
18 yes.
19     Q    And you signed a consent to search form?
20     A    I didn't sign anything. I gave -- I mean,
21 they asked me, "Do -- we -- do you want us to try to
22 get a search warrant or can we search your car?" So I
23 gave them full permission to search my car.
24     Q    Okay. Do you remember who searched it? Was
25 it the trooper who arrested you or another trooper?

Page 57

1     A    No, it was -- two of the guy cops that were
2 there searched it.
3     Q    Okay. Did they cease anything from the car?
4     A    No.
5     Q    Now, your complaint indicates that you, or
6 someone, was told to describe the empty package of the
7 vape cartridge. Were you told to do that?
8     A    I -- no, but I -- one -- I think one of
9 the -- if I remember correctly, one of the state
10 troopers threw it away.
11     Q    Okay.
12     A    I don't even remember seeing the package
13 myself. I was just told it was there.
14     Q    But you weren't arrested because of the vape
15 cartridge; correct?
16     A    I don't -- no. No.
17     Q    Okay. At least from what you know, you were
18 arrested because the trooper said you were driving
19 under the influence or driving while intoxicated;
20 correct?
21     A    Yes.
22     Q    Was anyone allowed to drive home from the
23 park?
24     A    So Allison had her license at the time, so
25 she could've, but the -- because she was only 17, they

Page 58

1  wanted her parents to come pick her up because they
2  thought she snuck out. Rachel was able to drive home,
3  but she didn't drive home, she drove to the police
4  station with -- and stayed there until, like, three in
5  the -- two, three in the morning until I left. And
6  then she had to go -- she had to be at work at, like,
7  seven in the morning, so she had to go right home
8  right after that.
9      Q   Okay. Now, I noticed in looking at your
10 complaint, you said that "the trooper's conduct caused
11 you a great deal of anxiety and anguish."
12     A   Yeah, it -- it was bad.
13     Q   Okay. But I think you indicated you never
14 sought any kind of medical attention for that;
15 correct?
16     A   No.
17     Q   And I'm looking at responses to your
18 interrogatories, number seven, we asked: "With regard
19 to the black packaging labeled "Ghost" found in your
20 car during the consent search state the following:
21 Where, from whom did you purchase the product, the
22 date you purchased the product, who was with you when
23 you purchased product, what exactly the product was,
24 and if it contained illegal substance drug and the
25 date and time when the product was utilized."

Page 59

1      Your response was: "The Ghost product was
2  purchased by Plaintiff at a Wawa in New Jersey
3  sometime before the incident. Plaintiff was not with
4  anyone else when he purchased the product. The
5  product was a vape pen that contained tobacco and was
6  used by the plaintiff after it was purchased. The
7  product did not contain CDS or anything illegal.
8  Moreover, this evidence was discarded at the command
9  of the law enforcement after it was determined that
10 the product did not contain CDS." Do you stand by
11 that? Did you purchase the Ghost product at Wawa?
12     A   I did not purchase any vapes that night at
13 Wawa.
14     Q   Well, what it says is that it was purchased
15 sometime before the incident.
16     A   That -- so I've got -- I have bought vapes
17 from Wawa before, but that night, I did not. But
18 they -- they do sell those at Wawa. They -- they just
19 have, like -- they don't sell -- there's different
20 ones. There's some with tobacco; there's some with
21 illegal substance in it. The ones with tobacco and
22 stuff, they're -- they sell at Wawa.
23     Q   Okay. But I'm looking at your response to
24 interrogatory number seven, and what it says is that
25 "the Ghost product was purchased by Plaintiff at a

Page 60

1  Wawa in New Jersey sometime before the incident." And
2  this is a document that you signed by a certification.
3  So do you stand by that?
4      A   I mean, at the time, if I said that, then
5  I -- I must've purchased it at Wawa that night. It's
6  been three years, so I don't fully remember.
7          MR. JAVIE: Objection. Mr. Freeman,
8  can you show him what you're talking about or do you
9  want me to show him what you're talking about?
10         MR. FREEMAN: Well, he signed his
11 interrogatory, and I'm just restating what he has
12 here; that's all.
13         THE WITNESS: If that was signed that
14 night, then I must've bought a vape at Wawa that
15 night.
16 BY MR. FREEMAN:
17     Q   I'm not saying this document was signed that
18 night. All I'm saying is that this document -- do you
19 recall receiving interrogatories? Questions that we
20 ask, written questions?
21     A   No.
22     Q   Okay. I know it's been a while ago. Have
23 you ever purchased a Ghost product that contained
24 illegal substances at Wawa?
25     A   No.

Page 61

1      Q   Can you purchase Ghost product, vape pens
2  that contain illegal substances at Wawa?
3      A   No.
4      Q   Have you ever purchased Ghost product that
5  contained illegal substances anywhere else?
6      A   Have I ever?
7      Q   Yeah.
8      A   No.
9      Q   You're saying that your only economic
10 damages here are $2,000 that you paid to your
11 attorney?
12     A   And then 300 -- around 300 for the car.
13     Q   Okay. And I think you're indicating here
14 that you're not pursuing any kind of wage loss claim;
15 correct?
16     A   I'm not sure how to answer that question.
17     Q   Are you --
18         MR. JAVIE: We'll stipulate there's no
19 wage loss claim.
20         MR. FREEMAN: Okay.
21 BY MR. FREEMAN:
22     Q   And no medical costs are being asserted as
23 well; correct?
24     A   Correct.
25     Q   And after you were released from the state

16 (Pages 58 - 61)

Page 62

1  police barracks, you weren't restricted or your
2  movements weren't restricted or you weren't
3  incarcerated at any other time for this incident;
4  correct?
5      A   Correct.  No.
6      Q   And the only thing that you had to do after
7  you were released from the state police barracks, do
8  you recall going to court with your attorney or you
9  don't remember?
10     A   I was in that court that day that they
11 dismissed the -- the case.
12     Q   You was in court?
13     A   I was in there with them when that happened.
14     Q   Okay.
15         MR. JAVIE:  And, again, that was on
16 Zoom.
17         THE WITNESS:  Yes, it was on Zoom
18 because the pandemic.
19 BY MR. FREEMAN:
20     Q   Okay.  So you didn't go to the courthouse?
21     A   No.
22     Q   Okay.
23     A   Everything was done one Zoom.
24         MR. FREEMAN:  Okay.  All right.  Let me
25 take another ten-minute, Counselor.  I believe I'm

Page 63

1  done, I just need to check my notes; okay?
2          MR. JAVIE:  Absolutely.  So come back
3  in ten minutes?
4          MR. FREEMAN:  Come back in ten minutes,
5  yes.
6          MR. JAVIE:  No problem.
7          MR. FREEMAN:  Thank you.
8          THE WITNESS:  Absolutely.  You're
9  welcome.
10         THE REPORTER:  We are now off the
11 record at 12:45 p.m.
12         (Off the record.)
13         THE REPORTER:  We are now back on the
14 record at 12:59 p.m.
15 BY MR. FREEMAN:
16     Q   Okay.  Mr. Birth, you're still under oath.
17     A   Yes.
18     Q   Just a couple of questions.  I'm looking at
19 the complaint in paragraph 19, it says:  "While
20 peering into Mr. Birth's vehicle, Defendant Ray,"
21 meaning the trooper, "observed the packaging of an
22 electronic cigarette that Mr. Birth's companion
23 purchased at a Wawa convenience store earlier that
24 night."  That's paragraph 19.  Are you aware of any of
25 your companions who purchased electronic cigarette

Page 64

1  that night at a Wawa?
2      A   No.
3      Q   You're not aware of that?
4      A   No.  If anybody purchased the -- no.  Unless
5  it was Rachel, but --
6      Q   Okay.
7      A   Because Rachel was in my car earlier that
8  night, but Rachel was the only one that was able --
9  is -- that could buy something like that from Wawa.
10     Q   Okay.  And then I'm looking at paragraph 36,
11 and it says:  "During the course of the investigation,
12 Defendant Ray and/or her fellow law enforcement
13 officers destroyed or caused to be destroyed material
14 evidence of investigation."  Do you recall Trooper Ray
15 discussing the empty packaging that was found on the
16 floor of your car?
17     A   I don't fully recall it, but I remember
18 that's the reason that they were -- that this all,
19 like -- she searched my car.
20     Q   Okay.  And do you remember what happened to
21 that packaging?
22     A   I think -- I think it was thrown out, if I
23 remember correctly.
24     Q   Are you certain of that, sir?
25     A   Not 100 percent sure, but I'm pretty sure

Page 65

1  that it was thrown out at that park that night.
2      Q   Okay.  And why do you believe it was thrown
3  out at the park that night?
4      A   Because she -- if I remember correctly, she
5  put it in my face and said, "This is what caused it
6  all."  And then either she threw it out or she gave it
7  to me to throw it out.
8      Q   Okay.  Do you recall her referring to it as
9  trash?
10     A   No.  I don't recall that.
11     Q   Okay.  But you don't recall that item being
12 placed in an evidence bag and being placed on the
13 front seat of a trooper's vehicle?  You don't recall
14 that?
15     A   No.
16         MR. FREEMAN:  Okay.  Mr. Javie, I have
17 no further questions.
18         I have no further questions, Mr. Birth.
19 Thank you very much for your time and cooperation.
20         THE WITNESS:  Absolutely.  I appreciate
21 it.
22         MR. FREEMAN:  Mr. Javie, anything?
23         MR. JAVIE:  Yeah, just a few things
24 that we're going to clean up here.
25 //

17 (Pages 62 - 65)

Page 66

1          EXAMINATION
2 BY MR. JAVIE:
3    Q    Mr. Birth, on the date of this incident, had
4 you drank anything alcoholic?
5    A    Absolutely not.
6    Q    Had you ingested any narcotics, illegal or
7 otherwise?
8    A    Absolutely not.
9    Q    When you first saw Trooper Ray, you were
10 located down by the lake?
11   A    We were not at the lake yet, but we were
12 headed towards that way until Rachel saw the
13 flashlights by my car.
14   Q    And when you realized they were police, I
15 think you told us that you turned around and you
16 walked back?
17   A    Yeah, we -- we walked out of the woods right
18 away.
19   Q    At any time while Trooper Ray was on scene
20 and you were interacting with her, did she drive a
21 vehicle?
22   A    No.
23   Q    At any time while Trooper Ray was on scene
24 and you were interacting with her, did you get into a
25 running vehicle?

Page 67

1    A    Absolutely not.
2    Q    Do you remember getting into your vehicle
3 when she told you to get into your vehicle?
4    A    She asked me to sit in my vehicle for a
5 minute or two, and then after that, I was out of it.
6    Q    When you gave a breathalyzer test back at
7 the barracks, was that something that she asked you to
8 take or the police asked you to take?
9    A    Yes.
10   Q    And do you remember the results of that?
11   A    Yes.  It was absolute -- it was the lowest,
12 zero.  It was zero.
13   Q    And you also offered, meaning you weren't
14 mandated to do it, but you offered to give a urine
15 test; is that right?
16   A    Absolutely.
17   Q    Nevertheless, you were still charged with
18 driving while under the influence; correct?
19   A    That's what I was charged for, yes.
20   Q    Were you charged with public intoxication?
21   A    Nope.
22   Q    Were you charged with possession of CDS or
23 what's known as a controlled dangerous substance?
24   A    No, I was not.
25   Q    Ultimately, your understanding of the

Page 68

1 charges being disposed of is what?
2    A    A DWI and a DUI.
3    Q    All right.  But what I mean is, what
4 happened with those charges in court?
5    A    They were all dropped.
6         MR. JAVIE:  Just give me a second; I'm
7 just thinking if there's anything else I want to ask
8 him.  I think that's it.  I don't have anything else.
9          EXAMINATION
10 BY MR. FREEMAN:
11   Q    Okay.  Just one follow-up, Mr. Birth.  How
12 old were you on the date of the incident, November
13 20th [sic] --
14   A    I was either 26 or just turned 27.
15   Q    So you were either 26 or 27 on the day of
16 the incident?
17   A    Yes.
18   Q    Who are the minors there?
19   A    Justin and Allison, the ones that I said
20 that were, like -- I knew since they were babies.
21 Like, I'm close to their family.
22   Q    How old was Justin --
23   A    Justin was 13 or 14.  And Allison was 17, I
24 think.
25   Q    And Rachel was how old?

Page 69

1    A    Twenty-ish.
2         MR. FREEMAN:  Okay.  I have nothing
3 further.  Thank you very much.
4         Okay.  Thank you very much, Madam Court
5 Reporter.  I would like a full version, and a
6 condensed version as well.
7         THE REPORTER:  Okay.
8         MR. JAVIE:  And I will do a condensed
9 version only, please.
10        THE REPORTER:  Okay.  Thank you.
11        Hearing no objections, we are now off
12 the record at 1:07 p.m.
13
14        (Whereupon, at 1:07 p.m., the
15        proceeding was concluded.)
16
17
18
19
20
21
22
23
24
25

Page 70

1      CERTIFICATE OF DEPOSITION OFFICER
2      I, JAHKARAH HAYNES-YOUNG, the officer before
3  whom the foregoing proceedings were taken, do hereby
4  certify that any witness(es) in the foregoing
5  proceedings, prior to testifying, were duly sworn;
6  that the proceedings were recorded by me and
7  thereafter reduced to typewriting by a qualified
8  transcriptionist; that said digital audio recording of
9  said proceedings are a true and accurate record to the
10 best of my knowledge, skills, and ability; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this was taken;
13 and, further, that I am not a relative or employee of
14 any counsel or attorney employed by the parties
15 hereto, nor financially or otherwise interested in the
16 outcome of this

17              JAHKARAH HAYNES-YOUNG
18         Notary Public in and for the
19              State of Michigan
20
21
22
23
24
25

Page 71

1        CERTIFICATE OF TRANSCRIBER
2      I, CHELSEE DELACRUZ, do hereby certify that
3  this transcript was prepared from the digital audio
4  recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to,
8  nor employed by any of the parties to the action in
9  which this was taken; and, further, that I am not a
10 relative or employee of any counsel or attorney
11 employed by the parties hereto, nor financially or
12 otherwise interested in the outcome of this action.
13
14
15              CHELSEE DELACRUZ
16
17
18
19
20
21
22
23
24
25

Page 72

1  Birth, Samuel v. Ray, Michelle Et Al
2  Samuel Birth (#6130496)
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Samuel  Birth            Date
25

Page 73

1  Birth, Samuel v. Ray, Michelle Et Al
2  Samuel Birth (#6130496)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Samuel  Birth, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Samuel  Birth            Date
13 *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

**[& - administered]** Page 1

| & | 2 | 4 |
|---|---|---|
| **&**  2:4 | **2,000**  61:10 | **4302**  12:12 |

**0**

**08102**  2:6
**08251**  1:17
**08330**  55:15
**08625**  2:17

**1**

**1**  4:8
**1-20**  1:9
**100**  29:5 34:18
  43:22 44:3,6
  50:11 64:25
**112**  2:16
**11:06**  1:15 4:5
**11:54**  36:25
**12**  49:4,20,23
**12:08**  37:3
**12:45**  63:11
**12:59**  63:14
**13**  29:21,22
  47:3 48:2
  68:23
**131**  10:5,18
  13:2
**13th**  55:15
**14**  29:20 68:23
**15**  29:20 42:5
**17**  57:25 68:23
**19**  63:19,24
**1:07**  69:12,14

**2**

**20**  4:8 42:5
  73:15
**2012**  13:18
**2013**  13:18
**2016**  15:24
**2017**  15:24
**2020**  13:5
  16:14 17:5,13
  31:9
**2022**  6:13
**2023**  1:14 4:9
  8:10
**20th**  68:13
**21st**  6:13
**22-5658**  1:8
**25**  2:15
**255**  14:6
**26**  14:13,25
  68:14,15
**27**  1:14 4:9
  8:10 68:14,15
**280**  49:16,18
**29**  40:2 47:6
**29541**  71:14

**3**

**300**  49:7,14,15
  49:18 61:12,12
**301**  2:5
**30234**  70:16
**36**  64:10
**376-2998**  2:19

**4**

**5**

**5**  3:3
**523**  2:5

**6**

**6**  13:5
**609**  2:19
**6101**  55:15
**6130496**  1:19
  72:2 73:2
**66**  3:4
**68**  3:5
**6th**  16:14 17:5
  17:13 31:9

**7**

**73**  50:13,14
**782-1007**  2:8

**8**

**856**  2:8

**9**

**9/20/94**  10:1

**a**

**a.m.**  1:15 4:5
  36:25
**ability**  8:11
  70:10 71:7
**able**  28:1 34:5
  34:8,12,17
  58:2 64:8
**above**  73:7

**absent**  4:14
**absolute**  67:11
**absolutely**  8:20
  13:9 17:7 63:2
  63:8 65:20
  66:5,8 67:1,16
**accommodate**
  8:5
**accurate**  34:8
  70:9 71:5
**accurately**  31:7
  31:11
**accused**  47:19
**acknowledge...**
  73:3
**acknowledg...**
  4:11
**action**  1:7
  70:12,16 71:8
  71:12
**activities**  47:6
**actual**  54:3,10
**actually**  26:3
  30:10 32:24
  34:17 45:17
  52:15 54:22
**additionally**
  4:14
**additions**  73:6
**address**  10:4,21
  12:8,10 13:3
**administer**
  4:11
**administered**
  34:20 35:6,8

38:24 41:16
**administering**
  37:9
**afraid**  16:25
**africa**  11:10
**ago**  14:5 31:2
  48:24 60:22
**agree**  4:12,16
  31:6,11
**ahead**  51:4
**al**  72:1 73:1
**alcoholic**  66:4
**alli**  28:19,21
**allison**  18:13
  18:22,25 19:10
  19:12 20:13
  25:3 28:23
  29:8 30:1,5
  33:16 57:24
  68:19,23
**allison's**  18:4,5
  18:9,18,18
  19:4,9,19,23
  20:1 30:6
  39:17 43:16,18
  43:19,25 44:17
  44:21 46:6,22
  49:1 50:7
  56:11
**allow**  7:25
  30:19
**allowed**  25:23
  49:20,22 57:22
**anguish**  58:11

**answer**  6:20
  7:18 8:7 38:3,5
  52:24 53:2,3,4
  61:16
**answering**  7:11
**answers**  6:21
**anxiety**  58:11
**anybody**  34:24
  43:6 64:4
**appearances**
  51:9
**appended**  73:7
**applicable**  4:20
**appreciate**
  36:21 65:20
**approached**
  27:1,5,25
**arcade**  14:10
  14:12 15:14,17
  15:21
**arrest**  17:4
  27:7,15 34:6
  35:11 39:1
**arrested**  17:6
  24:18 27:10
  30:8,14 31:20
  44:5 47:5,16
  52:5 56:15,25
  57:14,18
**arrive**  21:2
  23:19
**arrived**  18:2
  21:14 24:25
  28:3

**ashburner**
  12:12,13
**asked**  27:14
  42:14,16 45:10
  56:21 58:18
  67:4,7,8
**asking**  6:9,17
  7:12,13 42:19
  44:2,9,12,19
  48:16 52:21
**asserted**  61:22
**assessment**
  47:1
**assigned**  4:3
**associates**  2:4
**assume**  38:1
**assuming**  31:23
**asthma**  16:25
**atlantic**  10:14
  17:18
**attached**  39:17
  39:21 56:11
**attendance**  5:2
**attention**  58:14
**attorney**  2:13
  5:8,9 6:3,3
  7:21 8:18,22
  9:8,12 30:21
  51:14 55:23
  61:11 62:8
  70:14 71:10
**attorney's**
  55:20
**audio**  70:8 71:3

**aunt**  10:23
  11:19
**aunt's**  11:21
**authorized**
  4:10
**ave**  10:5,8
**avenue**  10:19
  12:8 13:2
**aware**  30:13,15
  63:24 64:3

**b**

**b**  3:7 9:19
**babies**  68:20
**back**  11:9,11
  15:17 23:16
  26:8 27:22
  28:10 30:2
  31:1,1 32:7,12
  32:23 33:1,5
  33:11,17 36:17
  36:19 37:2
  39:4,17,21
  41:7,18,25
  45:14 50:5,7
  52:3 53:17,23
  63:2,4,13
  66:16 67:6
**background**
  13:10
**bad**  16:25 51:1
  58:12
**bag**  65:12
**bakery**  16:2,2
**balance**  34:2,6
  34:9,13,17

**[balance - change]** Page 3

36:8,11
**balancing**
37:12 40:7,10
40:13
**balls** 37:20
**barracks** 50:6
50:9,10,15
62:1,7 67:7
**based** 28:17
46:25
**basically** 32:11
44:22
**bathroom**
48:18
**behalf** 2:2,10
**believe** 23:23
30:25 32:5,5
33:20 38:19,21
43:10,13 46:14
46:24 51:23
52:6 62:25
65:2
**best** 44:11,12
70:10 71:6
**better** 37:15
**birth** 1:5,13 2:2
4:6,7 5:4,4,6,10
5:13,16,25
9:16,23,25
12:5 14:2 37:5
38:5 53:21
55:18 63:16
65:18 66:3
68:11 72:1,2
72:24 73:1,2,4

73:12
**birth's** 63:20
63:22
**bit** 26:9
**black** 49:11
55:3 58:19
**blood** 11:16
19:10
**boardwalk**
14:10
**body** 30:15
31:6
**born** 9:23
**bought** 59:16
60:14
**box** 2:16
**break** 8:4,6,8
36:15
**breakout** 53:19
**breathalyzer**
41:8,9,10,16,19
42:10 52:2
53:25 67:6
**bring** 17:2 30:7
37:15
**brings** 13:4
16:13
**brother** 10:22
11:4,12,15
18:11,18 20:20
**brought** 35:22
**buena** 50:10
**bunch** 23:5
**burner** 12:14

**buy** 56:6 64:9

**c**

**c** 2:1 4:1 10:7
24:8 55:11,13
55:14
**called** 5:17 15:7
16:2 21:10
53:13
**camden** 1:3 2:6
**campground**
18:15
**cape** 10:15,16
10:17,17
**car** 20:15,18,19
23:15 24:23
25:15,22,23
26:4,7 29:12
40:24 45:8
49:4,6,9,19
50:8 55:22
56:8,16,17,22
56:23 57:3
58:20 61:12
64:7,16,19
66:13
**care** 51:6
**carl** 55:13
**cars** 20:1 22:23
26:17,20 27:23
**cartridge** 24:4
24:8,12,16,19
25:4 39:17,21
56:1,10 57:7
57:15

**cartridges** 56:7
**case** 6:15 32:18
50:19 53:12
54:6,8,9,10
55:20 62:11
**cases** 49:25
**cause** 26:15
**caused** 58:10
64:13 65:5
**caveat** 8:5
**cds** 59:7,10
67:22
**cease** 57:3
**cedardale** 10:5
10:8,19 12:7
13:2
**cell** 39:17,21
45:16 46:5,12
46:15,17,20
56:11
**certain** 64:24
**certainly** 36:18
**certificate** 70:1
71:1
**certification**
60:2
**certified** 4:17
**certify** 70:4
71:2
**chair** 42:4
45:15,19
**chairs** 42:1
**change** 72:4,7
72:10,13,16,19

**[changes - current]**

changes  73:6
charged  67:17
  67:19,20,22
charges  51:19
  52:16,19 53:6
  54:17 55:19
  68:1,4
check  19:24
  22:11 63:1
chelsee  71:2,15
cigarette  63:22
  63:25
civil  1:7
claim  61:14,19
clarify  44:10
clean  65:24
clear  52:12
  53:1
client  9:8
close  12:23
  15:17 18:14
  30:4,10 68:21
closed  22:5
closes  22:6
clumsy  36:11
  40:1,2,5
college  13:19
collings  17:22
  17:23 18:2
come  14:15
  32:17 36:19
  58:1 63:2,4
coming  7:24
command  59:8

committed
  47:14
companion
  63:22
companions
  63:25
complaint  6:13
  57:5 58:10
  63:19
complete  73:8
complex  2:14
concluded
  69:15
condensed  69:6
  69:8
conduct  6:4
  58:10
confirm  30:21
connection
  50:19
consent  56:19
  58:20
considered
  50:16
constitute  4:24
consumed  43:1
contact  31:8
contacted
  50:22
contain  59:7,10
  61:2
contained
  58:24 59:5
  60:23 61:5

continued
  53:12
control  34:3
controlled  54:2
  67:23
convenience
  63:23
conversation
  9:9
convicted  17:8
cooper  2:5
cooperation
  65:19
cop  26:16,20
  27:23 29:12,14
  29:16 44:22
  48:9,16,17
cops  26:10,17
  26:23 57:1
correct  12:25
  13:25 17:9,18
  18:10 19:1
  25:10 28:10
  33:6 37:6 39:8
  39:14 41:3
  54:9 57:15,20
  58:15 61:15,23
  61:24 62:4,5
  67:18 73:8
corrections
  73:6
correctly  15:13
  41:21 42:6
  53:18 57:9
  64:23 65:4

costs  61:22
could've  25:14
  29:18 57:25
counsel  70:11
  70:14 71:7,10
counselor
  62:25
count  16:11
county  10:14
  10:15,16,17
  17:18
couple  14:5,20
  31:1 36:8 53:7
  63:18
course  64:11
court  1:1 5:22
  6:23 24:6 45:5
  51:8 53:9
  54:20,21 55:14
  62:8,10,12
  68:4 69:4
courthouse
  62:20
cousin  10:23
  11:19,20
covid  16:25
  52:14
cpo  1:8
crime  17:9
  47:14
criminal  47:4,5
crllaw.com  2:7
cross  52:18
current  10:4

**[currently - education]**                                                    Page 5

| | | | |
|---|---|---|---|
| **currently** 14:7 | **delacruz** 71:2 | **discussing** | **drove** 20:17,21 |
| **d** | 71:15 | 64:15 | 33:8,10,14 |
| **d** 2:3 3:1 4:1 | **delivering** 16:5 | **dismiss** 54:5,17 | 50:7 58:3 |
| 9:18 10:7,7 | 16:5 | **dismissed** | **drug** 41:10 |
| 24:8 | **depicts** 48:13 | 51:22 52:16 | 42:10 47:18 |
| **dad** 12:22 | **deponent** 73:3 | 53:6 54:8 | 52:2 53:13 |
| **damages** 61:10 | **deposed** 6:5 | 55:19 62:11 | 58:24 |
| **dangerous** | **deposition** 1:12 | **disposed** 68:1 | **drugs** 35:1 |
| 67:23 | 4:6,22 6:4 8:15 | **distinctly** 54:13 | 37:25 38:7,13 |
| **dark** 21:19 | 24:9 30:20 | **district** 1:1,2 | 38:17 42:20,24 |
| **date** 1:14 9:25 | 53:4 70:1 | **divulge** 9:7 | 43:2 |
| 13:3 16:18 | **deputy** 2:13 5:7 | **doctor's** 14:6 | **dui** 35:11 49:25 |
| 17:5 45:5 | 6:2 | **document** 60:2 | 51:1 68:2 |
| 51:12 58:22,25 | **describe** 57:6 | 60:17,18 | **duly** 5:17 70:5 |
| 66:3 68:12 | **description** 3:8 | **documents** | **dwi** 35:12,14 |
| 72:24 73:12 | **destroyed** | 8:14 | 35:16,17,19 |
| **day** 25:15 49:5 | 64:13,13 | **doing** 36:9 | 68:2 |
| 49:20,23 50:20 | **details** 9:11 | 37:16 46:12 | **e** |
| 62:10 68:15 | 30:12 | 47:19 54:4,14 | **e** 2:1,1 3:1,7 4:1 |
| 73:15 | **detain** 27:7,11 | **drank** 66:4 | 4:1 9:17 10:7,7 |
| **deal** 36:15 | 27:12 | **drinking** 37:25 | 21:10 24:7,8 |
| 50:20 58:11 | **detained** 27:16 | 38:8,14 43:8 | 72:3,3,3 |
| **dealt** 51:6 | 27:19 | 43:11 47:10 | **eap** 1:8 |
| **decided** 19:20 | **determined** | **drive** 33:2,5,15 | **earlier** 6:23 |
| 19:24 | 59:9 | 33:16 57:22 | 23:17 25:16 |
| **declare** 73:4 | **device** 31:20,24 | 58:2,3 66:20 | 33:8 37:8 |
| **deemed** 73:6 | **different** 35:5 | **driven** 33:12 | 63:23 64:7 |
| **defend** 6:14 | 59:19 | **drives** 20:18 | **easiest** 48:25 |
| 50:23 | **digital** 70:8 | **driving** 16:10 | **easter** 14:15 |
| **defendant** 2:10 | 71:3 | 20:4,5,22 26:4 | **easy** 34:1 |
| 63:20 64:12 | **dinner** 18:8 | 35:13,21 57:18 | **economic** 61:9 |
| **defendants** | 19:18 | 57:19 67:18 | **edge** 26:15 |
| 1:10 | **discarded** 59:8 | **dropped** 51:19 | **education** |
| **definitely** 35:18 | **discussed** 9:11 | 68:5 | 13:11 |

[either - friends]                                                Page 6

**either** 7:5 16:19
  35:7 49:11
  65:6 68:14,15
**electronic**
  63:22,25
**embarrassing**
  47:15
**employed** 14:7
  70:11,14 71:8
  71:11
**employee** 70:13
  71:10
**employees**
  14:18,19
**employment**
  13:11 16:17
**empty** 57:6
  64:15
**encountered**
  39:11
**ends** 23:10
**enforcement**
  59:9 64:12
**entails** 14:17
**entire** 30:24
  31:7 47:6
**entrance** 50:13
**es** 70:4
**especially** 35:1
**esquire** 2:3,12
  55:14
**et** 72:1 73:1
**eventually**
  29:25 30:1

**evidence** 59:8
  64:14 65:12
**evidentiary**
  4:21
**exactly** 7:25
  13:18 21:18
  58:23
**examination**
  3:2 5:23 66:1
  68:9
**examined** 5:19
  52:18
**except** 19:10
**expenses** 55:19
**expert** 53:14
**extends** 23:1
**eye** 33:25 34:3
  34:5 35:2,25
  36:2,4 37:14
  37:16,16
**eyes** 35:2 36:10
  37:10,20 38:10

**f**

**face** 29:15 65:5
**fact** 37:19
**fainted** 48:7,8
**fair** 29:7
**familiar** 16:4
**family** 18:8,14
  30:4,10 68:21
**far** 19:23 52:13
**father** 11:1
**fees** 55:20
**feet** 34:1

**fellow** 64:12
**felt** 34:10,12
  47:7
**field** 32:24
  52:13
**figure** 18:24
**filed** 6:10,11,13
**financially**
  70:15 71:11
**fine** 33:24
  36:20 44:13
**finished** 7:12
  7:13
**first** 5:17 26:1
  26:2,4,21,22
  27:1,21,25
  29:1 30:25
  36:7 38:8
  39:12 53:9
  66:9
**five** 12:4 15:16
  19:16 22:1
  23:18 28:12
  34:21 35:7
  36:15,16
**flashlight** 37:14
**flashlights**
  22:24 23:20
  25:17 26:1,7
  28:9 66:13
**floor** 24:20
  25:9 64:16
**follow** 68:11
**following** 58:20

**follows** 5:19
**foot** 14:3 23:14
**foregoing** 70:3
  70:4 71:4 73:5
**form** 7:23 38:2
  39:9 56:19
**found** 31:21,24
  58:19 64:15
**four** 34:21 35:7
  53:11
**free** 32:14,14
  32:21
**freed** 32:13
**freeman** 2:12
  3:3,5 5:3,7,7,21
  5:24 6:2 24:6
  24:10 36:18,22
  37:4 38:4
  39:10 44:8
  45:1 52:11,21
  53:5 54:7,18
  54:24 55:2,5,7
  55:16,17 60:7
  60:10,16 61:20
  61:21 62:19,24
  63:4,7,15
  65:16,22 68:10
  69:2
**friedman** 2:4
**friend** 17:25
  18:4,14 19:4,5
  19:13,21 20:14
  26:3 33:17
**friends** 19:22
  47:16 56:5,7

**[front - holding]**

**front** 47:16 65:13

**full** 9:14 47:4 56:23 69:5

**fully** 22:22 29:13 42:18 49:12 60:6 64:17

**further** 65:17 65:18 69:3 70:13 71:9

**g**

**g** 4:1 21:10 24:7,8

**gateway** 14:13 14:25 15:18

**general** 2:13 5:8 6:3 56:8

**getting** 47:16 67:2

**ghost** 23:25 24:3,7,12,15,19 25:3,8 58:19 59:1,11,25 60:23 61:1,4

**give** 55:9,11 67:14 68:6

**given** 32:11 46:8 73:9

**go** 5:5 6:7 8:8 9:11 13:19 17:24 19:21,24 20:1 22:7 23:8 26:7,11 32:13 32:14,14,21

46:22 48:17 50:20 51:4,11 52:13 58:6,7 62:20

**goes** 22:25 23:9

**going** 7:10 9:10 10:20 14:15 19:20 27:17 31:20 33:2,5 33:11,12,13,15 33:16 35:10 40:6 62:8 65:24

**good** 4:2 5:25 6:1 7:18 34:11 36:22 40:8 47:21

**grabbed** 27:6

**graduate** 13:12 13:17

**grandfather** 8:25 9:9,12

**grandmother** 11:1

**grandparents** 10:22,25 12:21 17:3

**grandpop** 8:23 50:21

**granted** 52:20 54:6,16

**great** 34:6 36:21 58:11

**greatest** 36:11

**ground** 48:3,4 48:5,9,10,19

**growing** 18:15

**guard** 13:25

**guess** 11:15,15 45:25

**guessing** 28:2

**guy** 57:1

**guys** 41:19

**h**

**h** 3:7 9:19 11:24 12:14 24:7 72:3

**half** 11:15 15:4

**hamilton** 54:20 55:1,14

**hand** 5:14

**handcuffed** 29:8 39:2 42:1 42:3 45:19 46:2,17

**handcuffs** 27:6 27:9 28:20 29:9,22 30:2 31:15 32:1,3,6 32:8,9 39:3,4,7 40:23 41:23,25 42:3 45:22,23

**handled** 47:7 47:23,25

**hang** 21:21 32:17

**happened** 18:23 19:19 25:18 27:4

28:17 29:11,13 29:24 30:13 31:7,12 32:10 33:22 34:19 35:9 38:25 40:22,25 41:5 42:6 45:13 46:4 49:6 51:16 53:2 62:13 64:20 68:4

**haynes** 1:18 70:2,17

**hazy** 44:10

**head** 6:24 54:15

**headed** 66:12

**heading** 23:18 25:18 28:8

**hear** 7:22,23

**hearing** 5:11 69:11

**help** 14:20 42:25 51:7

**hereto** 70:15 71:11 73:7

**hesitate** 7:20

**high** 13:12,14 13:15 15:17 37:22,24 38:9 38:11,16 43:6

**highest** 34:24

**holding** 45:16 46:5,12,15,16 46:20

**holmesburg**
16:2
**home**  17:2 30:8
33:6,15 46:22
49:1 57:22
58:2,3,7
**honest**  33:3
34:11 44:6
47:15 56:14
**honestly**  11:8
**hopefully**  7:16
**horrible**  47:18
**horse**  49:11,11
55:4
**hospital**  15:9
**house**  18:4,5,9
19:19,23 20:1
33:17 47:21
**hughes**  2:14
**huh**  6:25
**hurt**  26:12

**i**

**identify**  5:2
**illegal**  58:24
59:7,21 60:24
61:2,5 66:6
**imagine**  14:16
**immediately**
21:23,25
**important**  7:8
**impound**  49:10
49:13
**incarcerated**
62:3

**incident**  6:10
13:3,4 16:13
17:12,14,17
59:3,15 60:1
62:3 66:3
68:12,16
**incorrect**  44:13
**indicated**  6:23
24:18 55:25
58:13
**indicates**  57:5
**indicating**
61:13
**influence**  35:14
35:21 37:25
38:7 43:11
44:24 47:10
57:19 67:18
**information**
13:11 40:8
**ingested**  66:6
**insane**  35:1
**instructions**
6:8
**intend**  33:4
**intended**  4:19
**interacting**
66:20,24
**interaction**
31:8 55:25
**interested**
70:15 71:12
**interfere**  8:11
**interrogate**
41:18

**interrogated**
42:7 45:11,13
45:18,21
**interrogating**
42:17
**interrogation**
45:21,24 46:4
46:12
**interrogatories**
58:18 60:19
**interrogatory**
59:24 60:11
**interrupted**
51:3
**intoxicated**
57:19
**intoxication**
67:20
**investigation**
27:16 64:11,14
**involved**  13:7
**ish**  14:6 21:16
69:1
**issue**  42:23
**issues**  42:23
47:18
**it'll**  7:16 36:16
**item**  65:11

**j**

**j**  18:20
**jack**  11:23
**jahkarah**  1:18
4:3 70:2,17
**jason**  2:3 5:9
6:4 9:1,3

**jason.javie**  2:7
**javi**  5:9
**javie**  2:3 3:4
5:9 6:4 7:22
36:14,20,23
38:2 39:9 44:8
44:16,19 52:10
52:23 53:7
54:9,19 55:1,3
55:6,9 60:7
61:18 62:15
63:2,6 65:16
65:22,23 66:2
68:6 69:8
**jersey**  1:2 6:11
6:14 10:11
15:19,21,23
55:15 59:2
60:1
**job**  1:19 6:14
34:11
**jobs**  16:8
**john**  1:9 4:8
6:12
**judge**  52:20
53:20,24 54:6
54:14,18,23
**justice**  2:14
**justin**  18:17,18
18:22,25 19:10
19:12 20:19,20
28:19,22 29:9
29:12,13 30:1
30:4 33:17
42:20,20 48:6

48:16 68:19,22
68:23
**justin's** 18:11
**juul** 56:5

**k**

**keep** 34:2,5,9
**kept** 29:14 34:5
**keys** 32:22 33:1
33:5 49:21,22
50:6
**kicked** 47:20
**kid** 29:22 47:3
48:2
**kids** 32:15,17
48:1
**kind** 31:21
47:15 54:2,14
58:14 61:14
**knew** 18:15
19:21 26:17
32:18 68:20
**know** 7:5,10,17
7:19,20 8:4,17
11:8 16:10
20:19 23:7
24:3,11,20
25:3,5,5,12
26:19,21 27:17
27:25 28:5,19
29:13,20,25
36:3,3 38:21
38:22 39:20
42:18,20 43:3
44:3,13 48:14
48:15 50:3,12

50:13,14,14,15
51:21 52:4,17
52:22 53:21,24
53:25 54:2,4
54:11,13,13,15
54:16 55:5
56:2,3,4,7,10
56:12,13 57:17
60:22
**knowledge**
70:10 71:6
**known** 67:23
**knows** 52:22

**l**

**l** 5:3,7 9:17
10:7,13,13
11:24 21:10
54:24 55:13
**labeled** 58:19
**lake** 17:22,23
17:25 18:1,3
19:1,3,22,24
20:1,2 21:5,6,8
21:12,22,24,25
22:2,10,12,18
22:22,23,25
23:19,22,25
24:15 25:1,18
28:8,13 29:3
66:10,11
**landing** 55:15
**late** 28:14
**law** 59:9 64:12
**law.njoag.gov**
2:18

**laws** 4:21
**lawsuit** 6:10,11
**lawyer** 50:22
50:22 51:1,7
**lazy** 33:25 35:2
35:25 37:10
**leads** 22:20
**leave** 16:23
**leaving** 43:16
**left** 19:25 34:3
58:5
**leg** 36:12
**legal** 13:8
**levin** 2:4
**license** 57:24
**life** 12:23 40:3
47:5,6,14,20
**lincoln** 13:15
**line** 72:4,7,10
72:13,16,19
**lines** 43:22 44:4
**listing** 52:17
53:9
**listings** 53:8,11
53:11
**litigation** 13:8
**little** 10:23
11:19,20 16:11
23:3 26:8 32:6
45:15,16 46:5
46:7 48:11
52:13
**live** 10:23,25
12:20,21 47:21

**lived** 10:18
**lives** 10:21,23
10:24 11:3,14
11:17 19:23
**located** 25:8
66:10
**location** 1:16
19:1
**long** 6:9 8:3
10:18 14:14
15:3,10 16:6
28:8 41:22
44:23 51:1
**look** 36:3 53:24
**looked** 34:16
**looking** 40:18
55:12 58:9,17
59:23 63:18
64:10
**loss** 61:14,19
**lot** 24:22 49:10
49:13
**lowest** 67:11
**lyft** 16:10

**m**

**m** 9:17,18 11:8
54:24,25,25
**madam** 5:22
24:6 69:4
**made** 43:13,25
44:1 54:11
73:5
**maintain** 34:12
34:17

**[make - new]** Page 10

| | | | n |
|---|---|---|---|
| **make** 9:7 10:2 26:9 51:5,8 52:11 53:1 55:12 | 68:3 **meaning** 63:21 67:13 **means** 4:23 **meant** 38:12 | **minutes** 28:12 36:17 42:5 63:3,4 **miranda** 41:2 **mistake** 43:13 | **n** 2:1 3:1 4:1 9:18 18:20 54:25 55:11,14 |
| **manager** 14:11 **managers** 14:21,23 | **medical** 58:14 61:22 | 44:1 **model** 20:6,7 **mom** 12:23 | **n.j.** 1:8 2:10 4:8 **name** 4:2 6:2 9:14,15,16,18 |
| **managing** 14:17,19 **mandated** 67:14 | **medications** 8:11 **mentioned** 19:21 | 30:6 43:16,18 43:19,25 44:21 46:6,22 49:1 50:7 | 9:18,21 11:5,9 11:22,23 14:12 18:20 19:6 55:7,10 |
| **manner** 4:22 **mariner** 20:8,9 20:11 24:20 25:10 | **mentioning** 37:19 **mercury** 20:5,7 20:11 24:20 25:9 | **money** 55:21 55:22,22 **months** 31:1 **morning** 4:2 | **named** 6:12 **names** 9:20 **narcotics** 66:6 **national** 13:24 |
| **marked** 3:9 **market** 2:15 **married** 12:5 12:25 13:1 | **met** 12:22 **michele** 1:8 2:10 4:7 6:12 54:19 | 5:25 6:1 33:16 58:5,7 **mother** 44:17 **motion** 52:20 | **necessary** 73:6 **need** 6:21 8:4 31:4 44:16 63:1 |
| **marvin** 2:12 5:3,7 6:2 36:14 **marvin.freem...** 2:18 | **michelle** 72:1 73:1 **michigan** 4:11 70:19 | 54:5,5,6,8,11 54:17 **move** 12:8 15:22 | **negative** 52:3 53:17,25 54:1 **neither** 70:11 71:7 |
| **material** 64:13 **matter** 4:7 51:12,21 | **middle** 9:17 **might've** 29:21 45:15 49:15 53:11 | **moved** 11:9,10 12:7 25:23 **movements** 62:2 | **never** 12:22 17:8 37:22 43:6 47:5,13 47:19 48:2 |
| **mays** 55:15 **mean** 11:20 20:6 24:22 25:14 29:20,23 31:1 34:10 37:24 40:20 47:12,20,24 48:1,24 50:25 56:20 60:4 | **military** 13:22 **mine** 47:16 **minor** 12:1 **minors** 68:18 **minute** 28:14 36:15 55:9 62:25 67:5 | **moving** 34:5 36:4 **municipal** 54:20,21 55:14 **mussa** 11:6 **must've** 60:5 60:14 | 50:23 52:17 58:13 **nevertheless** 67:17 **new** 1:2 6:11,14 10:11 15:18,21 15:22 20:18 55:15 59:2 |

**[new - own]**                                                        Page 11

| | | | |
|---|---|---|---|
| 60:1 | **oath**  6:18 37:6 | 9:23 10:18 | 44:2,10,15,18 |
| **night**  21:17 | 63:16 | 11:22 12:1,3,5 | 45:2,7,9,18 |
| 27:9 28:6 | **oaths**  4:11 | 12:7,10,15,19 | 46:1,16,19,23 |
| 29:17 30:14 | **object**  52:11 | 12:24 13:2,7 | 46:25 48:21 |
| 31:9,12 39:12 | **objecting**  7:25 | 13:17,19 14:4 | 49:1,9,17 50:2 |
| 43:12,25 44:5 | **objection**  4:14 | 14:7,16,22,25 | 50:5,17 51:8 |
| 49:3 56:8 | 7:22,23 38:2 | 15:5,10,14,22 | 51:11,16,21 |
| 59:12,17 60:5 | 39:9 60:7 | 15:25 16:6,8 | 52:4,21 54:18 |
| 60:14,15,18 | **objections**  5:12 | 16:13,22 17:1 | 55:2,6,16,24 |
| 63:24 64:1,8 | 69:11 | 17:4,11,20 | 56:24 57:3,11 |
| 65:1,3 | **observe**  24:15 | 18:2,7,9,13,17 | 57:17 58:9,13 |
| **nine**  10:3 | 24:24 | 18:22 19:7,12 | 59:23 60:22 |
| **nj**  1:17 2:6,17 | **observed**  63:21 | 19:16,18,25 | 61:13,20 62:14 |
| **nodding**  6:24 | **obviously**  17:8 | 20:9,14 21:2,9 | 62:20,22,24 |
| **nope**  17:10 | 26:22 30:3 | 21:14,21 22:9 | 63:1,16 64:6 |
| 67:21 | 32:18 42:22 | 22:18,25 23:8 | 64:10,20 65:2 |
| **northeast** | 45:4 50:24 | 23:12,17 24:14 | 65:8,11,16 |
| 12:16,17 | **occurred**  13:4 | 25:8,12,16 | 68:11 69:2,4,7 |
| **notary**  1:18 | 16:14 17:5,12 | 26:5,13,24 | 69:10 |
| 4:10 70:18 | 17:17 39:8 | 27:10,19,24 | **old**  10:2 29:22 |
| 73:13,19 | **offered**  67:13 | 28:3,16,24 | 47:3,6 48:2 |
| **noted**  73:7 | 67:14 | 29:1,7,7,11,24 | 68:12,22,25 |
| **notes**  63:1 | **office**  36:16 | 30:9,12,18 | **once**  22:21 26:9 |
| **notice**  26:14 | **officer**  46:24 | 31:3,6,14,17,22 | 30:6 37:14 |
| **noticed**  39:16 | 47:1 48:19 | 31:25 32:3,9 | **ones**  56:9 59:20 |
| 58:9 | 52:6,7 70:1,2 | 33:1,4,19,21 | 59:21 68:19 |
| **november**  13:5 | **officers**  64:13 | 34:19 35:3,4,8 | **opportunity** |
| 16:14 17:5,13 | **officially**  51:21 | 35:20,24 36:13 | 8:18 30:18,22 |
| 31:9 68:12 | **oh**  5:5 8:24 | 36:22 37:5,8 | **outcome**  70:16 |
| **number**  20:6 | 30:9 32:23 | 37:17 38:6,24 | 71:12 |
| 58:18 59:24 | 38:6 42:2 | 39:6,20 40:4 | **outside**  25:20 |
| **o** | **okay**  6:7,15,22 | 40:22,25 41:2 | **overall**  46:25 |
| **o**  4:1 9:18 24:7 | 7:2,3,6,7,14,15 | 41:5,9,12,14,15 | **own**  36:4 |
| 54:25 | 8:1,2,8,9,14,21 | 41:20 42:2,7 | |
| | 8:24 9:6,12,13 | 42:13 43:1,4,7 | |

[p - private]                                                                    Page 12

**p**

**p**  2:1,1 4:1 24:7
 55:11,14
**p.m.**  28:4 37:3
 49:4,20,23
 63:11,14 69:12
 69:14
**package**  24:19
 25:8 57:6,12
**packaging**
 58:19 63:21
 64:15,21
**page**  3:2,8 72:4
 72:7,10,13,16
 72:19
**paid**  49:14
 50:22 61:10
**pandemic**
 16:24 62:18
**paragraph**
 63:19,24 64:10
**parents**  12:19
 32:15,18,20
 47:17,17 58:1
**park**  15:7,18
 15:20 16:1
 17:17,21,23
 18:24 21:3,5,6
 21:11,15,21
 22:5,6,8,8
 23:22,24 24:25
 28:4 33:9,10
 33:12 35:6
 39:8,13 56:1
 57:23 65:1,3

**parked**  21:7,9
 21:10 22:8
 25:23
**parking**  15:8,8
**part**  12:15
 23:22 30:9
 40:7 47:11,11
**participate**
 8:12
**parties**  4:12,15
 70:12,14 71:8
 71:11
**parts**  37:13
**passed**  29:14
 48:10,20
**passenger**  25:9
**pay**  49:7 55:21
**paying**  50:25
 51:1
**pee**  48:16
**peed**  29:14 48:9
 48:18
**peeing**  48:19
**peering**  63:20
**pen**  24:1 59:5
**pending**  8:6
**pens**  61:1
**people**  24:23
 26:6,11
**percent**  29:6
 34:18 43:22
 44:6 50:11
 64:25
**perfectly**  7:18

**periodically**
 24:9
**permission**
 56:17,23
**permitted**  4:19
**personally**
 22:16 24:13,22
**ph**  11:6
**philadelphia**
 9:24 12:8,11
 12:15,16 13:16
 15:20 16:3,8
 16:12
**phone**  39:18,21
 56:11
**phrase**  54:3
**pick**  32:15,20
 49:22 58:1
**picked**  49:21
 50:17
**pike**  49:11,12
 55:4
**ping**  37:20
**place**  14:17,20
 15:7,8
**placed**  6:18
 28:16 34:6
 35:11 39:1,6
 46:5 65:12,12
**plaintiff**  1:6 2:2
 59:2,3,6,25
**players**  18:25
**playground**
 21:8

**please**  5:2,13
 69:9
**po**  2:16
**pockets**  32:12
**point**  31:14
 34:7 43:12
 44:10
**police**  17:13
 22:23 27:2
 30:2,7 32:7
 34:23,25 40:24
 49:21,22 50:5
 52:6,7 58:3
 62:1,7 66:14
 67:8
**pong**  37:20
**poorly**  47:2,4,8
 47:23
**position**  14:16
**possession**
 67:22
**possible**  29:18
**posted**  22:14
**preliminary**
 6:7
**preparation**
 8:15
**prepared**  71:3
**pretty**  16:25
 34:11 64:25
**prior**  13:8
 16:17 17:4,5
 70:5
**private**  22:13
 22:14,17 42:11

**privilege** 9:8
**privileged** 9:9
**probably** 29:19
  40:8
**problem** 63:6
**problems** 34:1
  36:12
**procedural**
  4:20
**procedurally**
  53:2
**proceed** 5:20
  8:1
**proceeding**
  1:16 4:4,18
  8:19 69:15
  71:4
**proceedings**
  8:12 70:3,5,6,9
  71:6
**produced** 4:17
**product** 58:21
  58:22,23,23,25
  59:1,4,5,7,10
  59:11,25 60:23
  61:1,4
**profana** 11:6
**property** 22:13
  22:15,17
**prosecutor**
  52:19 53:23
  54:11,22 55:8
**prosecutor's**
  54:8

**provide** 6:19
  7:1,13
**provided** 9:21
**public** 1:18
  67:20 70:18
  73:19
**pulled** 22:23
**purchase** 56:9
  58:21 59:11,12
  61:1
**purchased**
  25:13 56:2,12
  58:22,23 59:2
  59:4,6,14,25
  60:5,23 61:4
  63:23,25 64:4
**purposes** 45:23
**pursuing** 61:14
**put** 27:6,8,9,15
  27:20,22 28:19
  29:8,22 35:11
  39:3,4 40:22
  40:24 48:19
  65:5

**q**

**qualified** 70:7
**question** 6:20
  7:4,9,10,11,13
  7:14,23 8:6,7,7
  9:6 31:10 38:5
  43:3 52:25
  53:3 61:16
**questioned**
  42:12

**questions** 6:9
  6:17,20,21 7:1
  17:12 18:23
  42:13,16,19
  45:10 60:19,20
  63:18 65:17,18
**quick** 36:16
**quickly** 6:7
**quigley** 17:17
  21:10,11
**quite** 41:24

**r**

**r** 2:1 4:1 9:17
  9:18,19 10:7
  24:8,8 55:11
  55:13,14 72:3
  72:3
**r.j.** 2:14
**rachel** 17:25
  19:4,13,21
  20:17,20,22
  26:3,5,6 27:8,8
  32:14,21 33:14
  58:2 64:5,7,8
  66:12 68:25
**raise** 5:13
**random** 26:11
**rather** 9:10
  23:25
**ray** 1:8 2:10 4:7
  6:12 30:15
  37:9 39:25
  46:24 47:1
  53:15 63:20
  64:12,14 66:9

**66:19,23 72:1**
  73:1
**raymond** 9:16
**read** 41:2 73:5
**real** 36:16
**realize** 30:3
  37:13
**realized** 36:2,9
  66:14
**really** 19:5 23:4
  31:18 47:18,18
**reason** 33:14
  64:18 72:6,9
  72:12,15,18,21
**recall** 29:24
  37:17,19 39:24
  41:21 42:6,13
  42:16 44:14
  52:7,9 53:22
  55:10 60:19
  62:8 64:14,17
  65:8,10,11,13
**receive** 46:11
**receiving** 60:19
**recognition**
  53:14
**recollection**
  44:11,12,20
**record** 4:4,5,15
  5:2 6:24 9:15
  36:24 37:1,3
  52:12 63:11,12
  63:14 69:12
  70:9 71:5

**recorded** 4:22
70:6
**recorder** 30:16
**recording** 4:17
31:6 70:8 71:4
**reduced** 70:7
**referring** 24:8
65:8
**reflects** 31:7
**regard** 44:13
58:18
**regarding** 8:22
17:12
**regional** 54:21
**regular** 26:23
**related** 6:10
11:16 18:13
19:10 55:20
70:11 71:7
**relative** 70:13
71:10
**release** 31:17
**released** 31:16
31:25 45:3
46:6,19,21
51:18 55:19
61:25 62:7
**remember** 7:17
7:18,19 13:18
15:12,12,25
16:9 17:14
19:6,13,14
20:17,24 21:18
28:18 29:2
33:3 34:10,16

34:20 35:18,19
35:22,24 37:21
42:18 43:23
44:6,22 45:9
45:17 48:15,22
49:12 53:8,18
54:12,14 56:24
57:9,12 60:6
62:9 64:17,20
64:23 65:4
67:2,10
**remote** 1:16 4:9
**remotely** 4:13
**removed** 39:12
41:23 45:23
**rephrase** 7:5
**report** 22:12
53:14
**reported** 1:18
**reporter** 4:2,3
5:11,20,22
6:23 24:6
36:24 37:2
63:10,13 69:5
69:7,10
**representation**
53:6
**request** 41:13
**requested** 41:9
41:10
**required** 6:19
73:13
**reserve** 9:10
**reserves** 13:24

**resist** 7:12
**response** 7:1,14
37:17 59:1,23
**responses** 6:19
58:17
**restating** 60:11
**restricted** 62:1
62:2
**results** 51:25
53:16 54:1
67:10
**review** 8:14
**right** 5:14 14:3
16:22 19:1,3
21:8,19 22:4
22:22 23:20
26:8,10 28:3
29:7 33:9,21
36:17 46:3
48:18,23 49:15
50:11,12 51:6
54:25 55:3,18
58:7,8 62:24
66:17 67:15
68:3
**rights** 41:3
**road** 22:20,25
23:1,8
**room** 41:7,18
42:11 43:5
46:2 53:19
**rules** 4:21
**run** 51:2
**running** 14:17
14:20 66:25

**s**

**s** 2:1 3:7 4:1
9:17 10:13
11:8,8,24
12:14 18:20
24:7 72:3
**sam** 44:9
**samuel** 1:5,13
2:2 4:6,7 5:4,6
5:16 9:16 72:1
72:2,24 73:1,2
73:4,12
**sat** 45:14
**saw** 23:19
25:16 26:1,2,3
26:9,13,16
28:9 38:10
54:23 66:9,12
**saying** 6:25
18:17 34:13
35:20 38:8
40:15 44:4
47:9 54:7,13
54:16 60:17,18
61:9
**says** 22:12
59:14,24 63:19
64:11
**scared** 29:19,22
**scary** 50:24
**scene** 30:13
31:15 32:10
66:19,23
**school** 13:12,14
13:15,20 15:17

search  56:15,17
  56:19,22,22,23
  58:20
searched  25:22
  27:21 56:24
  57:2 64:19
searching
  27:22
seat  65:13
second  34:22
  35:3 53:10
  55:11 68:6
see  22:13,16
  24:13 25:6,21
  26:9 39:18
  48:21
seeing  57:12
seemed  32:21
  47:12
seen  11:10 25:6
  34:24 37:22
  39:23 43:6
sell  59:18,19,22
september  1:14
  4:9 6:13 8:10
series  6:9,17
served  13:22
seven  28:14
  58:7,18 59:24
several  14:23
severe  16:24
shaking  6:24
  54:14
she'd  37:22
  43:6

shining  22:24
  37:14
should've  48:2
show  18:1
  30:19 60:8,9
showed  48:16
  51:25
shows  31:11
  39:16
sic  20:20 68:13
side  25:9 50:13
sign  56:20
signature  70:16
  71:14
signed  56:19
  60:2,10,13,17
signs  22:13,16
silver  20:5,11
sir  9:15 14:1
  64:24
sit  67:4
situation  47:7
  47:13,22 50:21
  50:23,25
six  10:20,20
  12:4,4 14:3
  28:13
skills  70:10
  71:6
slept  49:3
sneak  30:11
snuck  30:5
  32:17 58:2
sobriety  32:25
  33:24

son  11:21,21
sorry  5:5 20:7
  25:25 28:25
  36:14 41:14
  51:3
sought  58:14
speak  7:9 8:21
spell  9:14 10:6
  11:7,9
spelled  9:17
spells  18:20
stand  59:10
  60:3
start  23:2,13
started  16:24
  37:14 44:5,24
starting  52:12
starts  23:7
state  1:8 2:10
  4:8 6:11,14
  7:25 9:14
  17:13 24:18
  26:19,21 50:5
  52:16 53:18
  57:9 58:20
  61:25 62:7
  70:19
state's  54:17
stated  23:17
  25:16
statement
  43:21
states  1:1
station  30:2,7
  32:7 34:23,25

39:7,13 41:1,6
  41:22,23 42:2
  46:9 49:22
  58:4
stay  9:8
stayed  58:4
stenographic
  4:23
steps  23:7
stipulate  61:18
stipulation
  4:24
stop  7:24 23:10
store  63:23
straight  22:22
street  2:5,15
  12:12 21:8,9
  21:12,22,24,25
  22:14 25:1
  28:8 50:14
  55:15
stuff  26:16
  31:21 32:11
  36:4,10 59:22
subscribed
  73:14
substance  54:2
  58:24 59:21
  67:23
substances
  60:24 61:2,5
suite  2:5
summons  46:8
  46:11,15,20,23

| | | | |
|---|---|---|---|
| **sure**  9:7 16:19 | **takes**  17:25 | **tests**  34:20 35:5 | 58:2 |
| 21:17 22:6 | **talk**  8:18 44:17 | 35:8 36:2,8,8 | **three**  15:14 |
| 25:5 26:9 29:6 | **talking**  7:24 9:2 | 40:10,13 | 20:15 28:11,12 |
| 50:11 51:5 | 9:3 32:13 60:8 | **thank**  5:11,21 | 48:24 53:10 |
| 52:12 53:1,7 | 60:9 | 63:7 65:19 | 58:4,5 60:6 |
| 55:12 61:16 | **tall**  14:2 | 69:3,4,10 | **threw**  57:10 |
| 64:25,25 | **tell**  5:18 8:1 | **thanks**  36:23 | 65:6 |
| **surprised** | 25:18 27:4,12 | **thing**  48:25 | **throw**  65:7 |
| 54:22 | 28:1 35:25 | 62:6 | **thrown**  48:2,4 |
| **suspect**  6:8 8:3 | 36:1,7,9 37:10 | **things**  25:24 | 48:4 64:22 |
| **suspicion**  35:13 | 37:11 38:14,16 | 65:23 | 65:1,2 |
| **suspicious** | 39:25 40:4,8 | **think**  10:15 | **ticket**  45:4,5 |
| 35:11 | 43:23 47:22 | 12:24 16:16 | **time**  1:15 5:1 |
| **swear**  4:12 | 49:24 | 20:14 23:17 | 7:9 16:16,20 |
| 5:12 | **telling**  37:21 | 27:8,11 29:4 | 19:25 20:18,25 |
| **sworn**  4:15 | **ten**  21:16 23:7 | 35:15 38:12 | 21:3,12,14,18 |
| 5:17 70:5 | 28:4 62:25 | 40:12,14,15,17 | 22:5,6 25:6 |
| 73:14 | 63:3,4 | 40:18 41:17,17 | 27:12,17,24 |
| **system**  51:20 | **tendency**  7:11 | 41:18,19 43:25 | 28:15 29:5,21 |
| 51:24 52:1 | **test**  32:25 | 44:24 47:1,2 | 31:7,14 32:8 |
| **t** | 33:24 34:4 | 47:22,25 53:8 | 32:16 38:7 |
| **t**  3:7 9:19 18:20 | 37:9,13 38:24 | 54:3,20 55:24 | 39:11,12 40:5 |
| 24:7,8 55:11 | 41:8,11,16,19 | 57:8 58:13 | 40:21 41:24 |
| 55:14 72:3,3 | 42:9,10,10 | 61:13 64:22,22 | 50:18 57:24 |
| **tackled**  48:8,10 | 51:25 52:3 | 66:15 68:8,24 | 58:25 60:4 |
| **take**  4:4,10 6:8 | 67:6,15 | **thinking**  68:7 | 62:3 65:19 |
| 8:3,6 15:16 | **tested**  40:7 | **thinks**  37:15 | 66:19,23 |
| 23:6 29:15,16 | **testified**  5:19 | **third**  14:15 | **times**  7:9,21 |
| 29:17 30:7 | 33:8 52:8 | **thought**  26:23 | **tobacco**  59:5,20 |
| 32:3 35:1 | **testify**  52:5 | 30:4 32:16 | 59:21 |
| 36:15,16 53:5 | **testifying**  70:5 | 35:15 38:9 | **today**  8:10,12 |
| 62:25 67:8,8 | **testimony** | 40:20,20 42:22 | 8:15 10:2 13:4 |
| **taken**  4:7 31:15 | 52:18,25 55:24 | 42:22,23 43:10 | 16:14 |
| 50:9 51:5 70:3 | 73:8 | 43:13 44:1 | **together**  22:2 |
| 70:12 71:9 | | 47:24 48:7 | |

| | | | |
|---|---|---|---|
| **told** 9:1,3,12 12:24 25:10 27:18 29:16 33:19,21,23,24 33:25 34:3,22 35:10 36:6,10 37:8,11 38:9 38:11 40:6,9 42:21 43:5,15 43:15,17,19 44:22 47:13 50:4 57:6,7,13 66:15 67:3 | **transcriptionist** 70:8 | **true** 22:5 70:9 71:5 73:8 | **understand** 4:16 7:4 11:17 28:7 37:5 52:24 54:15 |
| **took** 29:18 30:1 30:2 31:25 32:9,12 41:18 41:24 42:2,11 42:20 52:18 | **trash** 65:9 | **truth** 5:18,18 5:19 | **understanding** 17:17 22:4 67:25 |
| **total** 19:16 | **trashed** 25:15 | **truthful** 6:19 | **understood** 17:4 |
| **toward** 23:19 | **treated** 47:1,3 47:4 48:1 | **try** 7:12,16 56:21 | **unemployed** 16:16,21 |
| **towards** 66:12 | **tree** 23:10 | **trying** 18:24 | **uniform** 26:24 |
| **towed** 45:8 49:7,9,13 | **trees** 23:6,11 23:13 26:16 | **turned** 25:20 25:24 66:15 68:14 | **united** 1:1 |
| **towne** 15:7,18 15:20 16:1 | **trenton** 2:17 | **twenty** 10:3 69:1 | **urinalysis** 53:16,17 54:1 |
| **township** 54:20 | **trial** 51:10,11 51:17 52:8,15 52:16,25 54:10 | **two** 15:11,12 15:16 20:3,4 35:12 53:10 57:1 58:5 67:5 | **urine** 67:14 |
| **trade** 13:19 | **tried** 54:10 | **type** 20:7,24 | **used** 9:20 54:3 54:21 59:6 |
| **trail** 22:19,22 23:7,8,14,18 | **tripician** 55:10 55:13 | **typewriting** 70:7 | **uses** 4:19 |
| **trails** 23:9 | **trooper** 1:8 2:11 4:8 6:11 6:14 24:18 25:10 27:12,20 27:25 30:14,14 30:15 33:19 37:9,9 39:25 52:4,19 53:15 53:20 56:25,25 57:18 63:21 64:14 66:9,19 66:23 | | **using** 24:15 |
| **transcriber** 71:1 | | | **utilized** 58:25 |
| **transcript** 4:17 54:12 71:3,5 73:5,8 | **trooper's** 22:12 28:17 55:25 58:10 65:13 | | |

| **u** |
|---|

| **v** |
|---|

| | | | |
|---|---|---|---|
| | | **u** 9:17 11:8 18:20 21:10 | **v** 1:7 10:13 24:7 72:1 73:1 |
| | | **uh** 6:25,25,25 | **valet** 15:8 |
| | | **ultimately** 67:25 | **vape** 23:25 24:3,7,12,15,19 25:4,8 39:16 39:20 56:1,10 57:7,14 59:5 60:14 61:1 |
| | **troopers** 23:19 26:14,19,22 39:12 57:10 | **under** 4:20 6:18 27:15 34:6 35:11,13 35:21 37:6,25 38:7 39:1 43:11 44:24 57:19 63:16 67:18 | **vapes** 56:5 59:12,16 |
| | | | **vehicle** 20:4,16 20:17,21,24 |

**[vehicle - y]**                                                           Page 18

26:2 28:17
33:6,12 50:17
63:20 65:13
66:21,25 67:2
67:3,4
**vehicles**  21:2
21:23 25:17
**verbal**  6:21 7:1
**veritext**  4:4
**verno**  53:20
54:19
**version**  69:5,6
69:9
**vicinage**  1:3
**video**  30:24
31:11 34:16
39:16 48:12,13
48:14,15,15
**videoconfere...**
1:12 2:3,12
**villas**  1:17
10:11,12,14
**vineland**  19:24
**vista**  50:10
**voluntary**
53:16
**volunteered**
53:25
**vs**  4:7

**w**

**w**  11:24
**wage**  61:14,19
**wait**  7:12 32:15
52:10

**waited**  30:7
**waiting**  46:14
53:13,15
**walk**  22:19
24:25 28:14
**walked**  21:11
22:1 26:8,8,15
28:7 54:23
66:16,17
**walking**  23:18
**walmart**  15:2,3
15:5,15,18,20
16:19,20,21,22
16:23
**walsh**  11:23
**want**  7:24 8:17
11:16 13:10
15:4 16:10
17:2 18:23
20:13 21:16
26:11 27:5
28:5 29:4
30:12,21 32:24
32:24 35:15
36:19 43:23
49:10 50:25
52:10,11 53:2
53:3 56:21
60:9 68:7
**wanted**  18:1
22:11 25:21
27:11 33:23
36:3 51:5 53:1
58:1

**warrant**  56:22
**watch**  30:19,22
31:4,5
**watched**  30:23
30:24
**watching**  48:12
**wawa**  56:2,6,9
59:2,11,13,17
59:18,22 60:1
60:5,14,24
61:2 63:23
64:1,9
**way**  6:24 24:14
29:18 48:1
66:12
**ways**  51:6
**wearing**  30:15
**wednesday**
1:14 4:9
**weeks**  14:5
**weigh**  14:4
**weighed**  14:5
**welcome**  63:9
**went**  13:15
17:20 18:16
20:1 21:22,23
22:9,13 23:24
23:25 25:20
32:7 39:7,13
41:1,7 45:14
47:2 49:1 50:5
50:8 51:14,16
**white**  49:11
**wildwood**
14:10

**withdraw**  7:5
54:5
**withdrew**
52:19
**witness**  4:12,15
4:16 5:12,17
44:15,18,21
60:13 62:17
63:8 65:20
70:4
**woods**  17:24
21:7 22:1,19
22:21 23:3
25:21 26:8,18
66:17
**work**  7:17 14:9
14:10 15:10
33:15 58:6
**worked**  14:14
**working**  15:1,3
15:6 16:1,15
16:20 34:25
**works**  50:1
**would've**  25:23
42:24 53:14
55:13
**written**  4:24
45:4,5 60:20
**wrong**  53:9

**x**

**x**  3:1,7

**y**

**y**  9:18 21:10

**[yeah - zoom]**                                          Page 19

| | |
|---|---|
| **yeah**  10:13 | |
| 11:16 14:19 | |
| 18:11 20:10,22 | |
| 23:5,10 28:11 | |
| 28:15 31:16 | |
| 36:20 39:3 | |
| 40:11 42:9 | |
| 50:3 54:15 | |
| 55:1,6,12 | |
| 58:12 61:7 | |
| 65:23 66:17 | |
| **year**  13:17 | |
| 14:15 15:4,22 | |
| 16:7 29:22 | |
| 47:3 48:2 | |
| **years**  10:20 | |
| 11:10 15:11,12 | |
| 15:15,16,16 | |
| 34:24 40:2 | |
| 47:6 48:24 | |
| 60:6 | |
| **yelling**  29:15 | |
| **young**  1:18 4:3 | |
| 70:2,17 | |
| **younger**  10:22 | |
| 11:4 18:11 | |

**z**

**zero**  67:12,12
**zoom**  4:9 52:14
62:16,17,23

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit D



# The International Association of Chiefs of Police

*This is to certify that*

**Michelle Ray**

*has successfully completed all requirements
of the Drug Evaluation and Classification Program
and is hereby recognized as a*

# Drug Recognition Expert

**Presented on 8/1/2019**

**Vincent Talucci**
**Executive Director**
**International Association of Chiefs of Police**

**Kyle Clark**
**DEC Project Manager**
**International Association of Chiefs of Police**

CONFIDENTIAL

# Exhibit E

# In The Matter Of:

*SAMUEL BIRTH v.*
*TROOPER MICHELE STALLWORTH, et al.*

---

*TROOPER MICHELE STALLWORTH*
*September 29, 2023*

---



McDermott & Justice Reporting
215.805.8493
McDermottAndJustice@msn.com

*Min-U-Script® with Word Index*

Case 1:22-cv-05658-CPO-EAP   Document 25-3   Filed 12/19/23   Page 68 of 110 PageID: 202

SAMUEL BIRTH v.                                          TROOPER MICHELE STALLWORTH
TROOPER MICHELE STALLWORTH, et al.                                   September 29, 2023

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF NEW JERSEY
 3                  -  -  -
 4
   SAMUEL BIRTH,              :
 5        Plaintiff,         : NO.
                             : 1:22-cv-
 6        v.                 : 05658
                             :
 7   TROOPER MICHELE          :
     STALLWORTH, et al.,      :
 8        Defendants.        :
                  -  -  -  :
 9
             September 29, 2023
10
                  -  -  -
11
12        Remote oral deposition of
13   TROOPER MICHELE STALLWORTH taken pursuant
14   to notice, was conducted at the location
15   of the witness, beginning at 2:01 p.m.,
16   on the above date, before Benjamin
17   Pieczynski Jr., a Professional Reporter
18   and Notary Public.
19                  -  -  -
20
             McDERMOTT & JUSTICE REPORTING
21              701 E. Cathedral Road
                   Suite 45-136
22          Philadelphia, Pennsylvania 19128
                   (215) 805-8493
23           Mcdermottandjustice@msn.com
24
```

**Page 2**

```
 1   APPEARANCES:
 2
 3        FRIEDMAN & LEVIN ASSOCIATES
          BY:  JASON JAVIE, ESQUIRE
 4        1500 John F. Kennedy Boulevard
          Suite 900
 5        Philadelphia, Pennsylvania 19102
          (215) 563-7642
 6        jason.javie@crllaw.com
          Representing the Plaintiff
 7
 8        OFFICE OF THE ATTORNEY GENERAL
          BY:  MARVIN L. FREEMAN, ESQUIRE
 9        25 Market Street
          P.O. Box 112
10        Trenton, New Jersey 08625
          (609) 376-2998
11        marvin.freeman@law.njoag.gov
          Representing the Defendants
12
13
14
15                  -  -  -
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1                  -  -  -
 2               I-N-D-E-X
 3                  -  -  -
 4   Testimony of:  TROOPER MICHELE STALLWORTH
 5        By Mr. Javie           5
 6        By Mr. Freeman         79
 7
 8
 9
10
11                  -  -  -
12             E-X-H-I-B-I-T-S
13                  -  -  -
14   NO.       DESCRIPTION           PAGE
15   Exhibit-1  DRE Certification      79
16                  -  -  -
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1                  -  -  -
 2        DEPOSITION SUPPORT INDEX
 3                  -  -  -
 4
 5   DIRECTIONS NOT TO ANSWER:
 6   PAGES: None
 7
 8   REQUESTS FOR DOCUMENTS OR INFORMATION:
 9   PAGES: None
10
11   STIPULATIONS AND/OR STATEMENTS:
12   PAGES: None
13
14   MARKED QUESTIONS:
15   PAGES: None
16
17
18
19
20
21
22
23
24
```

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

Page 5

1           - - -
2           TROOPER MICHELE STALLWORTH,
3       after having been duly sworn, was
4       examined and testified as follows:
5           - - -
6           EXAMINATION
7           - - -
8  BY MR. JAVIE:
9       Q.   Trooper Stallworth, my name
10   is Jason Javie.  I represent an
11   individual by the name of Samuel Birth.
12           I think you -- do you know
13   who I'm talking about?
14       A.   Yes.
15       Q.   There was a lawsuit that was
16   filed against you, and it arises out of
17   an incident that occurred back in
18   November of 2021, I believe -- excuse
19   me -- November of -- give me one second,
20   I just want to be sure I have this right.
21           THE COURT REPORTER: I can't
22   hear.  One second.
23           - - -
24           (An interruption occurred.)

Page 6

1           - - -
2  BY MR. JAVIE:
3       Q.   So, I represent Mr. Birth in
4   connection with a lawsuit that what filed
5   against you.  It involves an incident
6   that happened back in November of 2020,
7   and I think you've already indicated that
8   you're familiar with the circumstance or
9   the situation?
10       A.   Correct.
11       Q.   Now, the -- before we get
12   into it -- and I know we had a little
13   technical difficulty there -- I was
14   asking you whether you've ever given a
15   deposition before, and I think you said
16   no?
17       A.   Correct.
18       Q.   So, I imagine that when you
19   talked to Mr. Freeman before, he went
20   over some of this stuff, but just a
21   couple of things, and I usually find that
22   it's not necessary when I'm dealing with
23   a police officer witness because you know
24   how to testify, you know, in court, you

Page 7

1   know the rules.
2           But obviously, we're going
3   to do verbal answers.  No uh-huhs,
4   uh-uhs, head shakes or gesticulations,
5   because the court reporter can't take it
6   down.
7       A.   Correct.
8       Q.   If at any time I ask you a
9   question that you think is confusing,
10   that you're not really sure what I'm
11   asking, I want to be as fair with you as
12   possible, just let me know, and I'll
13   either repeat it, rephrase it, whatever
14   we have to do.
15           Will you let me know if you
16   don't understand something I ask?
17       A.   Absolutely.
18       Q.   You can take a break at any
19   time, if you need to get a drink, speak
20   to your attorney, whatever the case may
21   be.  I would just ask that you answer
22   whatever the pending question is before
23   and then take as much time as you need.
24   I don't think we're going to be here

Page 8

1   terribly long.
2           Everything that I'm asking
3   is, really, from your personal knowledge,
4   unless I specify otherwise.  So I don't
5   want you to guess, I don't want you to
6   speculate.  If it comes to pass that
7   you're going to make an estimation or a
8   educated guess, just let me know you're
9   doing that.  But for the most part, I
10   just want to know what you know.
11           And then, finally, if at any
12   point in time as we're going through
13   this, you think of something that you
14   didn't know before, or you realize that
15   maybe you misspoke, you're free to revise
16   your answers, just let me know you want
17   to do it, and we can, you know, we can go
18   back to wherever we were, all right?
19       A.   Sounds good.
20       Q.   Any questions for me before
21   we begin?
22       A.   None.
23       Q.   So, Trooper Stallworth, I am
24   going to start by asking you how long

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

---

Page 9

1  you've been a law enforcement officer.
2      A.   Currently, I have been a
3  trooper for nine years and nine months --
4  ten months.
5      Q.   We're almost at the, almost
6  at the big ten, huh?
7      A.   Correct.
8      Q.   Prior to being a New Jersey
9  state trooper, were you working as a law
10 enforcement officer?
11     A.   I was not.
12     Q.   And I would imagine that in
13 order to become a trooper you had to
14 undergo some kind of education or some
15 kind of training with the police academy;
16 is that fair?
17     A.   Yes.
18     Q.   What kind of training did
19 you do?
20     A.   I attended a six-month
21 academy.
22     Q.   And what types of things did
23 you learn at the six-month academy?
24     A.   We took courses on how to

---

Page 10

1  speak to people, types of investigations
2  that will be performed, how to write
3  reports, case law, how to handcuff, how
4  to drive a law enforcement or police
5  vehicle, we call them troop cars, how to
6  utilize our service weapon, how to
7  perform swim or water rescues, defensive
8  tactics, physical qualifications as well,
9  and plenty of other things that I cannot
10 remember.
11     Q.   Fair enough.
12          Is -- do you receive ongoing
13 training?
14     A.   Yes.
15     Q.   I don't need to -- real
16 specific, but about how often are you
17 retrained?
18     A.   We are required to attend
19 inservice once a year.
20     Q.   And what's inservice?
21     A.   The subject of inservice
22 changes yearly.  And it's just once a
23 year when we perform our physical
24 qualification to maintain our physical

---

Page 11

1  fitness as well.
2      Q.   In the nine years and ten
3  months that you've been a trooper, have
4  you had different assignments, or have
5  you had the same assignment?
6      A.   Different assignments.
7      Q.   So, what I'd like to do is
8  I'd like to go through the different
9  assignments that you've had.
10          So if we can start off just
11 when you first got in, and you were first
12 hired, sworn in, what was your first
13 assignment?
14     A.   My first assignment was
15 Woodstown Station, located in Woodstown,
16 New Jersey.
17     Q.   Yes, ma'am.
18     A.   My second assignment was
19 Buena Vista Station in Buena Vista
20 Township.  From there, I was assigned to
21 the Atlantic City Expressway.  After
22 that, I returned to Buena Vista Station,
23 and then I went back to the Atlantic City
24 Expressway.  I went back to Buena Vista

---

Page 12

1  Station.  I went back to the Expressway.
2  I went back to Buena Vista Station for
3  the last time, and I have since been in
4  the selection process unit.
5      Q.   So, when you were working at
6  these stations, so when you were working
7  at station -- Woodstown Station, then
8  Buena Vista, you said?
9      A.   Buena Vista, yes.
10     Q.   Buena Vista.
11          Do you have a -- like, are
12 there certain roles that you have there,
13 or --
14     A.   Yes.
15     Q.   -- are you just a trooper?
16 I don't know how it works.
17     A.   As -- for those stations,
18 you're a general road trooper.
19     Q.   And what are the things that
20 a general road trooper does?
21     A.   We handle calls for service.
22 So that's your 911 calls, calls for aid,
23 either motor vehicle accident or at a
24 separate location.  We do proactive

---

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

Page 13

1  enforcement; that's traffic enforcement.
2  So, speed violations, or moving or
3  nonmoving violations.  Community service,
4  community policing we call it.  So you
5  are doing property checks at schools.
6  You have administrative responsibilities,
7  such as the firearms laws.  So those who
8  request a firearms ID card, it's done
9  through their local municipality.  So any
10  responsibilities that a local
11  municipality would have, and the state
12  police covers that area, that's those
13  responsibilities that we cover at those
14  stations.
15      Q.   And that's actually a great
16  segue into my next question, because what
17  I was going to ask was, in the areas that
18  you're working in Woodstown and Buena
19  Vista, these -- they do not have their
20  individual municipal police departments?
21      A.   Correct.
22      Q.   I see.
23           And then the AC Expressway,
24  is that more of an on-the-road job?

Page 14

1      A.   Yes.  That's more traffic
2  enforcement, or traffic-centric.
3      Q.   And I guess your, your busy
4  season just ended, right?
5      A.   For the expressway, yes.
6      Q.   Gotcha.
7           Okay.  And, now, you said
8  you're in the selection division?
9      A.   Selection processing unit.
10      Q.   Selection processing unit;
11  what is that?
12      A.   We have communication with
13  applicants trying to become troopers from
14  applicant inception.  So when they first
15  apply through the different phases to
16  them becoming a recruit in the academy.
17      Q.   Okay.  Is that a permanent
18  role, or is that -- are you, you just
19  kind of being phased in there?
20      A.   That -- I was transferred
21  here, and I put in for this position.  It
22  is currently permanent.  But if
23  operational needs change, then I can be
24  transferred.

Page 15

1      Q.   And where is the selection
2  processing unit located?
3      A.   We are based out of division
4  headquarters in west Trenton.
5      Q.   Okay.  And I don't want you
6  to tell me where you live, but do you
7  live in the state of New Jersey?
8      A.   Yes.
9      Q.   All right.  I want to talk a
10  little bit about this incident.  Like I
11  said, I don't think we're going to be
12  here very, very long, but I have some
13  questions for you, some things that I
14  want to clear up.
15           On this particular date, if
16  I am correct, and this would have been
17  November 7th of 2020, what was your tour
18  of duty?
19      A.   Can you clarify tour of
20  duty?
21      Q.   I'm sorry.  That's not a --
22  I guess that's not a good question.
23           On the -- so, you know the
24  date that we're talking about, when Mr.

Page 16

1  Birth was ultimately arrested --
2      A.   Yes.
3      Q.   -- and I guess it, it
4  started on -- did it start on the 6th and
5  went into the 7th?
6      A.   I do not --
7      Q.   Is that --
8      A.   I do not recall exactly what
9  time it started.
10      Q.   Okay.  But it, it did go
11  over, like, into a second day, correct?
12      A.   I would have to look at the
13  exact timestamps.
14      Q.   Okay.  The -- so, what was
15  your, your patrol that day, or what was,
16  what was it that you were supposed to be
17  doing that day?
18      A.   That night, I had a
19  probationary trooper with me.  We were,
20  at that time, patrolling Collings Lakes,
21  which is a neighborhood across the street
22  from the station.
23      Q.   How far is the, the station
24  from the -- this Quigley Park, where all

McDermott & Justice Reporting
215.805.8493

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

Page 17

1  this went down?
2      A.   Less than a mile.
3      Q.   Okay.  And were there any
4  specific calls or complaints that
5  evening, or was this simply proactive
6  policing?
7      A.   In regards to this incident?
8      Q.   Well --
9      A.   Or in the course of that
10 night?
11     Q.   Well, yeah.  So I don't
12 necessarily need to know the whole night,
13 but you were telling us that you were
14 patrolling in Collings Lakes
15 specifically.
16     A.   Yes.
17     Q.   Were you called to Collings
18 Lakes, or was this --
19     A.   We were not --
20     Q.   -- like I said --
21     A.   -- called to Collings Lakes.
22     Q.   So, proactive enforcement,
23 if you will?
24     A.   Correct.

Page 18

1      Q.   And my understanding of what
2  happened was you passed a parking lot --
3  now was this a public parking lot?
4      A.   It is a public parking lot.
5      Q.   And there were some vehicles
6  inside of the parking lot?
7      A.   Yes.
8      Q.   And, for whatever reason,
9  you decided to go check it out?
10     A.   Yes.
11     Q.   And when you get out of your
12 car, I imagine you -- do you run tags?
13     A.   We opened a job with our
14 dispatch using those tags, letting them
15 know that -- our location and what
16 vehicles we were with.
17     Q.   And when you say open a job,
18 what does opening a job mean?
19     A.   Calling into dispatch and
20 letting them know that we were performing
21 a property check at that location with
22 those vehicles.
23     Q.   And would it be fair to say
24 that, prior to your arrival, you hadn't

Page 19

1  seen those vehicles before that night?
2      A.   I had not.
3      Q.   And hadn't observed anybody
4  driving those vehicles that night?
5      A.   Correct.
6      Q.   And you get there, and
7  you're examining the vehicles, and at
8  some point in time, your eye is caught by
9  what you think could potentially be CDS,
10 correct?
11     A.   Correct.
12     Q.   And CDS, we mean controlled
13 dangerous substance, right?
14     A.   Correct.
15     Q.   Tell me what it was that you
16 saw.
17     A.   There was a small black box
18 with the words Ghost, or labeled Ghost,
19 on it, sitting on top of a mask, on top
20 of -- I called it a wristlet.  It's a
21 small wallet that females carry around
22 with a loop that they put around their
23 wrist.
24     Q.   And you were able to see

Page 20

1  that from outside of the vehicle just
2  shining a flashlight in it; am I correct?
3      A.   Yes.
4      Q.   When you saw that item, was
5  there anything about that item that
6  indicated it was CDS?
7      A.   My experience with that
8  specific label and seeing it in previous
9  jobs.
10     Q.   So, now -- and we'll back
11 up.
12          Because I know, at some
13 point in time, somebody got on a phone
14 and was Googling it, correct?
15     A.   Correct.
16     Q.   And I believe you might have
17 even used the words, you know, I would
18 need to take a closer look to make sure.
19          Does that sound about right?
20     A.   I don't recall saying that.
21     Q.   The -- well, you and I can
22 agree that even back when marijuana was
23 considered CDS in New Jersey --
24     A.   Mm-hmm.

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

Page 21

1    Q.   Well, actually, you know
2  what, strike that.
3         Is marijuana still
4  considered CDS?
5    A.   Is -- currently?
6    Q.   Yeah.
7    A.   No.
8    Q.   Okay.  I mean, there's --
9  are there limits to how much you have
10 can?
11   A.   Yes.
12   Q.   And if you go above those
13 limits, you can still be charged
14 criminally for possessing it.
15        Would that be fair?
16   A.   When not purchased or
17 obtained in the right ways.
18   Q.   Understood.
19        So, but back when this
20 happened, back in November of 2020,
21 marijuana was still CDS?
22   A.   Correct.
23   Q.   Now, you and I can agree
24 that, way back then, there were

Page 22

1  manufacturers of vape pens that were
2  putting tobacco or nicotine in those
3  pens, correct?
4    A.   There were.
5    Q.   And do you know whether or
6  not Ghost manufactured both tobacco vapes
7  and marijuana vapes?
8    A.   I do not know.
9    Q.   Do you think you knew back
10 then?
11   A.   No.
12   Q.   And we can agree that it
13 would have been completely legal to
14 possess a tobacco vape back in November
15 of 2020?
16   A.   Correct.
17   Q.   Okay.  Now, you've
18 identified that packaging in the car, and
19 do you remember if you were able to do
20 anything, either independently or with
21 your brother troopers, to confirm or
22 dispel your suspicion that it could be
23 CDS?
24   A.   Your -- repeat the question.

Page 23

1    Q.   Sure.  And if that was a bad
2  question, I apologize.
3         Do you recall, back on this
4  date, whether you did anything to either
5  confirm or dispel your suspicion that it
6  might be CDS?  Do you understand what I'm
7  asking you?
8    A.   Trooper Penlinni (ph)
9  Googled the Ghost THC pen, and what we
10 saw in his Google response --
11   Q.   Mm-hmm.
12   A.   -- or what populated in
13 Google, was what was sitting on the
14 floorboard of that car.
15   Q.   And so, if I understand
16 correctly, he specifically Googled Ghost
17 THC?
18   A.   I don't know what he
19 Googled.
20   Q.   All right.  So he, so he,
21 nevertheless, did some sort of a search
22 for Ghost?
23   A.   Correct.
24   Q.   And then something came up,

Page 24

1  and the packaging looked similar; is that
2  fair?
3    A.   Yes.
4    Q.   From where you were sitting,
5  and your vantage point, were you able to
6  see any indication on the package in the
7  car that it contained THC?
8    A.   Not to my knowledge.
9    Q.   Now, at this point in time,
10 the people who were in the woods come out
11 of the woods, correct?
12   A.   Correct.
13   Q.   And I just want to make sure
14 I understand.
15        The -- what area was -- is
16 private property?
17   A.   Where the cars were
18 parked --
19   Q.   Right.
20   A.   -- is a parking lot for the
21 park that is related to a school.
22   Q.   Okay.
23   A.   Where they walked out from
24 is privately owned.  It is what is called

Page 25

1 the pits. It is privately owned sand
2 dunes, quarries and forest area, and they
3 walked out of that area.
4     Q. Now, that particular area,
5 are there, like, residences there?
6     A. There are residences around.
7 But from where they walked out of, no.
8     Q. And it looks like woods.
9     Would that be fair?
10     A. Yes.
11     Q. And I guess there's a lake
12 or some sort of a body of water that you
13 can get to if you walk through the wooded
14 area?
15     A. There are multiple.
16     Q. And is any of that public
17 land, or is it all privately owned?
18     A. It's privately owned.
19     Q. On the night in question,
20 did you have anybody who I would call a,
21 quote-on-quote, complainant for a
22 trespassing charge?
23     A. No.
24     Q. So, there was nobody who was

Page 26

1 complaining about the kids being where
2 they were?
3     A. No.
4     Q. And nobody had called you to
5 specifically address people that were in
6 that area?
7     A. No.
8     Q. And from what you were able
9 to ascertain, was there anybody else, you
10 know, involved with the ownership of that
11 property there that night?
12     A. Not to my knowledge.
13     Q. Ultimately, nobody was
14 charged with trespassing or any kind of
15 property crime; is that fair?
16     A. Correct.
17     Q. And in fact, that night,
18 would you have even known who to list as
19 a complainant if you were to, to, to have
20 cited those kids for that?
21     A. Yes. That information is
22 held at the station.
23     Q. And I'm just curious, why is
24 that information in particular held at

Page 27

1 the station?
2     A. It is a known area where we
3 get trespassing complaints specifically
4 during the day, when there are bonfires
5 at night, and should there be an
6 emergency, like quad riders, dirt bike
7 riders, those who drown in the quarry, we
8 cannot access it, and we have to list the
9 owner on those reports.
10     Q. And so, that sounds to me
11 like, like sort of like a special need,
12 would that be fair, for that particular,
13 that particular property?
14     MR. FREEMAN: Object to the
15 form of the question.
16     You can answer, if you know,
17 trooper.
18     THE WITNESS: The -- what's
19 a special need? I need to -- you --
20 BY MR. JAVIE:
21     Q. Yeah. Like, I guess what
22 I'm saying is, would it be fair to say --
23 strike that.
24     Would it be fair to say that

Page 28

1 having that type of information for
2 property owners is atypical?
3     A. No. Because we have to deal
4 with that land quite often, due to
5 trespassers.
6     Q. I understand that land. But
7 I'm talking specifically the procedure
8 whereby you have, like, contact names and
9 numbers for, you know, different areas of
10 land.
11     A. So you're asking if that's
12 out of the norm?
13     Q. Well, let me ask it this
14 way.
15     You said there's houses that
16 are around this area, correct?
17     A. Correct.
18     Q. Do you have the names and
19 numbers of those people at the station?
20     A. If we have dealt with those
21 individuals, we have a records system, if
22 we were to take a report.
23     Q. Well, so, then, let's just
24 go back.

Page 29

1    Is that how you're accessing
2 the names and the numbers for the people
3 that own that quarry area?
4    A.   Yes.
5    Q.   You go into -- you just go
6 into your records, and you find the last
7 time that they were contacted?
8    A.   Correct.
9    Q.   Okay.  All right.  So I
10 think I, I think I understand what you're
11 saying.  So, let me just -- I just want
12 to clear this up, because I don't want
13 any confusion.  I want to make sure we're
14 all on the same page.
15    When I had asked you if you
16 had names and contact information for
17 complainants that night, if you had
18 decided to issue trespassing citations,
19 what you were expressing was that you
20 could have gotten it by going back and
21 looking through police records?
22    A.   Correct.
23    Q.   Now, it's come up, and at
24 any point, do any of the kids have either

Page 30

1 alcohol on their person or drugs on their
2 person?
3    A.   That we found out?  Or first
4 glance?
5    Q.   Well, I mean, why don't we
6 just do, for the entire night, you never
7 found any illegal alcohol on the kids?
8    A.   Correct.
9    Q.   You never found any illegal
10 drugs?
11    A.   Correct.
12    Q.   Nobody was ever charged with
13 either possessing alcohol or possessing
14 CDS?
15    A.   Correct.
16    Q.   And ultimately, as everybody
17 comes up, they're all -- is everybody put
18 in handcuffs?
19    A.   No.
20    Q.   Who, who was put in
21 handcuffs?
22    A.   The individuals who traveled
23 to that location in the vehicle that
24 contained the CDS, or suspected CDS.

Page 31

1    Q.   Okay.  And --
2    MR. JAVIE: Oops, I think we
3 lost the trooper.
4    - - -
5    (An interruption occurred.)
6    - - -
7 BY MR. JAVIE:
8    Q.   So, where we left off, I was
9 asking who was put in handcuffs, and the
10 answer was the people who traveled in the
11 car that contained the suspected CDS?
12    A.   Correct.
13    Q.   Now, I want to ask a general
14 question, because I want to make sure
15 that we're on the same page about this.
16    During this investigation,
17 would it be fair to say that there were
18 at least come concerns about the age of
19 Mr. Birth vis-a-vis the other, the other
20 children?
21    MR. FREEMAN: Objection as
22 to form.
23    You can answer.
24    THE WITNESS: Was I

Page 32

1 concerned, or was there a concern, is
2 what you're asking?
3 BY MR. JAVIE:
4    Q.   Yeah.
5    So, there's numerous times
6 throughout the body cam videos where
7 there's comments that are made about it
8 maybe being unusual that Mr. Birth, who's
9 26, is with some people who are a little
10 bit younger.
11    Was that ever something that
12 concerned you that night?  Or...
13    A.   It was in question.
14    Q.   And would it be fair to say
15 that you were able to dispel that
16 throughout your investigation?
17    A.   Dispel, meaning?
18    Q.   Well, you found out, for
19 example, that Mr. Birth and at least two
20 of the people that were there were very
21 close family friends?
22    A.   Yes.
23    Q.   That they had known each
24 other for a while?

Page 33

1      A.   Yes.
2      Q.   And I guess what I'm asking
3  you is, did that age difference in any
4  way affect what you did or didn't do that
5  night?
6      A.   No.
7      Q.   I'm sorry, you kind of went
8  out there; the answer's no?
9      A.   No.
10     Q.   Okay.
11     A.   The answer's no.
12     Q.   So that was not a concern.
13         Okay.  Now, when you were
14 talking to Mr. Birth throughout the
15 evening, was -- would it be fair to say
16 that he was cooperative with you?
17     A.   Yes.
18     Q.   He was polite?
19     A.   Yes.
20     Q.   And at what point in time
21 did you become concerned or suspicious
22 that he was under the influence?
23     A.   When he was performing his
24 sobriety test.

Page 34

1      Q.   All right.  So, now,
2  let's -- I guess we'll get to that, and
3  maybe we'll come back a little bit.
4         At some point in time,
5  you -- I mean, you did read him Miranda,
6  correct?
7      A.   Correct.
8      Q.   And did you consider him
9  under arrest at any point in time before
10 the field sobriety tests?
11     A.   He was detained.
12     Q.   Okay.  And after he was
13 detained, he gave you full permission to
14 search the car, right?
15     A.   Correct.
16     Q.   I think he even, at one
17 point in time, said, hey, there's a golf
18 bag in the back, make sure you check that
19 too?
20     A.   I don't recall.
21     Q.   Is that --
22     A.   I don't remember.
23     Q.   You don't recall that?
24     A.   Yeah.

Page 35

1      Q.   You conducted a search of
2  the car, fair?
3      A.   Trooper Penlinni (ph)
4  conducted the search.
5      Q.   There was nothing illegal
6  found in there?
7      A.   Correct.
8      Q.   And ultimately, the
9  packaging, it was determined that it was
10 not THC, correct?
11     A.   It was determined it was
12 empty.
13     Q.   Well, let me ask you a
14 question.
15         Did you -- what happened to
16 the packaging?
17     A.   It was transported back to
18 the station.
19     Q.   Okay.  And where, where is
20 that now?
21     A.   I do not know.
22     Q.   Well did -- was there any
23 investigation done to determine what --
24 you know, whether it was tobacco or

Page 36

1  whether it was THC?
2      A.   No.
3      Q.   And is there any reason for
4  that?
5      A.   Reasoning why it wasn't
6  investigated --
7      Q.   Yes.
8      A.   -- is what you're asking?
9      Q.   Mm-hmm.
10     A.   It wasn't relevant to the
11 DUI arrest.
12     Q.   And why wasn't it relevant
13 to the DUI arrest?
14     A.   Because it was empty.  It
15 was a box.
16     Q.   So now, ultimately, you
17 conduct a search, you don't find
18 anything, and did you personally examine
19 the packaging?
20     A.   I don't remember.
21     Q.   Well, let me ask you this.
22         Once you went into the car,
23 and you took it out, would that have been
24 something that you would have done,

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

Page 37

1  meaning look at it and see is it a THC
2  pen?
3      A.   I did not take it out of the
4  vehicle.
5      Q.   Did it -- so somebody did?
6      A.   Correct.
7      Q.   Do you know whether that
8  was -- anybody looked at it, right?
9          Did any of the troopers that
10 were there try to ascertain whether or
11 not it had THC?
12     A.   I do not know.  That's --
13     Q.   All right.  And after this,
14 you decide that Mr. Birth is free to
15 leave, correct?
16     A.   Yes.
17     Q.   And you told him as much,
18 correct?
19     A.   I told him I wanted him to
20 perform a sobriety test before leaving.
21     Q.   Okay.  And he, and he did
22 that, correct?
23     A.   Correct.
24     Q.   And he did that to your

Page 38

1  satisfaction?
2      A.   To my satisfaction, meaning
3  he completed it satisfactorily?
4      Q.   No, no, no, no.  We'll talk
5  about your interpretation of what
6  happened with the test.
7          But I just mean, like, he
8  complied, right --
9      A.   He performed --
10     Q.   -- like, you asked him to do
11 it, and he did it?
12     A.   He performed standardized
13 field sobriety test.
14     Q.   He told you that he had some
15 concerns about his being able to balance,
16 correct?
17     A.   Correct.
18     Q.   And he also told you that he
19 had some eye issues; is that fair?
20     A.   Correct.
21     Q.   And you conducted the --
22 these field sobriety tests, fair?
23     A.   Correct.
24     Q.   And you ultimately came to

Page 39

1  the opinion that -- or, were of the
2  opinion, rather, that he did not pass the
3  field sobriety tests?
4      A.   Correct.
5      Q.   Okay.  Now, at that point in
6  time, were you suspicious that he was
7  under the influence of alcohol, or were
8  you suspicious that he was under the
9  influence of CDS?
10     A.   I did not know, at the time.
11     Q.   And what specifically about
12 the test was not satisfactory?
13     A.   He -- well, would you like
14 me to break the test down in parts?
15     Q.   Yeah.  Yeah, absolutely.
16     A.   He had nystagmus at maximum
17 deviation.  He lacked smooth pursuit.  He
18 had nystagmus prior to 45 degrees.
19 During the walk and turn test, he failed
20 to touch heel to toe on all the steps, he
21 performed an improper turn, he left the
22 starting position.  For the one leg
23 stand, he placed his foot down on
24 numerous occasions.  And that led him to

Page 40

1  fail those tests.
2      Q.   All right.  So now, here we
3  are, he's failed the tests.
4          And at this point in time,
5  you place him under arrest; is that fair?
6      A.   Yes.
7      Q.   All right.  And you, you
8  charge him specifically with driving
9  while intoxicated, fair?
10     A.   Yes.
11     Q.   And at that point in time,
12 he was not in control of a vehicle?
13     A.   Correct.  I'm sorry, I
14 didn't know that was a question.
15     Q.   Yeah.
16          He wasn't operating a
17 vehicle?
18     A.   At that time, no.
19     Q.   He wasn't driving a vehicle?
20     A.   Correct.
21     Q.   And I want to be clear about
22 this, because I -- we had talked earlier
23 about you hadn't seen when anybody came.
24          So, at that point in time,

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

Page 41

1  even assuming that he was under the
2  influence of something, you had no
3  indication that he ever operated a
4  vehicle while he was under the influence;
5  is that fair?
6      A.   He admitted to driving
7  there.
8      Q.   Well, fair.
9           But we also know that he was
10  down on the -- down, down by the lake,
11  correct?
12      A.   Correct.
13      Q.   And, you know, for all you
14  knew, he could have consumed whatever it
15  was that you thought he was under the
16  influence of down at the lake.
17           Would that be fair?
18      MR. FREEMAN: Objection to
19  the form of the question.
20           You can answer, if you know,
21  trooper.
22      THE WITNESS: He did admit
23  that he had not consumed anything
24  there.

Page 42

1  BY MR. JAVIE:
2      Q.   But again, here's my, here's
3  my question.
4           He was denying the entire
5  time that he was under the influence of
6  drugs or alcohol; is that fair?
7      A.   Yes.
8      Q.   Okay.  And you asked him
9  several times whether or not he was under
10  the influence, fair?
11      A.   Yes.
12      Q.   All right.  Now, you then
13  determined, like I said, that you were
14  suspicious that he was under the
15  influence of, of, of either alcohol or
16  drugs?
17      A.   Correct.
18      Q.   All right.  But you, you
19  weren't able to, to -- I mean, like, you
20  couldn't say when he consumed anything,
21  correct?
22      A.   If he admitted that he had
23  consumed anything there, then,
24  reasonably, he would have to have

Page 43

1  consumed it in front of me, which he
2  didn't, or prior to driving there.
3      Q.   Okay.  So, what -- so, I
4  just want to understand -- so, what
5  you'll do in these situations is you'll
6  sort of truncate kind of things that
7  people say in order to, to, to, to, to,
8  to sort of reach your conclusions.
9           Is that, is that what I'm
10  getting here?
11      MR. FREEMAN: Objection to
12  the form of the question.
13           You can answer, trooper.
14      THE WITNESS: I need to --
15  is there a question?
16  BY MR. JAVIE:
17      Q.   Well, yeah.
18      A.   What's --
19      Q.   I guess what I'm getting at
20  is, on the one hand you're saying that
21  you don't believe what he's saying, that
22  he's not under the influence, right?
23      A.   Okay.
24      Q.   But then, on the other hand,

Page 44

1  you're saying, well, I believed him that
2  he didn't consume anything down by the
3  lake.
4           Is that, is that what I'm --
5  am I getting what you're saying?
6      A.   Mr. Birth was arrested based
7  off his performance of his sobriety
8  tests.
9      Q.   Right.  And I get that.
10           You didn't arrest him for
11  public intoxication, right?
12      A.   Correct.
13      Q.   You arrested him for driving
14  a vehicle --
15      A.   Intending --
16      Q.   -- while he was intoxicated?
17      A.   Intending to operate a
18  vehicle.  He admitted he was driving
19  away.
20      Q.   Okay.  And in fact, you told
21  him he could leave, correct?
22      A.   Once he performed
23  standardized field sobriety test,
24  correct.

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

Page 45

1    Q.   Okay.  And he never got into
2  a car?
3    A.   Correct.
4    Q.   He never turned on a car?
5    A.   Not in front of me.
6    Q.   And in fact, he didn't take
7  any steps to do that --
8    A.   Is that a question?
9    Q.   -- is that fair?
10    A.   Correct.
11    Q.   So when you're saying that
12  he intended to drive away, you actually
13  don't know that.
14    A.   He verbalized it.
15    Q.   Got it.
16      And so, based on that,
17  based -- and I just want to understand --
18  that's, that's the theory that we're
19  going with.
20      The theory we're going with
21  is he didn't pass his field sobriety
22  tests, and he had earlier -- earlier than
23  that, he had told you he wanted to drive,
24  he was going to leave, and based on that,

Page 46

1  that's why you arrested him for driving
2  under the influence?
3    A.   Correct.
4      MR. FREEMAN: I object to
5  the form of the question, counselor,
6  and I would really prefer if you just
7  asked direct questions rather than
8  prefacing it with comments.  She, she
9  didn't mention a theory she's dealing
10  with, or anything of that sort.  I
11  would appreciate just a direct
12  question of this witness.
13      MR. JAVIE: Well, with all
14  due respect, I get to ask why he was
15  arrested, and I get, and I get to
16  clear it up.  So if there's anything
17  else -- and I get to do that.  But let
18  me ask it again, let me see if I can
19  clear it up.
20  BY MR. JAVIE:
21    Q.   So, trooper, I want -- what
22  I want to know is why you arrested him
23  for driving while intoxicated.
24    A.   You need operation --

Page 47

1    Q.   Right.
2    A.   -- or intent to operate,
3  which I had.
4    Q.   Okay.
5    A.   He failed his standardized
6  field sobriety tests.  He was placed
7  under arrest for driving under the
8  influence.
9    Q.   Okay.  Even though -- and
10  so, you didn't have operation?
11    A.   I had intent to operate.
12    Q.   Great.  So let's focus on
13  intent to operate.
14    A.   Okay.
15    Q.   And your basis for that is
16  he said to you, I'm going to drive a car?
17    A.   Yes.  And the fact that he
18  wasn't going to stay there all night.
19    Q.   Now, after -- anything else?
20    A.   Both of the individuals in
21  his vehicle didn't have a license.
22    Q.   All right.  So -- well hold
23  on, we'll go through it.
24      So, the evidence of intent

Page 48

1  to operate was, he said, I'm going to
2  drive, the people in his car didn't have
3  a license, correct?
4    A.   That I know of.
5    Q.   And when you say he wasn't
6  going to stay there all night, what do
7  you mean by that?
8    A.   Those vehicles needed to be
9  removed from that park.  That park closes
10  at night.
11    Q.   Okay.  So, because his,
12  because his vehicle couldn't stay there,
13  that's -- you're, you're saying that
14  that's evidence of his intent to drive
15  away?
16    A.   He stated he was going to
17  drive home.
18    Q.   Okay.  Well -- and again,
19  I'm just, I'm just trying to clarify all
20  the things we're talking about.
21      So, he states, I'm going to
22  drive home, he can't stay there all
23  night, and nobody else had a driver's
24  license that you knew of.

Page 49

1   Anything else?
2   A.   It was his vehicle, or he
3   stated it was his vehicle.
4   Q.   It was his vehicle.
5   Anything else?
6   A.   No.
7   Q.   All right.  So I just want
8   to summarize, make sure I'm clear.
9   His intent to operate was
10  ascertained by him saying, at some point,
11  I'm going to drive, the fact that it was
12  his vehicle, the fact that the vehicle
13  couldn't stay there that night, and the
14  fact that nobody else had a driver's
15  license that you knew of?
16  MR. FREEMAN: Counselor, I,
17  again, object to the form of the
18  question.  You said, at some point, he
19  was going to drive.  That is not what
20  she said.
21  MR. JAVIE: Well let's
22  clarify it, then.  This doesn't have
23  to be -- I mean, it really is not --
24  it's not a trick.  But --

Page 50

1   MR. FREEMAN: I understand
2   what you're saying.  But, you know,
3   you're putting words in, you're
4   saying, at some point.  Well, at some
5   point could mean any time.  This
6   trooper was talking about a --
7   MR. JAVIE: No, no, no.
8   MR. FREEMAN: -- specific --
9   MR. JAVIE: No, no.  We're
10  not -- no, no, no, we're not, we're
11  not coaching witnesses here.
12  MR. FREEMAN: I'm not
13  coaching.  I'm just, just -- I just
14  don't want you to add things into
15  your -- into the responses that this
16  trooper did not say, that's all.
17  BY MR. JAVIE:
18  Q.   Trooper Stallworth, when did
19  he tell you he was going to drive?
20  A.   During the course of our
21  contact.
22  Q.   Right.
23  And how long was that
24  contact?

Page 51

1   A.   I do not know.
2   Q.   Okay.  So you don't remember
3   when he said that?
4   A.   Not a specific time, I do
5   not.
6   Q.   Okay.
7   MR. JAVIE: So, Mr. Freeman,
8   I'm now going to re-ask my question.
9   BY MR. JAVIE:
10  Q.   The following is what you
11  are pointing to as evidence of intent; at
12  some point during the investigation, he
13  said, I'm going to drive, no one else had
14  licenses that were in his car, the
15  vehicle couldn't stay there overnight,
16  and it was his vehicle.
17  Am I missing anything, or is
18  that it?
19  A.   That's it.
20  Q.   Okay.  Now, after you take
21  him into custody, and you bring him back
22  to the station, you tell him that he's
23  going to take this -- the alco test,
24  correct?

Page 52

1   A.   Correct.
2   Q.   And alco tests are mandatory
3   in New Jersey when you have a reason to
4   believe that somebody was driving a car
5   and under the influence; is that fair?
6   A.   Correct.
7   Q.   And he complied with your
8   directives.
9   Would that be fair?
10  A.   Yes.
11  Q.   And ultimately, what was the
12  result of the Breathalyzer?
13  A.   Zero percent blood alcohol
14  content.
15  Q.   And thereafter -- and I --
16  because I don't know, I actually was
17  trying to look this up -- are you able,
18  as a trooper, to ask him to take another
19  chemical test after he passes the breath
20  test?
21  A.   We don't have another
22  chemical test.
23  Q.   Well, ultimately, he gave
24  urine, correct?

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

Page 53

1    A.   Yes.
2    Q.   So that's, that's what I'm
3  talking about.
4    A.   That is the final step of
5  the drug recognition evaluation.
6    Q.   And so I guess what I'm,
7  what I'm trying to get to is, that kind
8  of, like, a mandatory -- in the way that
9  the alco, alco test is mandatory.
10       Do you understand what I'm
11  saying?
12    A.   Mandatory for him?
13    Q.   Yeah.
14       Like, I mean, you and I, we
15  know that if somebody refuses an alco
16  test, that's like a whole nother charge,
17  right --
18    A.   Right.
19    Q.   -- it's a refusal charge?
20    A.   Correct.
21    Q.   If he had said to you, I am
22  not giving you urine, would that have
23  been a refusal charge?
24    A.   No.

Page 54

1    Q.   Why not?
2    A.   I don't know why.  But urine
3  is not a mandatory bodily fluid in the
4  state of New Jersey.
5    Q.   Was there any other kind of
6  mandatory bodily fluid that you could
7  have asked for?
8    A.   No.
9    Q.   So, even though it wasn't
10  mandated, he agreed and allowed you to
11  take his urine?
12    A.   Yes.
13    Q.   All right.  And ultimately,
14  do you know what the, what the results of
15  that test were?
16    A.   Yes.
17    Q.   All right.  And what were --
18  what was that?
19    A.   No impairing drugs.
20    Q.   Got it.
21       Now, I want to talk about
22  the DRE.  You had mentioned that.  And I
23  will actually mark this as Exhibit-1.
24       So, are you able to see what

Page 55

1  I just pulled up?
2    A.   Yes.
3    Q.   All right.  So, the
4  information here, this is your, I guess,
5  certification or your certificate as
6  being a drug recognition expert?
7    A.   Correct.
8    Q.   Is this program still used
9  in New Jersey?
10    A.   Yes.
11    Q.   And are you still so
12  certified?
13    A.   No.
14    Q.   Why are you not certified
15  anymore?
16    A.   I was transferred to the
17  selection process unit, and I don't
18  enforce traffic laws.
19    Q.   So -- well, like, is this
20  something that you have to do, like you
21  have to stay up on it, or is it --
22    A.   Yes.
23    Q.   When you became certified as
24  a drug recognition expert, do you have

Page 56

1  stats, or do you have percentages of when
2  you're right and when you're wrong?
3    A.   You have a rolling log.
4    Q.   And how does the, how does
5  the rolling -- how do you keep the
6  rolling log?  Explain that to me.
7    A.   That is, I believe, kept in
8  a program that the drug recognition
9  experts have access to.
10    Q.   And do you -- is it
11  something that you fill out every day?
12  Every week?  Every month?
13    A.   When you are using your
14  certification, it's something that you
15  would keep track of when performing those
16  evaluations.
17    Q.   So, how often would you make
18  the log?
19    A.   You would make edits to it
20  anytime you performed an evaluation.
21    Q.   So now, in this particular
22  situation, we, you know, we have this
23  evaluation that you created in this case;
24  is that fair?

Page 57

1   A.   Yes.
2   Q.   All right.  And ultimately,
3  you gave an opinion -- one second -- that
4  the -- and then now I'm referring to Page
5  6 of 6 -- you gave an opinion that he was
6  under the influence of cannabis and is
7  unable to operate a vehicle safely.
8       And I want to -- I want you
9  to explain to me how you arrived at that
10 opinion.
11  A.   Yes.  Prior to providing
12 your opinion, you go through 11 other
13 steps, or ten other steps --
14  Q.   Mm-hmm.
15  A.   -- collecting signs and
16 symptoms from the individual.
17  Q.   Okay.
18  A.   From balance tests to
19 observations on scene, vital signs,
20 muscle tone, all listed in the prior
21 pages to this, and the -- everything that
22 you collect, you make a determination
23 based off of a drug matrix and what signs
24 and symptoms are associated with that

Page 58

1  drug use.
2   Q.   And how long is the course
3  that you took to do this DRE analysis?
4   A.   It is -- it was about two
5  weeks in the classroom, along with, I
6  believe, 40 or 60 -- 40 to 60 hours of
7  hands-on evaluations in the field, field
8  training.
9   Q.   So let -- and so let's -- I
10 want to break it down.
11      So two weeks in the
12 classroom.
13      Like, what are you doing in
14 the classroom?  Is it -- how -- let's
15 start with that -- what do you do in the
16 classroom?
17  A.   Tests, essays, quizzes.  You
18 are studying those drugs, how they affect
19 the human body.  You are learning how to
20 take vital signs.  You are learning about
21 how to evaluate eyes.  You are performing
22 and practicing those -- divided attention
23 tests, yeah.
24  Q.   Okay.  And who teaches it?

Page 59

1   A.   That is put on by the -- oh,
2  I don't know the official name of the
3  unit, but that would be our alcohol and
4  drug testing unit.
5   Q.   All right.  And like, do
6  they bring in -- I mean, do they bring
7  people in?  Are you being trained by
8  other troopers?  How does it, how does
9  it --
10  A.   Both.
11  Q.   -- work?
12  A.   Both.  There are troopers
13 that are trained as instructors who are
14 AICP certified.  There are municipal law
15 enforcement officers who are also
16 trained and have extensive, I guess,
17 certifications or training to be an
18 instructor.
19  Q.   All right.  And now let's go
20 to the 40 or 60 hours.
21      When you -- when you're
22 doing the 40 to 60 hours in the, in the
23 field, like, is that literally just 40
24 hours of looking at people and evaluating

Page 60

1  people and trying to figure out what
2  their -- what substance they're under the
3  influence?
4   A.   Yes.  It was broken up into
5  a few days where individuals from,
6  specifically Camden, New Jersey,
7  volunteered to be test subjects.  They
8  were under the influence of various
9  drugs, and they are put through
10 evaluations by those in the class.  As a
11 person in the class, you have to do at
12 least 12, or be a part of 12 evaluations,
13 six of which you are personally the
14 hands-on evaluator.
15  Q.   Now, when you keep your log,
16 is -- does the percentage change, like,
17 every -- like, like, do you have a --
18 strike that.
19      Are you able to know, at any
20 point in time when looking at your log,
21 what your, your percentage rate was?
22  A.   Percentage rate for what?
23  Q.   Well, in other words, is
24 there -- are there any kind of threshold

Page 61

1  benchmarks that you have to meet in order
2  to be certified?
3      A.   During training?
4      Q.   Yeah.
5      A.   During training, I had to
6  determine -- I had to be 75 percent
7  correct during training in order to
8  become certified.
9      Q.   And then throughout being
10 certified, do they continue to monitor --
11     A.   You have to --
12     Q.   -- your percentage rate?
13     A.   You have to do eight hours
14 of training a year and then perform --
15 or, every two years, you get recertified.
16 You need to do eight hours of continued
17 training, and it's four evaluations, and
18 one of which has to be in front of an
19 instructor.
20     Q.   So, if I'm understanding
21 what you're saying, your performance in
22 the field is not constantly monitored?
23     A.   By my instructors?
24     Q.   Or by anybody.

Page 62

1          Meaning that -- like, it's
2  not -- and we'll just -- let me see if I
3  can explain this, because I'm starting --
4  I don't want to confuse you and make this
5  sort of more complicated than I want it
6  to be.  We'll take you out of it.
7          Let's say, I wanted to go to
8  the Buena Vista station today, and walk
9  in, and I wanted to find out for any
10 particular trooper what their percentage
11 rate is in the field, is that information
12 that's available?
13     A.   Honestly, I don't know.
14     Q.   So, like, in this particular
15 situation, we have, you know, this report
16 that you prepared, where you gave an
17 opinion that he was under the influence
18 of cannabis, right?
19     A.   Correct.
20     Q.   After it was determined that
21 he was not, indeed, under the influence
22 of -- excuse me -- cannabis, was there
23 any notations made in your file, or
24 anything like that, in order to record

Page 63

1  the fact that, in this particular
2  instance, you know, your, your evaluation
3  was not correct?
4      A.   Yes.  That is logged, I
5  guess, on your personal rolling log.
6      Q.   Okay.  And then is that
7  personal rolling log something that you
8  are -- it's constantly updated?
9      A.   When you're performing
10 evaluations, yes.
11     Q.   And do you remember what
12 your percentage was, average percentage?
13     A.   No.
14     Q.   Is that information still
15 available?
16     A.   I don't know.
17     Q.   And was it ever something
18 that you looked into?
19     A.   No.
20     Q.   Do you know how that data is
21 used, if at all, by the state police?
22     A.   I don't know.
23     Q.   And were you ever
24 recertified, or did you only do one --

Page 64

1  did the initial certification?
2      A.   Never recertified.
3      Q.   And when were you -- well, I
4  guess I have the answer here.
5          All right.  So, you were
6  certified on or about August 1st of 2019?
7      A.   Yes.
8      Q.   And then that lasts for, how
9  long?
10     A.   Two years.
11     Q.   So that would have lasted
12 until August 1st of '21?
13     A.   Correct.
14     Q.   Now where were you working
15 August 1st of '21?
16     A.   Technically, I was off duty.
17     Q.   I don't want to get
18 personal, but was that -- I mean --
19     A.   I was on maternity leave.
20     Q.   Okay.
21     A.   I was on maternity leave at
22 that time.
23     Q.   Okay.  I understand.  That's
24 what I -- I didn't want to -- you know, I

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

Page 65

1  don't want to --
2      A.  I understand.
3      Q.  Yeah.  I don't want to
4  invade your privacy.  But
5  congratulations, as an aside.
6          So, when did you, when did
7  you come back to work?
8      A.  October of 2021.
9      Q.  And when you came back in
10 October of 2021, where were you
11 stationed?
12     A.  The selection process unit.
13     Q.  So, when you came back from
14 taking leave, you went right to selection
15 process?
16     A.  I was at selection process
17 prior to taking leave as well.
18     Q.  Okay.  When did you go to
19 selection process?  I'm sorry, I should
20 have asked that.
21     A.  February of 2021.
22     Q.  Okay.  I'm going to check my
23 notes here.  Just give me a minute.
24         MR. JAVIE: As a matter of

Page 66

1      fact, why don't we, why don't we take
2      five minutes.
3          MR. FREEMAN: Okay.
4              - - -
5      (A recess occurred.)
6              - - -
7  BY MR. JAVIE:
8      Q.  A couple of areas I just
9  want to touch on and, and get some
10 clarification.
11         I want to go back to the DRE
12 evaluation.
13         And was the -- what, what
14 specifically was it that led you to
15 believe cannabis as opposed to anything
16 else?
17     A.  Totality of everything put
18 together.  So, everything from the eye
19 exam, to his lack of coordination, to the
20 vital signs, using the drug matrix.
21     Q.  Okay.  And so, like, for --
22 just, for example, you would expect
23 different, different vital signs and --
24 if it was oxycodone, for example, or

Page 67

1  something like that?
2      A.  Correct.
3      Q.  Okay.  The -- there was
4  testimony in the case that when Sam was
5  picked up, that you had made a statement
6  to the effect that he might not be
7  intoxicated.
8          Do you have any recollection
9  of that?
10     A.  I do not.
11     Q.  Do you recall having a
12 conversation with the woman who picked
13 him up?
14     A.  Yes.
15     Q.  And do you, do you recall
16 what the substance of that conversation
17 was?
18     A.  Apologizing to her for
19 having to come out in the middle of the
20 night.
21     Q.  Mm-hmm.
22     A.  We spoke about her
23 relationship with Mr. Birth.  She
24 informed me that he lives with his

Page 68

1  grandfather.  And she asked me about how
2  to retrieve the vehicle, I recall.
3      Q.  Okay.
4      A.  Anything else, I'm not too
5  sure on.
6      Q.  One of the things that we
7  had talked about was the box for the vape
8  pen, and you said that you thought it was
9  taken back to the station; is that right?
10     A.  Yes.
11     Q.  So, what -- where would that
12 be indicated, or how would that be
13 logged?
14     A.  It was not logged.
15     Q.  All right.  So -- and again,
16 the reason I'm asking this is because I
17 didn't anything about this in the
18 discovery or in any of the paperwork.
19         So you bring this back, it's
20 evidence in the case; what's done with
21 it?
22     A.  It was --
23         MR. FREEMAN: Objection to
24     the form of the question.

Page 69

1    You can answer.
2    THE WITNESS: It was not
3  evidence in the case.  If it were
4  evidence, it would have been logged in
5  as evidence.
6  BY MR. JAVIE:
7    Q.   Well, let me ask you this.
8  I mean, at one point in time, I think
9  you, you said to Sam that -- and
10  referring to the packaging -- this was
11  the root of all of this, or something
12  like that.
13    Do you recall that?
14    A.   Yes.
15    Q.   And what you're saying is
16  you're saying that you didn't consider
17  that package to have any relevance to
18  this investigation at all?
19    A.   That packaging caused the
20  consent to search.
21    Q.   Right.
22    A.   And once it was determined
23  that it was empty, he was released.  And
24  then I asked him to perform sobriety

Page 70

1  tests.  And then he was subsequently
2  arrested.
3    Q.   So -- and let me, let me
4  just ask -- what you're saying is, you're
5  of the opinion or the position that that
6  packaging is not evidence in this case?
7    MR. FREEMAN: Again, I
8  object to the form of the question.
9    You can answer, trooper.
10    THE WITNESS: It was not
11  evidence in the DUI.
12  BY MR. JAVIE:
13    Q.   And you've testified in
14  court before, right?
15    A.   Yes.
16    Q.   Have you ever testified
17  during what we call, like, a suppression
18  hearing, or when somebody moves to
19  exclude evidence in the constitution?
20    A.   No.
21    Q.   Do you know about that?
22    A.   I know it exists.
23    Q.   And do you know that that's
24  something that a person who is arrested

Page 71

1  has a right to do?
2    A.   Yes.
3    Q.   And ultimately, under those
4  circumstances -- well, let me ask you
5  this -- when -- strike that.
6    When somebody files a motion
7  to suppress, sometimes they're seeking to
8  keep evidence out of court, right?
9    A.   Okay.
10    Q.   And one of the things that
11  becomes very relevant in those situations
12  is how an investigation proceeds.
13    Would that be fair?
14    MR. FREEMAN: I object --
15    THE WITNESS: Yes.
16    MR. FREEMAN: -- to the form
17  of the question.
18  BY MR. JAVIE:
19    Q.   And we talk about, there's
20  thing like reasonable suspicion, probable
21  cause.
22    You're familiar with those
23  terms, right?
24    A.   Correct.

Page 72

1    Q.   And, in fact, there were --
2  there was discussion between you and your
3  fellow troopers about the automobile
4  exception, correct?
5    A.   Correct.
6    Q.   And specifically, the
7  fact -- the discussion was about whether
8  or not you had a right to search that car
9  based on seeing that packaging.
10    Would that be fair?
11    A.   Correct.
12    Q.   And so, I guess, what I'm
13  trying to understand is, this was a --
14  sort of like a whole series of
15  transactions that ultimately culminated
16  in Mr. Birth's arrest, right?
17    A.   Correct.
18    Q.   And I'm just curious why you
19  wouldn't log the item that basically set
20  off the whole chain of events.
21    A.   What's the question?
22    Q.   Why wouldn't you have logged
23  that item?
24    A.   I do not know.

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

Page 73

1    Q.   And you -- but you do know,
2  and you do acknowledge, sitting here,
3  that that could have been relevant at a
4  criminal trial?
5         MR. FREEMAN: Objection to
6     the form of the question.
7         You can answer, trooper, if
8     you know.
9         THE WITNESS: Are you asking
10    me if it could be relevant to the
11    trial?
12 BY MR. JAVIE:
13    Q.   Well, to any proceedings in
14  court arising out of the arrest, whether
15  it's a motion to suppress, whether it's,
16  you know, another pretrial motion, or the
17  trial.
18        MR. FREEMAN: Again, I
19    object to the form of the question.
20        THE WITNESS: It's possible.
21    I do not know.
22 BY MR. JAVIE:
23    Q.   Okay.  And if I understand
24  just what ended up happening, like, we

Page 74

1  just don't know what happened to this
2  package?
3    A.   I don't know.
4    Q.   And so there would be no
5  way, today, for me -- at least that you
6  know of, I'm not saying under any
7  possibility -- but there's no way that
8  you know of today for me to actually get
9  that package and inspect it?
10   A.   I don't know of one, no.
11   Q.   We have went through a
12 little bit of kind of the elements of the
13 offense, and, and I think we, you know,
14 we talked about the reason that he was
15 ultimately arrested, was based on your
16 conclusion that he intended to drive,
17 right?
18   A.   Correct.
19   Q.   And I'm just going to ask
20 you, is there any reason that, after you
21 did the field sobriety tests, that you
22 didn't say to him, like, look, you can't
23 drive, you got to get a ride or -- you
24 know, but you can't, you can't drive?  Is

Page 75

1  there any reason for that?
2    A.   I don't recall, at that
3  time.
4    Q.   I mean, and that's something
5  that you could have done, right?
6         MR. FREEMAN: Object to the
7     form of the question.
8         THE WITNESS: I can't say.
9     In that moment, he was impaired, and
10    he intended to drive.
11 BY MR. JAVIE:
12    Q.   Okay.  And when you say he
13  was impaired, as you sit here today, are
14  you still under the, the -- you're still
15  of the opinion that he was impaired?
16    A.   At -- that night, my
17  observations were that he was impaired.
18    Q.   Right.
19         And then -- and, you know,
20  maybe it's not necessarily relevant, but
21  I'm just curious, knowing what you know
22  now, I mean, do you have a different take
23  on the situation?
24    A.   No.

Page 76

1    Q.   So, do you have any
2  explanation, then, for how all of the
3  chemical testing came back negative?
4    A.   I don't have an explanation.
5    Q.   What do you think he was
6  impaired -- like, what, what do you think
7  that was actually impairing him?
8         MR. FREEMAN: Objection to
9     the form of the question.
10        THE WITNESS: My -- sorry.
11        MR. FREEMAN: You can
12    answer.
13        THE WITNESS: My
14    determination was that he was impaired
15    by cannabis.  It was made that night,
16    based on my observations that night.
17 BY MR. JAVIE:
18    Q.   Okay.  And now it's 2023,
19  and we know that, from the, from the
20  testing, there was no cannabis in his
21  urine and there -- you know, he was given
22  an alco test, and that was also negative.
23        So, are you still of the
24  opinion today that he was under the

Case 1:22-cv-05658-CPO-EAP   Document 25-3   Filed 12/19/23   Page 87 of 110 PageID: 221

SAMUEL BIRTH v.                                          TROOPER MICHELE STALLWORTH
TROOPER MICHELE STALLWORTH, et al.                      September 29, 2023

Page 77

1    influence of cannabis?
2          MR. FREEMAN: I object to
3    the form of the question.
4          Counsel, this is the second
5    time you've asked the same question.
6    She's answered it before.
7          MR. JAVIE: Well, she didn't
8    answer -- it's a little bit different,
9    actually, because I'm asking -- I
10   understand what she said, she made an
11   evaluation that night, and I'm just
12   asking her now if she has the same
13   opinion or if that opinion's changed.
14         THE WITNESS: The opinion
15   that I provided that night was the
16   opinion that I provided that night.  I
17   cannot speculate three years later.
18   BY MR. JAVIE:
19     Q.   And -- well strike that.
20         Let me just ask, if Mr.
21   Birth were here, would you apologize to
22   him for arresting him that night?
23         MR. FREEMAN: I object to
24   the form of the question.

Page 78

1          You can answer, trooper, if
2    you know.
3          THE WITNESS: Apologize for
4    my actions?  For arresting him, is
5    what you're asking me?
6    BY MR. JAVIE:
7      Q.   Yeah.
8      A.   I don't know.  I don't know.
9      Q.   And is there a reason that
10   you don't know?
11     A.   Because I am sorry that we
12   met that way, yes.  But I'm not sorry
13   that my -- that the actions that I took
14   that night were what they were.
15     Q.   All right.
16         MR. JAVIE: Well, I think, I
17   think, with that, I think I've covered
18   everything.  So I appreciate your
19   willingness to move from the morning
20   today.  I know that it's Friday, and
21   it's kind of getting late.  But I
22   don't have anything else.  Mr. Freeman
23   may have something for you.
24         MR. FREEMAN: Just, just one

Page 79

1    question, trooper.
2          - - -
3          EXAMINATION
4          - - -
5    BY MR. FREEMAN:
6      Q.   As you sit here today, do
7    you stand by the test that you conduct
8    that night?
9      A.   Yes, sir.
10         MR. FREEMAN: I have nothing
11   further.
12         MR. JAVIE: I hope everybody
13   has a wonderful weekend.
14         THE WITNESS: Thank you.
15   You as well.
16         MR. FREEMAN: I will take a
17   full condensed version of the
18   deposition transcript.
19         (Whereupon, the deposition
20   concluded at 3:28 p.m.)
21         (Whereupon, deposition
22   Exhibit-1 was marked for
23   identification.)
24

Page 80

1
2              CERTIFICATE
3
4
5          I HEREBY CERTIFY that the
6    witness was duly sworn by me and that the
7    deposition is a true record of the
8    testimony given by the witness.
9
10
11
12   BENJAMIN PIECZYNSKI JR., a
     Professional Reporter and
     Notary Public
13   Dated:  October 25th, 2023
14
15
16
17
18
19         (The foregoing certification
20   of this transcript does not apply to any
21   reproduction of the same by any means,
22   unless under the direct control and/or
23   supervision of the certifying reporter.)
24

**A**

**able (10)** 19:24;22:19;
24:5;26:8;32:15;38:15;
42:19;52:17;54:24;
60:19
**above (1)** 21:12
**Absolutely (2)** 7:17;
39:15
**AC (1)** 13:23
**academy (4)** 9:15,21,
23;14:16
**access (2)** 27:8;56:9
**accessing (1)** 29:1
**accident (1)** 12:23
**acknowledge (1)** 73:2
**across (1)** 16:21
**actions (2)** 78:4,13
**actually (8)** 13:15;21:1;
45:12;52:16;54:23;
74:8;76:7;77:9
**add (1)** 50:14
**address (1)** 26:5
**administrative (1)** 13:6
**admit (1)** 41:22
**admitted (3)** 41:6;
42:22;44:18
**affect (2)** 33:4;58:18
**again (7)** 42:2;46:18;
48:18;49:17;68:15;
70:7;73:18
**against (2)** 5:16;6:5
**age (2)** 31:18;33:3
**agree (3)** 20:22;21:23;
22:12
**agreed (1)** 54:10
**AICP (1)** 59:14
**aid (1)** 12:22
**alco (6)** 51:23;52:2;
53:9,9,15;76:22
**alcohol (8)** 30:1,7,13;
39:7;42:6,15;52:13;
59:3
**allowed (1)** 54:10
**almost (2)** 9:5,5
**along (1)** 58:5
**analysis (1)** 58:3
**AND/OR (1)** 4:11
**answered (1)** 77:6
**answer's (2)** 33:8,11
**anymore (1)** 55:15
**apologize (3)** 23:2;
77:21;78:3
**Apologizing (1)** 67:18
**applicant (1)** 14:14
**applicants (1)** 14:13
**apply (1)** 14:15
**appreciate (2)** 46:11;
78:18
**area (10)** 13:12;24:15;
25:2,3,4,14;26:6;27:2;
28:16;29:3

**areas (3)** 13:17;28:9;
66:8
**arises (1)** 5:16
**arising (1)** 73:14
**around (4)** 19:21,22;
25:6;28:16
**arrest (8)** 34:9;36:11,
13;40:5;44:10;47:7;
72:16;73:14
**arrested (9)** 16:1;44:6,
13;46:1,15,22;70:2,24;
74:15
**arresting (1)** 77:22;78:4
**arrival (1)** 18:24
**arrived (1)** 57:9
**ascertain (2)** 26:9;37:10
**ascertained (1)** 49:10
**aside (1)** 65:5
**assigned (1)** 11:20
**assignment (4)** 11:5,13,
14,18
**assignments (3)** 11:4,6,
9
**associated (1)** 57:24
**assuming (1)** 41:1
**Atlantic (2)** 11:21,23
**attend (1)** 10:18
**attended (1)** 9:20
**attention (1)** 58:22
**attorney (1)** 7:20
**atypical (1)** 28:2
**August (3)** 64:6,12,15
**automobile (1)** 72:3
**available (2)** 62:12;
63:15
**average (1)** 63:12
**away (3)** 44:19;45:12;
48:15

**B**

**back (28)** 5:17;6:6;
8:18;11:23,24;12:1,2;
20:10,22;21:19,20,24;
22:9,14;23:3;28:24;
29:20;34:3,18;35:17;
51:21;65:7,9,13;66:11;
68:9,19;76:3
**bad (1)** 23:1
**bag (1)** 34:18
**balance (2)** 38:15;
57:18
**based (9)** 15:3;44:6;
45:16,17,24;57:23;
72:9;74:15;76:16
**basically (1)** 72:19
**basis (1)** 47:15
**became (1)** 55:23
**become (4)** 9:13;14:13;
33:21;61:8
**becomes (1)** 71:11
**becoming (1)** 14:16
**begin (1)** 8:21

**benchmarks (1)** 61:1
**big (1)** 9:6
**bike (1)** 27:6
**Birth (11)** 5:11;6:3;
16:1;31:19;32:8,19;
33:14;37:14;44:6;
67:23;77:21
**Birth's (1)** 72:16
**bit (5)** 15:10;32:10;
34:3;74:12;77:8
**black (1)** 19:17
**blood (1)** 52:13
**bodily (2)** 54:3,6
**body (3)** 25:12;32:6;
58:19
**bonfires (1)** 27:4
**both (4)** 22:6;47:20;
59:10,12
**box (3)** 19:17;36:15;
68:7
**break (3)** 7:18;39:14;
58:10
**breath (1)** 52:19
**Breathalyzer (1)** 52:12
**bring (4)** 51:21;59:6,6;
68:19
**broken (1)** 60:4
**brother (1)** 22:21
**Buena (10)** 11:19,19,
22,24;12:2,8,9,10;
13:18;62:8
**busy (1)** 14:3

**C**

**call (4)** 10:5;13:4;
25:20;70:17
**called (5)** 17:17,21;
19:20;24:24;26:4
**Calling (1)** 18:19
**calls (4)** 12:21,22,22;
17:4
**cam (1)** 32:6
**Camden (1)** 60:6
**came (6)** 23:24;38:24;
40:23;65:9,13;76:3
**can (23)** 7:18;8:17,17;
11:10;14:23;15:19;
20:21;21:10,13,23;
22:12;25:13;27:16;
31:23;41:20;43:13;
46:18;62:3;69:1;70:9;
73:7;76:11;78:1
**cannabis (7)** 57:6;
62:18,22;66:15;76:15,
20;77:1
**car (15)** 18:12;22:18;
23:14;24:7;31:11;
34:14;35:2;36:22;45:2,
4;47:16;48:2;51:14;
52:4;72:8
**card (1)** 13:8
**carry (1)** 19:21

**cars (2)** 10:5;24:17
**case (7)** 7:20;10:3;
56:23;67:4;68:20;69:3;
70:6
**caught (1)** 19:8
**cause (1)** 71:21
**caused (1)** 69:19
**CDS (13)** 19:9,12;20:6,
23;21:4,21;22:23;23:6;
30:14,24,24;31:11;39:9
**certain (1)** 12:12
**certificate (1)** 55:5
**certification (3)** 55:5;
56:14;64:1
**certifications (1)** 59:17
**certified (8)** 55:12,14,
23;59:14;61:2,8,10;
64:6
**chain (1)** 72:20
**change (2)** 14:23;60:16
**changed (1)** 77:13
**changes (1)** 10:22
**charge (5)** 25:22;40:8;
53:16,19,23
**charged (3)** 21:13;
26:14;30:12
**check (4)** 18:9,21;
34:18;65:22
**checks (1)** 13:5
**chemical (3)** 52:19,22;
76:3
**children (1)** 31:20
**circumstance (1)** 6:8
**circumstances (1)** 71:4
**citations (1)** 29:18
**cited (1)** 26:20
**City (2)** 11:21,23
**clarification (1)** 66:10
**clarify (3)** 15:19;48:19;
49:22
**class (2)** 60:10,11
**classroom (4)** 58:5,12,
14,16
**clear (6)** 15:14;29:12;
40:21;46:16,19;49:8
**close (1)** 32:21
**closer (1)** 20:18
**closes (1)** 48:9
**coaching (2)** 50:11,13
**collect (1)** 57:22
**collecting (1)** 57:15
**Collings (4)** 16:20;
17:14,17,21
**comments (2)** 32:7;46:8
**communication (1)**
14:12
**Community (1)** 13:3,4
**complainant (2)** 25:21;
26:19
**complainants (1)** 29:17
**complaining (1)** 26:1
**complaints (2)** 17:4;
27:3

**completed (1)** 38:3
**completely (1)** 22:13
**complicated (1)** 62:5
**complied (2)** 38:8;52:7
**concern (2)** 32:1;33:12
**concerned (3)** 32:1,12;
33:21
**concerns (2)** 31:18;
38:15
**concluded (1)** 79:20
**conclusion (1)** 74:16
**conclusions (1)** 43:8
**condensed (1)** 79:7
**conduct (2)** 36:17;79:7
**conducted (3)** 35:1,4;
38:21
**confirm (2)** 22:21;23:5
**confuse (1)** 62:4
**confusing (1)** 7:9
**confusion (1)** 29:13
**congratulations (1)** 65:5
**connection (1)** 6:4
**consent (1)** 69:20
**consider (2)** 34:8;69:16
**considered (2)** 20:23;
21:4
**constantly (2)** 61:22;
63:8
**constitution (1)** 70:19
**consume (1)** 44:2
**consumed (5)** 41:14,23;
42:20,23;43:1
**contact (4)** 28:8;29:16;
50:21,24
**contacted (1)** 29:7
**contained (3)** 24:7;
30:24;31:11
**content (1)** 52:14
**continue (1)** 61:10
**continued (1)** 61:16
**control (1)** 40:12
**controlled (1)** 19:12
**conversation (2)** 67:12,
16
**cooperative (1)** 33:16
**coordination (1)** 66:19
**correctly (1)** 23:16
**Counsel (1)** 77:4
**counselor (2)** 46:5;
49:16
**couple (2)** 6:21;66:8
**course (5)** 17:9;50:20;
58:2
**courses (1)** 9:24
**COURT (6)** 5:21;6:24;
7:5;70:14;71:8;73:14
**cover (1)** 13:13
**covered (1)** 78:17
**covers (1)** 13:12
**created (1)** 56:23
**crime (1)** 26:15
**criminal (1)** 73:4
**criminally (1)** 21:14

**culminated (1)** 72:15
**curious (3)** 26:23;
72:18;75:21
**Currently (3)** 9:2;14:22;
21:5
**custody (1)** 51:21

**D**

**dangerous (1)** 19:13
**data (1)** 63:20
**date (3)** 15:15,24;23:4
**day (5)** 16:11,15,17;
27:4;56:11
**days (1)** 60:5
**deal (1)** 28:3
**dealing (2)** 6:22;46:9
**dealt (1)** 28:20
**decide (1)** 37:14
**decided (2)** 18:9;29:18
**defensive (1)** 10:7
**degrees (1)** 39:18
**denying (1)** 42:4
**departments (1)** 13:20
**DEPOSITION (5)** 4:2;
6:15;79:18,19,21
**detained (2)** 34:11,13
**determination (2)** 57:22;
76:14
**determine (2)** 35:23;
61:6
**determined (5)** 35:9,11;
42:13;62:20;69:22
**deviation (1)** 39:17
**difference (1)** 33:3
**different (9)** 11:4,6,8;
14:15;28:9;66:23,23;
75:22;77:8
**difficulty (1)** 6:13
**direct (2)** 46:7,11
**DIRECTIONS (1)** 4:5
**directives (1)** 52:8
**dirt (1)** 27:6
**discovery (1)** 68:18
**discussion (2)** 72:2,7
**dispatch (2)** 18:14,19
**dispel (4)** 22:22;23:5;
32:15,17
**divided (1)** 58:22
**division (2)** 14:8;15:3
**DOCUMENTS (1)** 4:8
**done (5)** 13:8;35:23;
36:24;68:20;75:5
**down (10)** 7:6;17:1;
39:14,23;41:10,10,10,
16;44:2;58:10
**DRE (3)** 54:22;58:3;
66:11
**drink (1)** 7:19
**drive (16)** 10:4;45:12,
23;47:16;48:2,14,17,
22;49:11,19;50:19;
51:13;74:16,23,24;

75:10
**driver's (2)** 48:23;49:14
**driving (11)** 19:4;40:8,
19;41:6;43:2;44:13,18;
46:1,23;47:7;52:4
**drown (1)** 27:7
**drug (8)** 53:5;55:6,24;
56:8;57:23;58:1;59:4;
66:20
**drugs (7)** 30:1,10;42:6,
16;54:19;58:18;60:9
**due (2)** 28:4;46:14
**DUI (3)** 36:11,13;70:11
**duly (1)** 5:3
**dunes (1)** 25:2
**during (9)** 27:4;31:16;
39:19;50:20;51:12;
61:3,5,7;70:17
**duty (3)** 15:18,20;64:16

**E**

**earlier (3)** 40:22;45:22,
22
**edits (1)** 56:19
**educated (1)** 8:8
**education (1)** 9:14
**effect (1)** 67:6
**eight (2)** 61:13,16
**either (7)** 7:13;12:23;
22:20;23:4;29:24;
30:13;42:15
**elements (1)** 74:12
**else (11)** 26:9;46:17;
47:19;48:23;49:1,5,14;
51:13;66:16;68:4;
78:22
**emergency (1)** 27:6
**empty (3)** 35:12;36:14;
69:23
**ended (2)** 14:4;73:24
**enforce (1)** 55:18
**enforcement (8)** 9:1,10;
10:4;13:1,1,14:2;
17:22;59:15
**enough (1)** 10:11
**entire (2)** 30:6;42:4
**essays (1)** 58:17
**estimation (1)** 8:7
**evaluate (1)** 58:21
**evaluating (1)** 59:24
**evaluation (6)** 53:5;
56:20,23;63:2;66:12;
77:11
**evaluations (6)** 56:16;
58:7;60:10,12;61:17;
63:10
**evaluator (1)** 60:14
**even (7)** 20:17,22;
26:18;34:16;41:1;47:9;
54:9
**evening (2)** 17:5;33:15
**events (1)** 72:20

**everybody (3)** 30:16,17;
79:12
**evidence (11)** 47:24;
48:14;51:11;68:20;
69:3,4,5;70:6,11,19;
71:8
**exact (1)** 16:13
**exactly (1)** 16:8
**exam (1)** 66:19
**EXAMINATION (2)** 5:6;
79:3
**examine (1)** 36:18
**examined (1)** 5:4
**examining (1)** 19:7
**example (3)** 32:19;
66:22,24
**exception (1)** 72:4
**exclude (1)** 70:19
**excuse (2)** 5:18;62:22
**Exhibit-1 (2)** 54:23;
79:22
**exists (1)** 70:22
**expect (1)** 66:22
**experience (1)** 20:7
**expert (2)** 55:6,24
**experts (1)** 56:9
**Explain (3)** 56:6;57:9;
62:3
**explanation (2)** 76:2,4
**expressing (1)** 29:19
**Expressway (5)** 11:21,
24;12:1;13:23;14:5
**extensive (1)** 59:16
**eye (3)** 19:8;38:19;
66:18
**eyes (1)** 58:21

**F**

**fact (11)** 26:17;44:20;
45:6;47:17;49:11,12,
14;63:1;66:1;72:1,7
**fail (1)** 40:1
**failed (3)** 39:19;40:3;
47:5
**fair (30)** 7:11;9:16;
10:11;18:23;21:15;
24:2;25:9;26:15;27:12,
22,24;31:17;32:14;
33:15;35:2;38:19,22;
40:5,9;41:5,8,17;42:6,
10;45:9;52:5,9;56:24;
71:13;72:10
**familiar (2)** 6:8;71:22
**family (1)** 32:21
**far (1)** 16:23
**February (1)** 65:21
**fellow (1)** 72:3
**females (1)** 19:21
**few (1)** 60:5
**field (13)** 34:10;38:13,
22;39:3;44:23;45:21;
47:6;58:7,7;59:23;

61:22;62:11;74:21
**figure (1)** 60:1
**file (1)** 62:23
**filed (2)** 5:16;6:4
**files (1)** 71:6
**fill (1)** 56:11
**final (1)** 53:4
**finally (1)** 8:11
**find (4)** 6:21;29:6;
36:17;62:9
**firearms (2)** 13:7,8
**first (6)** 11:11,11,12,14;
14:14;30:3
**fitness (1)** 11:1
**five (1)** 66:2
**flashlight (1)** 20:2
**floorboard (1)** 23:14
**fluid (2)** 54:3,6
**focus (1)** 47:12
**following (1)** 51:10
**follows (1)** 5:4
**foot (1)** 39:23
**forest (1)** 25:2
**form (15)** 27:15;31:22;
41:19;43:12;46:5;
49:17;68:24;70:8;
71:16;73:6,19;75:7;
76:9;77:3,24
**found (5)** 30:3,7,9;
32:18;35:6
**four (1)** 61:17
**free (2)** 8:15;57:14
**Freeman (28)** 6:19;
27:14;31:21;41:18;
43:11;46:4;49:16;50:1,
8,12;51:7;66:3;68:23;
70:7;71:14,16;73:5,18;
75:6;76:8,11;77:2,23;
78:22,24;79:5,10,16
**Friday (1)** 78:20
**friends (1)** 32:21
**front (3)** 43:1;45:5;
61:18
**full (2)** 34:13;79:17
**further (1)** 79:11

**G**

**gave (5)** 34:13;52:23;
57:3,5;62:16
**general (3)** 12:18,20;
31:13
**gesticulations (1)** 7:4
**Ghost (6)** 19:18,18;
22:6;23:9,16,22
**given (2)** 6:14;76:21
**giving (1)** 53:22
**glance (1)** 30:4
**golf (1)** 34:17
**good (2)** 8:19;15:22
**Google (2)** 23:10,13
**Googled (3)** 23:9,16,19
**Googling (1)** 20:14

**Gotcha (1)** 14:6
**grandfather (1)** 68:1
**great (2)** 13:15;47:12
**guess (16)** 8:5,8;14:3;
15:22;16:3;25:11;
27:21;33:2;34:2;43:19;
53:6;55:4;59:16;63:5;
64:4;72:12

**H**

**hand (2)** 43:20,24
**handcuff (1)** 10:3
**handcuffs (3)** 30:18,21;
31:9
**handle (1)** 12:21
**hands-on (2)** 58:7;
60:14
**happened (6)** 6:6;18:2;
21:20;35:15;38:6;74:1
**happening (1)** 73:24
**head (1)** 7:4
**headquarters (1)** 15:4
**hear (1)** 5:22
**hearing (1)** 70:18
**heel (1)** 39:23
**held (2)** 26:22,24
**here's (2)** 42:2,2
**hey (1)** 34:17
**hired (1)** 11:12
**hold (1)** 47:22
**home (2)** 48:17,22
**Honestly (1)** 62:13
**hope (1)** 79:12
**hours (6)** 58:6;59:20,
22,24;61:13,16
**houses (1)** 28:15
**huh (1)** 9:6
**human (1)** 58:19

**I**

**ID (1)** 13:8
**identification (1)** 79:23
**identified (1)** 22:18
**illegal (3)** 30:7,9;35:5
**imagine (5)** 6:18;9:12;
18:12
**impaired (6)** 75:9,13,15,
17;76:6,14
**impairing (2)** 54:19;
76:7
**improper (1)** 39:21
**inception (1)** 14:14
**incident (4)** 5:17;6:5;
15:10;17:7
**indeed (1)** 62:21
**independently (1)** 22:20
**INDEX (1)** 4:2
**indicated (2)** 6:7;20:6;
68:12
**indication (2)** 24:6;41:3
**individual (3)** 5:11;

SAMUEL BIRTH v.
TROOPER MICHELE STALLWORTH, et al.

TROOPER MICHELE STALLWORTH
September 29, 2023

13:20;57:16
**individuals (4)** 28:21;
30:22;47:20;60:5
**influence (19)** 33:22;
39:7,9;41:2,4,16;42:5,
10,15;43:22;46:2;47:8;
52:5;57:6;60:3,8;62:17,
21;77:1
**INFORMATION (8)** 4:8;
26:21,24;28:1;29:16;
55:4;62:11;63:14
**informed (1)** 67:24
**initial (1)** 64:1
**inservice (3)** 10:19,20,
21
**inside (1)** 18:6
**inspect (1)** 74:9
**instance (1)** 63:2
**instructor (2)** 59:18;
61:19
**instructors (2)** 59:13;
61:23
**intended (3)** 45:12;
74:16;75:10
**Intending (2)** 44:15,17
**intent (7)** 47:2,11,13,24;
48:14;49:9;51:11
**interpretation (1)** 38:5
**interruption (2)** 5:24;
31:5
**into (14)** 6:12;13:16;
16:5,11;18:19;29:5,6;
36:22;45:1;50:14,15;
51:21;60:4;63:18
**intoxicated (4)** 40:9;
44:16;46:23;67:7
**intoxication (1)** 44:11
**invade (1)** 65:4
**investigated (1)** 36:6
**investigation (6)** 31:16;
32:16;35:23;51:12;
69:18;71:12
**investigations (1)** 10:1
**involved (1)** 26:10
**involves (1)** 6:5
**issue (1)** 29:18
**issues (1)** 38:19
**item (4)** 20:4,5;72:19,23

## J

**Jason (1)** 5:10
**JAVIE (31)** 5:8,10;6:2;
27:20;31:2,7;32:3;
42:1;43:16;46:13,20;
49:21;50:7,9,17;51:7,9;
65:24;66:7;69:6;70:12;
71:18;73:12,22;75:11;
76:17;77:7,18;78:6,16;
79:12
**Jersey (8)** 9:8;11:16;
15:7;20:23;52:3;54:4;
55:9;60:6

**job (4)** 13:24;18:13,17,
18
**jobs (1)** 20:9

## K

**keep (4)** 56:5,15;60:15;
71:8
**kept (1)** 56:7
**kids (4)** 26:1,20;29:24;
30:7
**kind (12)** 9:14,15,18;
14:19;26:14;33:7;43:6;
53:7;54:5;60:24;74:12;
78:21
**knew (4)** 22:9;41:14;
48:24;49:15
**knowing (1)** 75:21
**knowledge (3)** 8:3;24:8;
26:12
**known (3)** 26:18;27:2;
32:23

## L

**label (1)** 20:8
**labeled (1)** 19:18
**lack (1)** 66:19
**lacked (1)** 39:17
**lake (4)** 25:11;41:10,
16;44:3
**Lakes (4)** 16:20;17:14,
18,21
**land (4)** 25:17;28:4,6,
10
**last (2)** 12:3;29:6
**lasted (1)** 64:11
**lasts (1)** 64:8
**late (1)** 78:21
**later (1)** 77:17
**law (5)** 9:1,9;10:3,4;
59:14
**laws (2)** 13:7;55:18
**lawsuit (2)** 5:15;6:4
**learn (1)** 9:23
**learning (2)** 58:19,20
**least (4)** 31:18;32:19;
60:12;74:5
**leave (7)** 37:15;44:21;
45:24;64:19,21;65:14,
17
**leaving (1)** 37:20
**led (2)** 39:24;66:14
**left (2)** 31:8;39:21
**leg (1)** 39:22
**legal (2)** 22:13
**Less (1)** 17:2
**letting (2)** 18:14,20
**license (4)** 47:21;48:3,
24;49:15
**licenses (1)** 51:14
**limits (2)** 21:9,13
**list (2)** 26:18;27:8

**listed (1)** 57:20
**literally (1)** 59:23
**little (6)** 6:12;15:10;
32:9;34:3;74:12;77:8
**live (2)** 15:6,7
**lives (1)** 67:24
**local (2)** 13:9,10
**located (2)** 11:15;15:2
**location (4)** 12:24;
18:15,21;30:23
**log (8)** 56:3,6,18;60:15,
20;63:5,7;72:19
**logged (6)** 63:4;68:13,
14;69:4;72:22
**long (6)** 8:1,24;15:12;
50:23;58:2;64:9
**look (5)** 16:12;20:18;
37:1;52:17;74:22
**looked (3)** 24:1;37:8;
63:18
**looking (3)** 29:21;
59:24;60:20
**looks (1)** 25:8
**loop (1)** 19:22
**lost (1)** 31:3
**lot (5)** 18:2,3,4,6;24:20

## M

**ma'am (1)** 11:17
**maintain (1)** 10:24
**mandated (1)** 54:10
**mandatory (6)** 52:2;
53:8,9,12;54:3,6
**manufactured (1)** 22:6
**manufacturers (1)** 22:1
**marijuana (4)** 20:22;
21:3,21;22:7
**mark (1)** 54:23
**MARKED (2)** 4:14;
79:22
**mask (1)** 19:19
**maternity (2)** 64:19,21
**matrix (2)** 57:23;66:20
**matter (1)** 65:24
**maximum (1)** 39:16
**may (2)** 7:20;78:23
**maybe (4)** 8:15;32:8;
34:3;75:20
**mean (16)** 18:18;19:12;
21:8;30:5;34:5;38:7;
42:19;48:7;49:23;50:5;
53:14;59:6;64:18;69:8;
75:4,22
**meaning (4)** 32:17;
37:1;38:2;62:1
**meet (1)** 61:1
**mention (1)** 46:9
**mentioned (1)** 54:22
**met (1)** 78:12
**MICHELE (1)** 5:2
**middle (1)** 67:19
**might (3)** 20:16;23:6;

67:6
**mile (1)** 17:2
**minute (1)** 65:23
**minutes (1)** 66:2
**Miranda (1)** 34:5
**missing (1)** 51:17
**misspoke (1)** 8:15
**Mm-hmm (5)** 20:24;
23:11;36:9;57:14;
67:21
**moment (1)** 75:9
**monitor (1)** 61:10
**monitored (1)** 61:22
**month (1)** 56:12
**months (3)** 9:3,4;11:3
**more (3)** 13:24;14:1;
62:5
**morning (1)** 78:19
**most (1)** 8:9
**motion (3)** 71:6;73:15,
16
**motor (1)** 12:23
**move (1)** 78:19
**moves (1)** 70:18
**moving (1)** 13:2
**much (5)** 7:23;21:9;
37:17
**multiple (1)** 25:15
**municipal (2)** 13:20;
59:14
**municipality (2)** 13:9,11
**muscle (1)** 57:20

## N

**name (3)** 5:9,11;59:2
**names (4)** 28:8,18;29:2,
16
**necessarily (2)** 17:12;
75:20
**necessary (1)** 6:22
**need (11)** 7:19,23;
10:15;17:12;20:18;
27:11,19,19;43:14;
46:24;61:16
**needed (1)** 48:8
**needs (1)** 14:23
**negative (2)** 76:3,22
**neighborhood (1)** 16:21
**nevertheless (1)** 23:21
**New (8)** 9:8;11:16;
15:7;20:23;52:3;54:4;
55:9;60:6
**next (1)** 13:16
**nicotine (1)** 22:2
**night (28)** 16:18;17:10,
12;19:1,4;25:19;26:11,
17;27:5;29:17;30:6;
32:12;33:5;47:18;48:6,
10,23;49:13;67:20;
75:16;76:15,16;77:11,
15,16,22;78:14;79:8
**nine (3)** 9:3,3;11:2

**nobody (5)** 25:24;26:4,
13;30:12;48:23;49:14
**None (5)** 4:6,9,12,15;
8:22
**nonmoving (1)** 13:3
**norm (1)** 28:12
**notations (1)** 62:23
**notes (1)** 65:23
**nother (1)** 53:16
**November (6)** 5:18,19;
6:6;15:17;21:20;22:14
**numbers (3)** 28:9,19;
29:2
**numerous (2)** 32:5;
39:24
**nystagmus (2)** 39:16,18

## O

**Object (9)** 27:14;46:4;
49:17;70:8;71:14;
73:19;75:6;77:2,23
**Objection (6)** 31:21;
41:18;43:11;68:23;
73:5;76:8
**observations (3)** 57:19;
75:17;76:16
**observed (1)** 19:3
**obtained (1)** 21:17
**obviously (1)** 7:2
**occasions (1)** 39:24
**occurred (4)** 5:17,24;
31:5;66:5
**October (2)** 65:8,10
**off (6)** 11:10;31:8;44:7;
57:23;64:16;72:20
**offense (1)** 74:13
**officer (3)** 6:23;9:1,10
**officers (1)** 59:15
**official (1)** 59:2
**often (3)** 10:16;28:4;
56:17
**once (5)** 10:19,22;
36:22;44:22;69:22
**one (14)** 5:19,22;34:16;
39:22;43:20;51:13;
57:3;61:18;63:24;68:6;
69:8;71:10;74:10;
78:24
**ongoing (1)** 10:12
**only (1)** 63:24
**on-the-road (1)** 13:24
**Oops (1)** 31:2
**open (1)** 18:17
**opened (1)** 18:13
**opening (1)** 18:18
**operate (7)** 44:17;47:2,
11,13;48:1;49:9;57:7
**operated (1)** 41:3
**operating (1)** 40:16
**operation (2)** 46:24;
47:10
**operational (1)** 14:23

**opinion (13)** 39:1,2;
57:3,5,10,12;62:17;
70:5;75:15;76:24;
77:13,14,16
**opinion's (1)** 77:13
**opposed (1)** 66:15
**order (5)** 9:13;43:7;
61:1,7;62:24
**otherwise (1)** 8:4
**out (21)** 5:16;15:3;18:9,
11;24:10,23;25:3,7;
28:12;30:3;32:18;33:8;
36:23;37:3;56:11;60:1;
62:6,9;67:19;71:8;
73:14
**outside (1)** 20:1
**over (2)** 6:20;16:11
**overnight (1)** 51:15
**own (1)** 29:3
**owned (4)** 24:24;25:1,
17,18
**owner (1)** 27:9
**owners (1)** 28:2
**ownership (1)** 26:10
**oxycodone (1)** 66:24

**P**

**package (4)** 24:6;
69:17;74:2,9
**packaging (9)** 22:18;
24:1;35:9,16;36:19;
69:10,19;70:6;72:9
**page (3)** 29:14;31:15;
57:4
**PAGES (5)** 4:6,9,12,15;
57:21
**paperwork (1)** 68:18
**Park (4)** 16:24;24:21;
48:9,9
**parked (1)** 24:18
**parking (5)** 18:2,3,4,6;
24:20
**part (2)** 8:9;60:12
**particular (9)** 15:15;
25:4;26:24;27:12,13;
56:21;62:10,14;63:1
**parts (1)** 39:14
**pass (3)** 8:6;39:2;45:21
**passed (1)** 18:2
**passes (1)** 52:19
**patrol (1)** 16:15
**patrolling (2)** 16:20;
17:14
**pen (3)** 23:9;37:2;68:8
**pending (1)** 7:22
**Penlinni (2)** 23:8;35:3
**pens (2)** 22:1,3
**people (13)** 10:1;24:10;
26:5;28:19;29:2;31:10;
32:9,20;43:7;48:2;59:7,
24;60:1
**percent (2)** 52:13;61:6

**percentage (7)** 60:16,
21,22;61:12;62:10;
63:12,12
**percentages (1)** 56:1
**perform (5)** 10:7,23;
37:20;61:14;69:24
**performance (2)** 44:7;
61:21
**performed (6)** 10:2;
38:9,12;39:21;44:22;
56:20
**performing (5)** 18:20;
33:23;56:15;58:21;
63:9
**permanent (2)** 14:17,22
**permission (1)** 34:13
**person (4)** 30:1,2;
60:11;70:24
**personal (4)** 8:3;63:5,7;
64:18
**personally (2)** 36:18;
60:13
**ph (2)** 23:8;35:3
**phased (1)** 14:19
**phases (1)** 14:15
**phone (1)** 20:13
**physical (3)** 10:8,23,24
**picked (2)** 67:5,12
**pits (1)** 25:1
**place (1)** 40:5
**placed (2)** 39:23;47:6
**plenty (1)** 10:9
**pm (1)** 79:20
**point (21)** 8:12;19:8;
20:13;24:5,9;29:24;
33:20;34:4,9,17;39:5;
40:4,11,24;49:10,18;
50:4,5;51:12;60:20;
69:8
**pointing (1)** 51:11
**police (7)** 6:23;9:15;
10:4;13:12,20;29:21;
63:21
**policing (2)** 13:4;17:6
**polite (1)** 33:18
**populated (1)** 23:12
**position (3)** 14:21;
39:22;70:5
**possess (1)** 22:14
**possessing (3)** 21:14;
30:13,13
**possibility (1)** 74:7
**possible (2)** 7:12;73:20
**potentially (1)** 19:9
**practicing (1)** 58:22
**prefacing (1)** 46:8
**prefer (1)** 46:6
**prepared (1)** 62:16
**pretrial (1)** 73:16
**previous (1)** 20:8
**Prior (7)** 9:8;18:24;
39:18;43:2;57:11,20;
65:17

**privacy (1)** 65:4
**private (1)** 24:16
**privately (4)** 24:24;25:1,
17,18
**proactive (3)** 12:24;
17:5,22
**probable (1)** 71:20
**probationary (1)** 16:19
**procedure (1)** 28:7
**proceedings (1)** 73:13
**proceeds (1)** 71:12
**process (6)** 12:4;55:17;
65:12,15,16,19
**processing (3)** 14:9,10;
15:2
**program (2)** 55:8;56:8
**property (7)** 13:5;18:21;
24:16;26:11,15;27:13;
28:2
**provided (2)** 77:15,16
**providing (1)** 57:11
**public (4)** 18:3,4;25:16;
44:11
**pulled (1)** 55:1
**purchased (1)** 21:16
**pursuit (1)** 39:17
**put (8)** 14:21;19:22;
30:17,20;31:9;59:1;
60:9;66:17
**putting (2)** 22:2;50:3

**Q**

**quad (1)** 27:6
**qualification (1)** 10:24
**qualifications (1)** 10:8
**quarries (1)** 25:2
**quarry (2)** 27:7;29:3
**Quigley (1)** 16:24
**quite (1)** 28:4
**quizzes (1)** 58:17
**quote-on-quote (1)**
25:21

**R**

**rate (4)** 60:21,22;61:12;
62:11
**rather (2)** 39:2;46:7
**reach (1)** 43:8
**read (1)** 34:5
**real (1)** 10:15
**realize (1)** 8:14
**really (4)** 7:10;8:3;46:6;
49:23
**re-ask (1)** 51:8
**reason (8)** 18:8;36:3;
52:3;68:16;74:14,20;
75:1;78:9
**reasonable (1)** 71:20
**reasonably (1)** 42:24
**Reasoning (1)** 36:5
**recall (10)** 16:8;20:20;

23:3;34:20,23;67:11,
15;68:2;69:13;75:2
**receive (1)** 10:12
**recertified (3)** 61:15;
63:24;64:2
**recess (1)** 66:5
**recognition (4)** 53:5;
55:6,24;56:8
**recollection (1)** 67:8
**record (1)** 62:24
**records (3)** 28:21;29:6,
21
**recruit (1)** 14:16
**referring (2)** 57:4;69:10
**refusal (2)** 53:19,23
**refuses (1)** 53:15
**regards (1)** 17:7
**related (1)** 24:21
**relationship (1)** 67:23
**released (1)** 69:23
**relevance (1)** 69:17
**relevant (6)** 36:10,12;
71:11;73:3,10;75:20
**remember (6)** 10:10;
22:19;34:22;36:20;
51:2;63:11
**removed (1)** 48:9
**repeat (2)** 7:13;22:24
**rephrase (1)** 7:13
**report (2)** 28:22;62:15
**REPORTER (2)** 5:21;
7:5
**reports (2)** 10:3;27:9
**represent (2)** 5:10;6:3
**request (1)** 13:8
**REQUESTS (1)** 4:8
**required (1)** 10:18
**rescues (1)** 10:7
**residences (2)** 25:5,6
**respect (1)** 46:14
**response (1)** 23:10
**responses (1)** 50:15
**responsibilities (3)** 13:6,
10,13
**result (1)** 52:12
**results (1)** 54:14
**retrained (1)** 10:17
**retrieve (1)** 68:2
**returned (1)** 11:22
**revise (1)** 8:15
**ride (1)** 74:23
**riders (2)** 27:6,7
**right (51)** 5:20;8:18;
14:4;15:9;19:13;20:19;
21:17;23:20;24:19;
29:9;34:1,14;37:8,13;
38:8;40:2,7;42:12,18;
43:22;44:9,11;47:1,22;
49:7;50:22;53:17,18;
54:13,17;55:3;56:2;
57:2;59:5,19;62:18;
64:5;65:14;68:9,15;
69:21;70:14;71:1,8,23;

72:8,16;74:17;75:5,18;
78:15
**road (2)** 12:18,20
**role (1)** 14:18
**roles (1)** 12:12
**rolling (5)** 56:3,5,6;63:5,
7
**root (1)** 69:11
**rules (1)** 7:1
**run (1)** 18:12

**S**

**safely (1)** 57:7
**Sam (2)** 67:4;69:9
**same (5)** 11:5;29:14;
31:15;77:5,12
**Samuel (1)** 5:11
**sand (1)** 25:1
**satisfaction (2)** 38:1,2
**satisfactorily (1)** 38:3
**satisfactory (1)** 39:12
**saw (3)** 19:16;20:4;
23:10
**saying (18)** 20:20;
27:22;29:11;43:20,21;
44:1,5;45:11;48:13;
49:10;50:2,4;53:11;
61:21;69:15,16;70:4;
74:6
**scene (1)** 57:19
**school (1)** 24:21
**schools (1)** 13:5
**search (7)** 23:21;34:14;
35:1,4;36:17;69:20;
72:8
**season (1)** 14:4
**second (6)** 5:19,22;
11:18;16:11;57:3;77:4
**seeing (2)** 20:8;72:9
**seeking (1)** 71:7
**segue (1)** 13:16
**selection (10)** 12:4;
14:8,9,10;15:1;55:17;
65:12,14,16,19
**separate (1)** 12:24
**series (1)** 72:14
**service (3)** 10:6;12:21;
13:3
**set (1)** 72:19
**several (1)** 42:9
**shakes (1)** 7:4
**shining (1)** 20:2
**signs (5)** 57:15,19,23;
58:20;66:20,23
**similar (1)** 24:1
**simply (1)** 17:5
**sit (2)** 75:13;79:6
**sitting (4)** 19:19;23:13;
24:4;73:2
**situation (4)** 6:9;56:22;
62:15;75:23
**situations (2)** 43:5;

71:11
**six (1)** 60:13
**six-month (2)** 9:20,23
**small (2)** 19:17,21
**smooth (1)** 39:17
**sobriety (12)** 33:24;
34:10;37:20;38:13,22;
39:3;44:7,23;45:21;
47:6;69:24;74:21
**somebody (6)** 20:13;
37:5;52:4;53:15;70:18;
71:6
**sometimes (1)** 71:7
**sorry (7)** 15:21;33:7;
40:13;65:19;76:10;
78:11,12
**sort (8)** 23:21;25:12;
27:11;43:6,8;46:10;
62:5;72:14
**sound (1)** 20:19
**Sounds (2)** 8:19;27:10
**speak (2)** 7:19;10:1
**special (2)** 27:11,19
**specific (5)** 10:16;17:4;
20:8;50:8;51:4
**specifically (10)** 17:15;
23:16;26:5;27:3;28:7;
39:11;40:8;60:6;66:14;
72:6
**specify (1)** 8:4
**speculate (2)** 8:6;77:17
**speed (1)** 13:2
**spoke (1)** 67:22
**STALLWORTH (4)** 5:2,
9;8:23;50:18
**stand (2)** 39:23;79:7
**standardized (3)** 38:12;
44:23;47:5
**start (4)** 8:24;11:10;
16:4;58:15
**started (2)** 16:4,9
**starting (2)** 39:22;62:3
**state (5)** 9:9;13:11;
15:7;54:4;63:21
**stated (2)** 48:16;49:3
**statement (1)** 67:5
**STATEMENTS (1)** 4:11
**states (1)** 48:21
**Station (16)** 11:15,19,
22;12:1,2,7,7;16:22,23;
26:22;27:1;28:19;
35:18;51:22;62:8;68:9
**stationed (1)** 65:11
**stations (3)** 12:6,17;
13:14
**stats (1)** 56:1
**stay (7)** 47:18;48:6,12,
22;49:13;51:15;55:21
**step (1)** 53:4
**steps (4)** 39:20;45:7;
57:13,13
**still (9)** 21:3,13,21;55:8,
11;63:14;75:14,14;

76:23
**STIPULATIONS (1)**
4:11
**street (1)** 16:21
**strike (5)** 21:2;27:23;
60:18;71:5;77:19
**studying (1)** 58:18
**stuff (1)** 6:20
**subject (1)** 10:21
**subjects (1)** 60:7
**subsequently (1)** 70:1
**substance (3)** 19:13;
60:2;67:16
**summarize (1)** 49:8
**SUPPORT (1)** 4:2
**supposed (1)** 16:16
**suppress (2)** 71:7;73:15
**suppression (1)** 70:17
**sure (10)** 5:20;7:10;
20:18;23:1;24:13;
29:13;31:14;34:18;
49:8;68:5
**suspected (2)** 30:24;
31:11
**suspicion (3)** 22:22;
23:5;71:20
**suspicious (4)** 33:21;
39:6,8;42:14
**swim (1)** 10:7
**sworn (2)** 5:3;11:12
**symptoms (2)** 57:16,24
**system (1)** 28:21

T

**tactics (1)** 10:8
**tags (2)** 18:12,14
**talk (4)** 15:9;38:4;
54:21;71:19
**talked (4)** 6:19;40:22;
68:7;74:14
**talking (7)** 5:13;15:24;
28:7;33:14;48:20;50:6;
53:3
**teaches (1)** 58:24
**technical (1)** 6:13
**Technically (1)** 64:16
**telling (1)** 17:13
**ten (4)** 9:4,6;11:2;57:13
**terms (1)** 71:23
**terribly (1)** 8:1
**test (18)** 33:24;37:20;
38:6,13;39:12,14,19;
44:23;51:22;52:19,20,
22;53:9,16;54:15;60:7;
76:22;79:7
**testified (3)** 5:4;70:13,
16
**testify (1)** 6:24
**testimony (1)** 67:4
**testing (3)** 59:4;76:3,20
**tests (14)** 34:10;38:22;
39:3;40:1,3;44:8;

45:22;47:6;52:2;57:18;
58:17,23;70:1;74:21
**THC (7)** 23:9,17;24:7;
35:10;36:1;37:1,11
**theory (3)** 45:18,20;
46:9
**thereafter (1)** 52:15
**though (2)** 47:9;54:9
**thought (2)** 41:15;68:8
**three (1)** 77:17
**threshold (1)** 60:24
**throughout (4)** 32:6,16;
33:14;61:9
**times (2)** 32:5;42:9
**timestamps (1)** 16:13
**tobacco (4)** 22:2,6,14;
35:24
**today (7)** 62:8;74:5,8;
75:13;76:24;78:20;
79:6
**toe (1)** 39:20
**together (1)** 66:18
**told (6)** 37:17,19;38:14,
18;44:20;45:23
**tone (1)** 57:20
**took (4)** 9:24;36:23;
58:3;78:13
**top (2)** 19:19,19
**Totality (1)** 66:17
**touch (2)** 39:20;66:9
**tour (2)** 15:17,19
**Township (1)** 11:20
**track (1)** 56:15
**traffic (3)** 13:1;14:1;
55:18
**traffic-centric (1)** 14:2
**trained (1)** 59:7,13,16
**training (10)** 9:15,18;
10:13;58:8;59:17;61:3,
5,7,14,17
**transactions (1)** 72:15
**transcript (1)** 79:18
**transferred (3)** 14:20,
24;55:16
**transported (1)** 35:17
**traveled (2)** 30:22;
31:10
**Trenton (1)** 15:4
**trespassers (1)** 28:5
**trespassing (4)** 25:22;
26:14;27:3;29:18
**trial (3)** 73:4,11,17
**trick (1)** 49:24
**troop (1)** 10:5
**TROOPER (27)** 5:2,9;
8:23;9:3,9,13;11:3;
12:15,18,20;16:19;
23:8;27:17;31:3;35:3;
41:21;43:13;46:21;
50:6,16,18;52:18;
62:10;70:9;73:7;78:1;
79:1
**troopers (6)** 14:13;

22:21;37:9;59:8,12;
72:3
**truncate (1)** 43:6
**try (1)** 37:10
**trying (6)** 14:13;48:19;
52:17;53:7;60:1;72:13
**turn (2)** 39:19,21
**turned (1)** 45:4
**two (5)** 32:19;58:4,11;
61:15;64:10
**type (1)** 28:1
**types (2)** 9:22;10:1

U

**uh-huhs (1)** 7:3
**uh-uhs (1)** 7:4
**ultimately (13)** 16:1;
26:13;30:16;35:8;
36:16;38:24;52:11,23;
54:13;57:2;71:3;72:15;
74:15
**unable (1)** 57:7
**under (25)** 33:22;34:9;
39:7,8;40:5;41:1,4,15;
42:5,9,14;43:22;46:2;
47:7,7;52:5;57:6;60:2,
8;62:17,21;71:3;74:6;
75:14;76:24
**undergo (1)** 9:14
**Understood (1)** 21:18
**unit (8)** 12:4;14:9,10;
15:2;55:17;59:3,4;
65:12
**unless (1)** 8:4
**unusual (1)** 32:8
**up (15)** 15:14;20:11;
23:24;29:12,23;30:17;
46:16,19;52:17;55:1,
21;60:4;67:5,13;73:24
**updated (1)** 63:8
**urine (5)** 52:24;53:22;
54:2,11;76:21
**use (1)** 58:1
**used (3)** 20:17;55:8;
63:21
**using (3)** 18:14;56:13;
66:20
**usually (1)** 6:21
**utilize (1)** 10:6

V

**vantage (1)** 24:5
**vape (3)** 22:1,14;68:7
**vapes (2)** 22:6,7
**various (1)** 60:8
**vehicle (22)** 10:5;12:23;
20:1;30:23;37:4;40:12,
17,19;41:4;44:14,18;
47:21;48:12;49:2,3,4,
12,12;51:15,16;57:7;
68:2

**vehicles (7)** 18:5,16,22;
19:1,4,7;48:8
**verbal (1)** 7:3
**verbalized (1)** 45:14
**version (1)** 79:17
**videos (1)** 32:6
**violations (2)** 13:2,3
**vis-a-vis (1)** 31:13
**Vista (10)** 11:19,19,22,
24;12:2,8,9,10;13:19;
62:8
**vital (4)** 57:19;58:20;
66:20,23
**volunteered (1)** 60:7

W

**walk (3)** 25:13;39:19;
62:8
**walked (3)** 24:23;25:3,7
**wallet (1)** 19:21
**water (2)** 10:7;25:12
**way (7)** 21:24;28:14;
33:4;53:8;74:5,7;78:12
**ways (1)** 21:17
**weapon (1)** 10:6
**week (1)** 56:12
**weekend (1)** 79:13
**weeks (2)** 58:5,11
**weren't (1)** 42:19
**west (1)** 15:4
**what's (5)** 10:20;27:18;
43:18;68:20;72:21
**whereby (1)** 28:8
**Whereupon (2)** 79:19,
21
**wherever (1)** 8:18
**whole (4)** 17:12;53:16;
72:14,20
**who's (1)** 32:8
**willingness (1)** 78:19
**witness (17)** 6:23;
27:18;31:24;41:22;
43:14;46:12;69:2,2;
70:10;71:15;73:9,20;
75:8;76:10,13;77:14;
78:3;79:14
**witnesses (1)** 50:11
**woman (1)** 67:12
**wonderful (1)** 79:13
**wooded (1)** 25:13
**woods (3)** 24:10,11;
25:8
**Woodstown (4)** 11:15,
15;12:7;13:18
**words (4)** 19:18;20:17;
50:3;60:23
**work (2)** 59:11;65:7
**working (5)** 9:9;12:5,6;
13:18;64:14
**works (1)** 12:16
**wrist (1)** 19:23
**wristlet (1)** 19:20

**write (1)** 10:2
**wrong (1)** 56:2

## Y

**year (3)** 10:19,23;61:14
**yearly (1)** 10:22
**years (5)** 9:3;11:2;
   61:15;64:10;77:17
**younger (1)** 32:10

## Z

**Zero (1)** 52:13

## 1

**11 (1)** 57:12
**12 (2)** 60:12,12
**1st (3)** 64:6,12,15

## 2

**2019 (1)** 64:6
**2020 (4)** 6:6;15:17;
   21:20;22:15
**2021 (4)** 5:18;65:8,10,
   21
**2023 (1)** 76:18
**21 (2)** 64:12,15
**26 (1)** 32:9

## 3

**3:28 (1)** 79:20

## 4

**40 (5)** 58:6,6;59:20,22,
   23
**45 (1)** 39:18

## 6

**6 (2)** 57:5,5
**60 (4)** 58:6,6;59:20,22
**6th (1)** 16:4

## 7

**75 (1)** 61:6
**7th (2)** 15:17;16:5

## 9

**911 (1)** 12:22

# Exhibit M

**(Intentionally left blank)**

# Exhibit P

**NEW JERSEY STATE POLICE**
## Consent to Obtain and Test Urine

Case Number
A090-2020-000940

I, _Samuel Birth_, hereby voluntarily consent to provide a
*(Name of Consenting Party)*

urine sample(s) to _Tpr. D. Pamlanye #8494_, a member of _NJSP_,
*(Name of Person Requesting Urine Sample)*                          *(Name of Agency)*

and any other representative designated to assist, and I voluntarily consent to the testing of

my urine sample(s).

I have been advised by _Tpr. D. Pamlanye #8494_ and fully understand that I have
*(Name & Badge Number of Trooper)*

the right to refuse giving my consent to the providing and testing of my urine sample(s).

I have been further advised that I may withdraw my consent at any time and for any reason

up until the time that I give my urine sample(s) to _Tpr. D. Pamlanye #8494_.
*(Name of Person Collecting Sample)*

or any other representative designated to assist.

I have knowingly and voluntarily given my written consent to the providing and testing of

my urine sample(s).

_____     _11/7/2020_  _2:43 Am_
Signature of Consenting Party               Date        Time

**Witness**

_TPR Morgan  824_                  _____ 891
Print Name                                      Signature

*[DCJ PS&TB 6/25/15]*

S.P. 374A (11/15) (S.O.P. F26)

NJSP BIRTH 045

CONFIDENTIAL

# Exhibit Q

| Office of Forensic Sciences **Evidence Submission Review** | Submitting Agency (Case Number) A090202000094D | Laboratory Number |
|---|---|---|

| STATE OF NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY **DIVISION OF STATE POLICE** | |
|---|---|

**Offense**
Driving Under the Influence - Drugs

**County of**
ATLANTIC

**Submitting Agency**
NJSP Buena Vista          1045 Rt. 54  Williamstown, NJ  08094      (609) 561 - 1800

**Investigated By**
Tpr. M. Ray #7527

**Brief History**
Offense Date: 11/07/2020          Offense Location:  John W. Quigley Park, Buena Vista Twp
Court Date: 11/25/2020
Case History:    Suspect was charged with driving while intoxicated.  Driver suspected to be impaired by cannabis.  Please send MR
01 to South Lab to test for cannabis content.

**Name Info**

| Name Type | Last Name | First Name | Middle Name | Sex | Race | DOB |
|---|---|---|---|---|---|---|
| Suspect | Birth | Samuel | r | M | W | 09/20/1994 |

**Item Info**

| Dept. Item # | Source | Package Type | Item Type | Description |
|---|---|---|---|---|
| MR01 | S1 | One plastic bag containing | Urine sample - Toxicology | One NJSP evidence bag containing one plastic container further containing urine specimen of Samuel Birth. |

*The evidence will be examined in accordance with established laboratory capabilities and procedures by employing appropriate methods developed by the laboratory, other reputable organizations, or documented in published journals, scientific texts, or as specified by the manufacturer of equipment, and subjected to validation and/or performance check testing. The method employed, deviations from requested analysis, the number of items analyzed, and the location of the laboratory performing necessary analyses will be at the discretion of the Forensic Investigations Bureau, Ballistics Unit.  By submitting this evidence, the submitting agency agrees to the conditions outlined above.*

| OFS(Admin)049 | Ver 10/18 | Approved by: OFS Director | Page 1 of 1 |
|---|---|---|---|

NJSP BIRTH 048

# Exhibit T



NEW JERSEY STATE POLICE
OFFICE OF FORENSIC SCIENCES

**LABORATORY REPORT**
**TOXICOLOGY ANALYSIS**

| Laboratory Address: | Laboratory Number |
|---|---|
| South Regional Laboratory<br>NJSP Office of Forensic Sciences<br>3434 White Horse Pike (Rt.30)<br>Hammonton, NJ 08037<br>609-561-2060 | S20-08568  |
| Submitting Agency | Agency Number |
| NJSP Buena Vista<br>1045 Rt. 54<br>Williamstown, NJ 08094 | A090202000094D |

| Case: | Start of Examination: | Date Report Issued: |
|---|---|---|
| Samuel r Birth [S] | 02/04/2021 | 02/19/2021 |

See *Evidence Receipt* for list of items submitted to the Office of Forensic Sciences for examination.

Results of Examination:                                                               Page 1 of 1

**Item# 1 - Urine**

No impairing drugs were confirmed after immunoassay and GC/MS screening.

All drugs may not be detected or reported due to analytical methods and/or OFS protocols
**REMAINING SPECIMEN(S) WILL BE DESTROYED NINETY (90) DAYS AFTER THE FINAL REPORT IS ISSUED**
Results apply to the evidence as received by the laboratory and relate only to the items tested.
This report shall not be reproduced, except in full, without the written approval of the laboratory.

**The following immunoassay screens were performed on the urine:**

| | | | | | |
|---|---|---|---|---|---|
| Amphetamines | Barbiturate | Benzodiazepine | Cocaine Metabolite | | Cannabinoid |
| Methadone | Opiate | Oxycodone | Phencyclidine | Tramadol | Fentanyl |
| Zolpidem | | | | | |

**KEY:**    OFS - Office of Forensic Sciences    GC - gas chromatograph    MS - mass spectrometer    g - gram    mL - milliliter

I have been employed by a State Forensic Laboratory for 2 years, I have a BS degree, and I have qualified as an expert witness on 0 occasions in Municipal and Superior Courts in New Jersey; the above laboratory report fairly and accurately documents the type and results of the analysis performed; I am the person responsible for the analysis and the conclusions set forth in the above laboratory report; the equipment used to perform the type of analysis described above was functioning properly.

The test procedures used are accurate, reliable, objective in nature, and performed on a routine basis within the laboratory.

*R Vassallo*

Raychel Vassallo, Forensic Scientist 1

Peer Reviewed By: *MA*

Approved By: *CW*

# Exhibit V

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625
Attorney for Defendant Michelle Ray

By:  Marvin L. Freeman
     Deputy Attorney General
     (609) 376-2998

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF CAMDEN

| | | |
|---|---|---|
| SAMUEL BIRTH, | : | CIVIL ACTION NO.  22-5658 |
| Plaintiff, | : | (CPO-EAP) |
| v. | : | CIVIL ACTION |
| MICHELE   RAY,   N.J.   STATE TROOPER; JOHN DOES 1-20, | : | **DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT, SEPARATE DEFENSES, AND JURY DEMAND** |
| | : | |
| Defendants. | | |

Defendant,  Michelle  Ray,  hereinafter  referred  to  as "Answering Defendant", by way and through her undersigned counsel, hereby  responds  to  the  allegations  set  forth  in  Plaintiff's Complaint and by way of Answer to said Complaint states:

**PRELIMINARY STATEMENT**

1.   Answering Defendant makes no response to paragraph 1 because it contains only legal conclusions, not allegations of fact.

2.   Answering Defendant makes no response to paragraph 2 because it contains only legal conclusions, not allegations of fact.

3.   Answering Defendant makes no response to paragraph 3 because it contains only legal conclusions, not allegations of fact.

4.   Answering Defendant admits paragraph 4.

5.   Answering Defendant admits paragraph 5.

6.   Answering Defendant admits paragraph 6.

7.   Answering Defendant makes no response to paragraph 7 because it contains only legal conclusions, not allegations of fact.

8.   Answering Defendant denies paragraph 8, except that Answering Defendant makes no response to the legal conclusions stated therein.

9.   Answering Defendant makes no response to paragraph 9 because the allegations in paragraph 9 are not directed at Answering Defendant, but are directed at "John Doe" defendants.

10.  Answering Defendant denies paragraph 10, but makes no response to the allegations in paragraph 10 not directed at Answering Defendant, but which are directed at others.

11.  Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 11.

### COUNT I: Ku Klux Klan Act (42 USC 1983)
### Samuel Birth v. Michele Ray and John Does 1-2
### <u>UNREASONABLE SEARCH AND SEIZURE</u>

12.  Answering Defendant repeats the answers contained in the preceding paragraphs as if set forth at length herein.

13.   Answering   Defendant   denies   paragraph   13,   except   that
Answering Defendant makes no response to the legal conclusions
stated therein.

14.   Answering   Defendant   admits   that   on   November   6,   2020,
Plaintiff's car and another car were parked at John W. Quigley
Park  in  Buena  Vista,  Atlantic  County,  New  Jersey.  Answering
Defendant  lacks  knowledge  or  information  sufficient  to  form  a
belief as to the truth of the remaining allegations in paragraph
14.

15.   Denied, except that Answering Defendant admits that, on the
same evening, Trooper Ray was working in an official capacity as
a law enforcement officer patrolling the area around Buena Vista
Township New Jersey.

16.   Answering Defendant denies paragraph 16.

17.   Answering Defendant lacks knowledge or information sufficient
to form a belief as to the truth of the allegations in paragraph
17.

18.   Answering Defendant admits paragraph 18.

19.   Answering Defendant denies paragraph 19.

20.   Answering   Defendant   denies   paragraph   20,   except   that
Answering Defendant admits she stated the CDS was in plain view.

21.   Answering Defendant denies paragraph 21.

22.   Answering Defendant admits paragraph 22.

23.   Answering Defendant denies paragraph 23.

3

24.    Answering Defendant denies paragraph 24, except Answering Defendant admits the Plaintiff and the others were separated and questioned about their reason for being at the recreation area, and the Plaintiff was questioned about the CDS.

25.    Answering Defendant denies paragraph 25.

26.    Answering Defendant admits that Plaintiff experienced a medical issue. As to whether Plaintiff suffered a panic attack, the Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth of that allegation.

27.    Answering Defendant denies paragraph 27.

28.    Answering Defendant denies paragraph 28.

29.    Answering Defendant admits field sobriety tests were performed. Answering Defendant makes no response to the legal conclusions contained in paragraph 29.

30.    Answering Defendant denies paragraph 30, except that Answering Defendant admits that Plaintiff and his vehicle were searched.

31.    Answering Defendant denies paragraph 31, except that Answering Defendant admits the Plaintiff was arrested, transported to the station, and plaintiff passed the breath test.

32.    Answering Defendant denies paragraph 32.

33.    Answering Defendant denies paragraph 33.

34.    Answering Defendant denies paragraph 34.

35.   Answering   Defendant   denies   paragraph   35,   except   that Answering Defendant admits that she did not observe Plaintiff operate his vehicle.

36.   Answering Defendant denies paragraph 36.

37.   Answering   Defendant   denies   paragraph   37,   except   that Answering Defendant admits Plaintiff was transported to the station and administered a breath test, which he passed.

38.   Answering   Defendant   denies   paragraph   38,   except   that Answering Defendant admits that Plaintiff provided a urine sample.

39.   Answering Defendant admits that at that time, she was a Drug Recognition Expert. Answering Defendant makes no response to the legal conclusions stated in paragraph 39.

40.   Answering Defendant admits she was a trained Drug Recognition Expert.   Answering   Defendant   makes   no   response   to   the   legal conclusions stated in paragraph 40.

41.   Answering Defendant admits paragraph 41.

42.   Answering   Defendant   denies   paragraph   42,   except   that Answering Defendant admits the Plaintiff was charged.

43.   Answering Defendant denies paragraph 43.

44.   Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations paragraph 44.

45.   Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations paragraph 45.

46.   Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations paragraph 46.

47.   Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations paragraph 47.

48.   Answering Defendant denies paragraph 48.

49.   Answering Defendant denies paragraph 49.

50.   Answering Defendant makes no response to paragraph 50 because it contains only legal conclusions, not allegations of fact.

   **WHEREFORE,** Answering Defendant denies the Plaintiff is entitled to the relief he seeks, and demands judgment dismissing the Plaintiff's Complaint with prejudice, together with an award to the Answering Defendant for attorney's fees and costs of suit.

**COUNT II**
**Samuel Birth v. Michele Ray**
**FALSE IMPRISONMENT**

51.   Answering Defendant repeats the answers in the preceding paragraphs as if set forth at length herein.

52.   Answering Defendant makes no response to paragraph 52 because it contains only legal conclusions, not allegations of fact.

53.   Answering Defendant denies paragraph 53.

54.   Answering Defendant denies paragraph 54.

55.   Answering Defendant denies paragraph 55.

56.   Answering Defendant denies paragraph 56.

57. Answering Defendant denies paragraph 57, except that Answering Defendant makes no response to the legal conclusions stated therein.

58. Answering Defendant denies paragraph 58, except that Answering Defendant makes no response to the legal conclusions stated therein.

59. Answering Defendant denies paragraph 59, except that Answering Defendant makes no response to the legal conclusions stated therein.

60. Answering Defendant denies paragraph 60, except that Answering Defendant admits she was a law enforcement officer on November 6, 2020.

**WHEREFORE,** Answering Defendant denies the Plaintiff is entitled to the relief he seeks, and demands judgment dismissing the Plaintiff's Complaint with prejudice, together with an award to the Answering Defendant for attorney's fees and costs of suit.

## SEPARATE DEFENSES

### FIRST SEPARATE DEFENSE

At all times relevant hereto, Answering Defendant has acted in good faith and without fraud or malice.

### SECOND SEPARATE DEFENSE

Answering Defendant did not know, and was not reasonably expected to know, that any actions taken by her with respect to

this Plaintiff, at all relevant times, were in violation of the Plaintiff's constitutional rights.

### THIRD SEPARATE DEFENSE

Answering Defendant is immune from suit based on the doctrine of Sovereign Immunity.

### FOURTH SEPARATE DEFENSE

The Plaintiff's Complaint is barred by the Eleventh Amendment of the United States Constitution.

### FIFTH SEPARATE DEFENSE

Answering Defendant is an official of an agency of the State of New Jersey and at all relevant times was performing acts within the scope of her official duties in good faith without fraud or malice, and is immune from any liability sought to be imposed upon her based on the doctrine of Qualified Immunity.

### SIXTH SEPARATE DEFENSE

Recovery is barred in this action by reason of the applicable statutes of limitations.

### JURY DEMAND

Answering Defendant demands a trial by jury for all issues of fact.

## DESIGNATION OF TRIAL COUNSEL

The Court is hereby advised that Marvin L. Freeman, Deputy Attorney General, is hereby designated as trial counsel for Answering Defendant in this action.

> MATTHEW J. PLATKIN
> ATTORNEY GENERAL OF NEW JERSEY
> Attorney for Defendant
>
> By: *s/Marvin L. Freeman*
>
> Marvin L. Freeman
> Deputy Attorney General

Dated: December 21, 2022

## CERTIFICATION REGARDING OTHER PROCEEDINGS AND PARTIES

The undersigned counsel hereby certifies, in accordance with L. Civ. R. 11.2, that the matters in controversy in this action are not the subject of any other pending or contemplated action in any court or arbitration proceeding known to Defendant at this time, nor is any non-party known to Defendant at this time who should be joined in this action, or who is subject to joinder.

> *s/Marvin L. Freeman*
>
> Marvin L. Freeman
> Deputy Attorney General

Dated: December 21, 2022